IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

───────────────────────────────

DAVID McCULLOUGH,

                       Petitioner,

        v.

NYS DIVISION OF PAROLE,

                     Respondent.

Civil Action No.
9:11-CV-1112 (DNH/DEP)

───────────────────────────────

APPEARANCES:

FOR PETITIONER:

DAVID McCULLOUGH, *Pro Se*
2500 South Salina St
Syracuse, NY 13205

FOR RESPONDENT:

HON. ERIC T. SCHNEIDERMAN
New York State Attorney General
120 Broadway
New York, NY 10271

THOMAS B. LITSKY, ESQ.
Assistant Attorney General

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro se* petitioner David McCullough, a New York State prisoner, has commenced this proceeding pursuant to 28 U.S.C. § 2254 seeking habeas relief.[1] McCullough's petition centers upon a parole revocation proceeding that resulted in an additional two-year period of incarceration, following his initial release on parole. McCullough contends that during the revocation hearing, he was deprived of the effective assistance of counsel and his due process rights were violated.

In opposition to the petition, the respondent, the New York State Division of Parole, argues that (1) McCullough has forfeited the right to pursue either ground based upon his failure to exhaust those claims by first presenting them to the highest court in New York State, and is now procedurally barred from raising his claims in state court; and (2) all of petitioner's claims lack merit. For the reasons set forth below, I concur on both counts and recommend that McCullough's petition be dismissed.

---

[1]    At the time McCullough filed his petition, he was released from the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") on parole. Dkt. No. 1 at 1. According to publicly available information, however, petitioner is currently in DOCCS custody once again. DOCCS Inmate Information, http://nysdoccslookup.doccs.ny.gov/GCA00P00/WIQ3/WINQ130 (last visited Mar.23, 2015).

I.     BACKGROUN

Following a jury trial in Onondaga County, petitioner was convicted in 1995 of rape, sodomy, unlawful imprisonment, and assault. Dkt. No. 12-1 at 61-62.[2] As a result of his criminal history, which included prior felony convictions, petitioner was sentenced to concurrent prison terms of between ten and twenty years on the rape and sodomy charges, and one year each with respect to the unlawful imprisonment and assault counts. *Id.* Following a remand for an evidentiary hearing to address issues raised by the petitioner, McCullough's conviction was affirmed on appeal, and leave to appeal was subsequently denied by the New York State Court of Appeals, both initially and on request for reconsideration. *See People v. McCullough*, 248 A.D.2d 938 (4th Dep't 1998), *aff'd following remand*, *People v. McCullough*, 254 A.D.2d 750 (4th Dep't 1998), *lv. denied*, 92 N.Y.2d 1035 (1998), *reconsideration denied*, 92 N.Y.2d 1035 (1998). An application for a writ of error *coram nobis* was subsequently denied by the New York State Supreme Court, Fourth Department. *People v. McCullough*, 261 A.D.2d 975 (4th Dep't 1999), *lv. to appeal dismissed*, 93 N.Y.2d 1004

---

[2]     The court appreciates that the pertinent state court records submitted by respondent's counsel have been indexed and paginated for ease of reference.

(1999).[3]

McCullough was released to parole supervision on April 28, 2009. Dkt. No. 12-1 at 65. Petitioner's release conditions included electronic monitoring and a requirement that he obtain permission before leaving Onondaga County or being out of his residence between 9:00 p.m. and 7:00 a.m. *Id.* at 69-70.

On May 13, 2009, petitioner was accused of committing four separate violations of those two conditions of supervised release. *Id.* at 65. After being served with the notice of violation, petitioner executed a written waiver of his right to a preliminary hearing concerning the charges on that same date. Dkt. No. 12-1 at 64. The Frank H. Hiscock Legal Aid Society ("Legal Aid") was subsequently assigned on May 20, 2009 to represent McCullough in the matter. *Id.* at 135. A notice of appearance on petitioner's behalf was filed by Lawrence J. Young, Esq., an attorney with Legal Aid, on May 22, 2009. *Id.* at 136. On that same date, Attorney Young corresponded by letter with the petitioner, informing him that he would be representing him in connection with the matter. *Id.* at 20.

On May 26, 2009, Parole Revocation Specialist Mary Hotaling

---

[3]      A subsequent petition to this court for a writ of habeas corpus in connection with that conviction was initially granted. *McCullough v. Bennett*, 317 F. Supp. 2d 112 (N.D.N.Y. 2003) (Hurd, J.). That determination, however, was reversed on appeal. *McCullough v. Bennett*, 143 F. App'x 379 (2d Cir. 2005), *cert. denied*, 546 U.S. 1079 (2005), *reh'g denied*, 546 U.S. 1211 (2006).

forwarded a notice to petitioner's counsel advising that a parole revocation hearing in the matter had been scheduled for June 2, 2009. Dkt. No. 12-1 at 21. The hearing was subsequently convened on that date before Administrative Law Judge ("ALJ") Gerald Hamill. *Id.* at 22-32. During the hearing, ALJ Hamill established that petitioner had received a copy of the violation report and inquired as to whether petitioner's counsel had received adequate notice of the hearing, to which he replied, "Yes, I did." *Id.* at 25. ALJ Hamill then asked petitioner's counsel, "Are there any issues outstanding as to the notice?", and counsel responded, "There are not." *Id.* After confirming that Attorney Young had advised petitioner concerning his rights and available options, ALJ Hamill placed on the record an agreement that was reached between the Division of Parole and petitioner, whereby, in return for McCullough's guilty plea, the ALJ would recommend that the parole board impose a twenty-four month period of incarceration as a sanction for the violations. *Id.* at 25, 26-27. Based upon that agreement, petitioner entered a plea of guilty to two of the four counts charged in the violation notice. *Id.* at 28. After acknowledging he had made "bad decisions" and needed "to be able to do the right thing by following the rules and regulations of parole," petitioner was advised of the ALJ's recommendation that he receive a "time assessment" of twenty-four months, and counts one

and three of the violation notice were dismissed. *Id.* at 28-30.

II.    PROCEDURAL HISTORY

    A.    State Court Proceedings

On November 1, 2009, petitioner, acting *pro se*, filed a petition seeking a writ of habeas corpus pursuant to New York Civil Practice Law and Rules ("CPLR") Article 70 in New York State Supreme Court, Orleans County, challenging certain aspects of the parole revocation hearing. Dkt. No. 12-1 at 13-18. In support of his application for state court habeas relief, McCullough argued that he was not provided with at least fourteen days' notice of the revocation hearing, as required by N.Y. Executive Law § 259-i(f)(iii), and that he received ineffective assistance of counsel in connection with his revocation hearing. *Id.* Specifically, in that petition McCullough argued that Attorney Young (1) never visited him to discuss the violation charges, (2) spoke only briefly with him prior to commencement of the hearing, (3) did not argue for or suggest a twelve-month assessment, and (4) failed to object to the untimely hearing notice. *Id.* at 16. McCullough's state court habeas petition was denied by Acting Supreme Court Justice James P. Punch on February 18, 2010. Dkt. No. 12-1 at 7-12. In his decision, Justice Punch rejected both claims and specifically found that the petitioner's counsel had provided adequate representation and had

sufficient time to prepare for the hearing. *Id.* at 11-12. That determination was upheld on appeal to the New York State Supreme Court Appellate Division, Fourth Department, on March 25, 2011.[4] *See People ex rel. McCullough v. N.Y. State Div. of Parole*, 82 A.D.3d 1640 (4th Dep't 2011). In its decision, the Fourth Department concluded that petitioner had waived any issue concerning the allegedly untimely notice of the revocation hearing and his ineffective assistance of counsel claim could not be raised in an Article 70 proceeding, and the court declined to convert the petition to one seeking relief under Article 78 of the CPLR. *People ex rel. McCullough*, 82 A.3d at 1640. Leave to appeal to the New York Court of Appeals was subsequently denied. *People ex rel. McCullough v. N.Y. State Div. of Parole*, 17 N.Y.3d 704 (2011).

B.    Proceedings Before This Court

Petitioner commenced this proceeding on September 20, 2011. Dkt. No. 1. In his petition, McCullough asserts two grounds for relief, including (1) ineffective assistance of counsel based upon the fact that his attorney did not meet with him until twenty minutes before the scheduled revocation hearing, had no strategy or plan, failed to return his telephone calls or visit

---

[4]    Petitioner was represented by counsel in connection with both his appeal to the Fourth Department and his subsequent efforts to obtain leave to appeal to the New York Court of Appeals.

him to discuss the case, and did not object to the late hearing notice; and (2) violation of due process based upon the untimely notice. *Id.* at 4. The petition, which sets forth the grounds in only summary terms, was not augmented by a legal memorandum or briefing providing further elaboration regarding those claims. *See generally id.* Respondent has since answered the petition, arguing that petitioner's claims are forfeited based upon his failure to properly present them to the state courts and the fact that he is now precluded from doing so, and additionally arguing that the claims lack merit. *See generally* Dkt. No. 11. McCullough's petition, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

A.   Exhaustion

Before addressing the merits of petitioner's two habeas claims, the court must first determine whether he is procedurally barred from raising them, as respondent argues, based on his failure to present them to the state courts for determination.

Prior to seeking federal habeas relief, a petitioner must exhaust available state remedies or establish either an absence of available state

remedies or that such remedies cannot adequately protect his rights. *Aparicio v. Artuz*, 269 F.3d 78, 89 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(b)(1)); *Ellman v. Davis*, 42 F.3d 144, 147 (2d Cir. 1994), *cert. denied*, 515 U.S. 1118, 115 S.Ct. 2269 (1995). The exhaustion doctrine recognizes "respect for our dual judicial system and concern for harmonious relations between the two adjudicatory institutions." *Daye v. Attorney Gen. of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982); *see also Galdamez v. Keane*, 394 F.3d 68, 72 (2d Cir. 2005) ("Comity concerns lie at the core of the exhaustion requirement."). Though both federal and state courts are charged with securing a state criminal defendant's federal rights, the state courts must initially be given the opportunity to consider and correct any violations of federal law. *Galdamez*, 394 F.3d at 72 (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999)). "The chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court." *Daye*, 696 F.2d at 192 (footnote omitted).

This exhaustion requirement is satisfied if the federal claim has been "'fairly present[ed]'" to the state court. *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)). A claim has been "fairly presented" if the state court was apprised of "both the

factual and the legal premises of the claim [the petitioner] asserts in federal court." *Daye*, 696 F.2d at 191. Thus, "the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature." *Id.* at 192.

Like petitions challenging criminal convictions, those addressing parole revocations are subject to this exhaustion requirement. *Blanchard v. West*, No. 04-CV-1492, 2008 29429 2949388, at *3 (N.D.N.Y. July 30, 2008) (Sharpe, J., *adopting report and recommendation by* Treece, M.J.); *Scales v. N.Y. State Div. of Parole*, 396 F. Supp. 2d 423, 428 (S.D.N.Y. 2005).[5] The typical path for exhausting a claim concerning a petitioner's parole revocation proceeding includes both completion of the internal, administrative appeal process within the Division of Parole and, in the event of an adverse determination, commencement of a CPLR Article 78 proceeding. *Blanchard*, 2008 WL 2949388, at *3; *Scales*, 396 F. Supp. 2d at 428. Alternatively, a parolee may exhaust a constitutional claim by commencing a state court habeas corpus proceeding pursuant to Article 70 of the CPLR. *Hall v. N.Y. State Div. of Parole*, No. 99-CV-11317, 2000 WL 33952256, at *4 (S.D.N.Y. Nov. 29, 2000).

---

[5]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

In this instance, petitioner's ineffective assistance of counsel claim is unexhausted because it was not presented to a court in a manner under which it could have been addressed on the merits – that is, by way of an Article 78 petition. Under New York law, it is well established, as the Fourth Department held in this instance, that Article 70 does not provide relief based upon an alleged denial of effective assistance of counsel in the context of a parole revocation hearing. *People ex rel. McCullough v. N.Y. State Div. of Parole*, 82 A.D.3d 1640, 1640 (4th Dep't 2011); *see also People ex rel. Santoro v. Hollins*, 273 A.D.2d 829 (4th Dep't. 2000); *People ex rel. Dell v. Walker*, 186 A.D.2d 1043, 1043-44 (4th Dep't 1992). Petitioner has therefore failed to exhaust his ineffective assistance of counsel claim.[6]

Petitioner's due process claim is similarly unexhausted. There is nothing in petitioner's state-court briefs suggesting that, by referencing the

---

[6]     Respondent also argues that the ineffective assistance of counsel claim is unexhausted because petitioner did not parse out and present to the New York courts the portions of his claim that rely on his attorney's failure to meet with him before the hearing and object to the allegedly inadequate notice of the proceeding, thereby alerting the state courts of the constitutional basis of his claim. Dkt. No. 11 at 9-10. Although petitioner presented his ineffective assistance of counsel claim to the state courts by citing state law, it is well settled that the state and federal standards governing such a claim are materially different. *Cornell v. Kirkpatrick*, 665 F.3d 369, 376 (2d Cir. 2011). Accordingly, petitioner did not fairly present this claim to the state courts, thereby providing an additional ground upon which the court could conclude that petitioner's ineffective assistance of counsel claim was never fairly presented to the state courts prior to commencement of this proceeding. *See Cornell*, 665 F.3d at 376 ("[A petitioner]'s mere mention of 'ineffective assistance of counsel' in a filing in the Appellate Division, without more, is insufficient to alert the New York courts to the possible federal basis of that claim.").

concept of due process, he intended to set forth a constitutional basis for his claim, especially in light of his reliance on New York Executive Law § 259. Dkt. No. 12-2 at 15-18. The mere incantation of the phrase "due process" is insufficient to give rise to a finding that the state courts were placed on notice that petitioner intended to advance a federal constitutional claim. *See Grady v. LeFevre*, 846 F.2d 862, 864 (2d Cir. 1988) (finding that the mere reference to "constitutional rights" did not alert the state court to a confrontation clause issue); *Petrucelli v. Coombe*, 735 F.3d 684, 688 (2d Cir. 1984) ("[A] mere statement that 'due process' rights have been violated does not necessarily give rise to a specific federal constitutional claim. 'Due process,' like 'fair trial,' can be a catchphrase used by habeas petitioners as part of an allegation about any type of trial court error, including errors in rulings based on state law.").

While the petitioner has failed to exhaust both of the claims now before this court, it is clear that he is no longer in a position to do so and his claims therefore should be considered to have been both exhausted and procedurally defaulted. *See Aparicio*, 269 F.3d at 90 ("When a claim has never been presented to a state court, a federal court may theoretically find that there is an absence of available State corrective process under § 2254(b)(1)(B)(i) if it is clear that the unexhausted claim is procedurally

barred by state law and, as such, its presentation in the state forum would be futile."). The dismissal of petitioner's Article 70 state court habeas petition was the subject of both an appeal to the Appellate Division and an application for leave to appeal to the New York Court of Appeals, and he is now foreclosed from further state court appeals with regard to that petition. *Id.* at 91. While it is true that petitioner could have presented at least certain portions of his ineffective assistance of counsel claim in an Article 78 proceeding, he is now precluded from doing so because the time for the commencing such a proceeding is four months from the date of the accrual of the claim, a deadline that has long since passed. 9 N.Y.C.R.R. § 8006.2(a); *see also Matter of Sumpter v. Supreme Court of Bronx Cnty.*, 76 A.D.3d 1155, 1156 (3d Dep't 2010) (dismissing the petitioner's request for a writ of habeas corpus because he failed to perfect his administrative appeal).

Based upon petitioner's procedural default, this court may not engage in habeas review of his claims unless he demonstrates either (1) good cause for and actual prejudice resulting from his procedural default, or (2) that "he is actually innocent."[7] *Bousley v. United* States, 523 U.S. 614, 622

---

[7] Because petitioner in this case has not claimed actual innocence and there is nothing before me to suggest that this exception applies, I have not addressed it in this report. *See Clark*, 510 F.3d at 393 (addressing cause and prejudice because "actual

(1998); *accord, Clark v. Perez*, 510 F.3d 382, 393 (2d Cir. 2008). To establish "cause" sufficient to excuse a procedural default, a petitioner must show that some objective external factor impeded his ability to comply with the relevant procedural rule. *Coleman v. Thompson*, 501 U.S. 722, 753 (1991) (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Examples of such external mitigating circumstances can include ineffective assistance of counsel, "a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable."[8] *Murray*, 477 U.S. at 488 (quotation marks and citations omitted); *Coleman*, 501 U.S. at 753. When a petitioner has failed to establish adequate cause for his procedural default, the court need not proceed to examine the issue of prejudice because federal habeas relief is generally unavailable as to procedurally defaulted claims unless both cause and prejudice are demonstrated. *Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985); *accord, Long v. Lord*, No. 03-CV-0461, 2006 WL 1977435, at *6 (N.D.N.Y. March 21, 2006) (McCurn, J.).

---

innocence [was] not in issue").

[8]     It should be noted, however, that "[a]ttorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of attorney error.'" *Coleman*, 501 U.S. at 753 (quoting *Murray*, 477 U.S. at 488).

In this case, petitioner has failed to establish adequate cause for his procedural default, thereby obviating the need to examine the issue of prejudice. Accordingly, I recommend a finding that petitioner has procedurally forfeited the right to pursue both of the claims set forth in his petition.[9]

B.     <u>AEDPA Standard of Review on the Merits</u>

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the adjudication of the claim (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Cullen v. Pinholster*, --- U.S. ----, 131 S. Ct. 1388, 1398, 1400 (2011) (citing 28 U.S.C. § 2254(d)); *Premo v. Moore*, --- U.S. ----, 131 S. Ct. 733, 739 (2011); *Thibodeau v. Portuondo*, 486 F.3d 61 (2d Cir. 2007) (Sotomayor, J.). The AEDPA "'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" *Felkner v. Jackson*,

---

[9]     Notwithstanding this recommendation, I have addressed the merits of petitioner's contentions out of an abundance of caution.

--- U.S. ----, 131 S. Ct. 1305, 1307 (2011) (*per curiam*) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)); *accord, Cullen*, 131 S. Ct. at 1398. Federal habeas courts must presume that the state court's factual findings are correct "unless applicants rebut this presumption with 'clear and convincing evidence.'" *Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007) (quoting § 2254(e)(1)); *see also Boyette v. Lefevre*, 246 F.3d 76, 88 (2d Cir. 2001). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro*, 550 U.S. at 473 (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

As required by section 2254, on federal habeas review, a court may only consider claims that have been adjudicated on the merits by the state courts. 28 U.S.C. § 2254(d); *Cullen*, 131 S. Ct. at 1398; *Wash. v. Schriver*, 255 F.3d 45, 52-55 (2d Cir. 2001). The Second Circuit has held that, when a state court adjudicates a claim on the merits, "a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim – even if the state court does not explicitly refer to either the federal claim or to relevant federal case law." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).

C.    Ineffective Assistance of Counsel

In his first habeas claim, McCullough argues that he did not receive effective assistance of counsel from Attorney Young, the attorney assigned to represent him at the revocation hearing. Dkt. No. 1 at 4.

1.    Clearly Established Supreme Court Precedent

Under the well-established standard governing ineffective assistance of counsel claims,

> the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Wash.*, 466 U.S. 668, 687 (1984); *accord, Murden v. Artuz*, 497 F.3d 178, 198 (2d Cir. 2007).

To be constitutionally deficient, the attorney's conduct must fall "outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690; *accord, Rivas v. Fischer*, --- F.3d ----, No. 13-2974, 2015 WL 1036047, at *15 (2d Cir. Mar. 11, 2015). An attorney's performance is judged against this standard in light of the totality of the circumstances and from the perspective of counsel at the time of trial, with every effort made to

"eliminate the distorting effects of hindsight[.]" *Strickland*, 466 U.S. at 689; *see also Rivas*, 2015 WL 1036047, at *15 (noting the court's "scrutiny of counsel's performance must be 'highly deferential'" (quoting *Strickland*, 466 U.S. at 689)).

Addressing the second prong of the *Strickland* test, courts have generally held that prejudice is established by showing that there is a "reasonable probability" that, but for the attorney's deficient conduct, "the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *see also Murden*, 497 F.3d at 198 ("Under *Strickland*, a defendant must show that . . . there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (quotation marks omitted))

## 2. State Court Determination

In his determination in connection with McCullough's state court habeas petition, Acting Supreme Court Justice James P. Punch concluded that petitioner's ineffective assistance of counsel claim was without merit because, based on his review of the plea agreement and statements made at the parole revocation hearing, petitioner's attorney provided "adequate representation." Dkt. No. 12-1 at 12.

### 3. Contrary to or Unreasonable Application of Controlling Supreme Court Precedent

As was discussed above, to establish the denial of effective assistance of counsel as guaranteed by the Constitution and judged according to the standard set forth in *Strickland*, a petitioner must show that his counsel's conduct fell below an objective standard of reasonableness, and that, but for they attorney's substandard performance, the outcome would have been different. Petitioner in this matter has made neither of these showings. Although it is true that New York Executive Law § 259-i(3)(f)(iii) provides that both the alleged parole violator and counsel "shall be given written notice of the date, place and time of the hearing . . . at least fourteen days prior to the scheduled date," a requirement that was not satisfied in this case, petitioner has failed to demonstrate how he was prejudiced by Attorney Young's failure to object to the untimely notice. As respondent argues, even assuming Attorney Young did interpose an objection on this ground, the appropriate remedy would have been adjournment of the hearing. *See People ex rel. Smith v. N.Y. State Bd. of Parole*, 131 A.D.2d 401, 403 (1st Dep't 1987) (finding that, where the petitioner was not provided adequate notice pursuant to Executive Law § 259-i, adjournment of the hearing was required, notwithstanding that the hearing would then have been deemed untimely). By regulation, final

revocation hearings must be held within ninety days of a waiver of the preliminary hearing. 9 N.Y.C.R.R. § 8005.17(a). Because the preliminary waiver hearing occurred on May 13, 2009, a revocation hearing could have been adjourned until, at the latest, August 11, 2009. Petitioner has not demonstrated, or even suggested, how an adjournment would have produced a different result.

Similarly, petitioner has not demonstrated any prejudice with respect to his claim that Attorney Young attended the parole revocation hearing without a "strategy or plan." Dkt. No. 1 at 4. A review of the strategy employed by petitioner's counsel, encouraging McCullough to plead guilty, reveals no departure from the norm. With the assistance of Attorney Young, petitioner was able to enter into a plea bargain whereby the ALJ would recommend an additional two-year period of incarceration in exchange for petitioner's plea of guilty to the two charges accusing him of violating the parole restrictions concerning curfew and movement outside of Onondaga County. Dkt. No. 12-1 at 26-27. Given the nature of petitioner's underlying conviction and his prior criminal history, I am unable to conclude that the plea agreement was unreasonable or that Attorney Young's counseling petitioner to enter into that agreement was objectively unreasonable.

Petitioner has also failed to provide any indication as to an alternative

strategy that could have been employed, had Attorney Young met with him prior to the day of the revocation hearing. As was discussed above, to prevail on his ineffective assistance of counsel claim, petitioner must demonstrate that a different result was attainable absent Attorney Young's conduct.

In sum, the state court's finding that petitioner was not denied effective assistance of counsel was neither contrary to nor an unreasonable application of the Supreme Court's *Strickland* standard.

### D. Due Process Claim

The second claim raised by the petitioner asserts a deprivation of process, based upon the Division of Parole's failure to provide him with adequate notice of the revocation hearing. [Dkt. No. 1 at 4](Dkt. No. 1 at 4).

### 1. Clearly Established Supreme Court Precedent

The Supreme Court has held that the Due Process Clause of the Fourteenth Amendment applies to the revocation of parole. *Morrissey v. Brewer*, 408 U.S. 471, 481-82 (1972); *see also Greenholtz v. Inmates of the Neb. Penal & Corr. Complex*, 442 U.S. 1, 9 (1979). Individuals in parole revocation proceedings, however, are not entitled to "the full panoply of rights" that are accorded in a criminal prosecution. *Morrissey*, 408 U.S. at 480 (citing *Mempa v. Rhay*, 389 U.S. 128 (1967)). Rather, given that the

state has an "overwhelming" interest in being able to return parole violators to prison "without the burden of a new adversary criminal trial," the Due Process Clause merely requires that an "informal hearing" be held "to assure that the finding of a parole violation will be based on verified facts and that the exercise of discretion will be informed by an accurate knowledge of the parolee's behavior." *Id.* at 483-84. Thus, the Supreme Court has delineated the following "minimum requirements of due process" to include

> (a) written notice of the claimed violations of parole;
> (b) disclosure to the parolee of evidence against him;
> (c) opportunity to be heard in person and to present witnesses and documentary evidence;
> (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation);
> (e) a 'neutral and detached' hearing body; and
> (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.

*Id.* at 489; *accord, Calhoun v. N.Y. State Div. of Parole Officers*, 999 F.2d 647, 652 (2d Cir.1993) (holding that the state may not revoke a person's parole without providing minimum due process protections which include "a preliminary probable cause hearing . . ., as well as a final revocation hearing, at which a parolee may present evidence and confront witnesses").

*Morrissey* represents the "clearly established Federal law" for purposes of federal habeas review. 28 U.S.C. § 2254(d)(1). Further, the Second Circuit has determined that the procedures set forth in New York Executive Law § 259-i generally satisfy due process. *Calhoun*, 999 F.2d at 652 (citing N.Y. Exec. Law § 259-i(3)(f)).

### 2.    State Court Determination

In his decision in connection with McCullough's state court habeas petition, Acting Supreme Court Justice Punch found, in essence, that the question of whether petitioner's counsel received timely notice was "irrelevant" based upon statements by the attorney that he had in fact received adequate notice of the hearing and there were no outstanding issues concerning the notice. Dkt. No. 12-1 at 11-12. On appeal, the Fourth Department concluded that any argument regarding the alleged untimeliness of the revocation hearing notice was waived. *People ex rel. McCullough*, 82 A.D.3d at 1640.

### 3.    Contrary to or Unreasonable Application of Controlling Supreme Court Precedent

In this case it is unnecessary to address the question of whether the state courts' determination regarding the due process claim was either contrary to or an unreasonable application of clearly established Supreme Court precedent. Regardless of whether the notice received by petitioner of

23

his hearing was constitutionally adequate, petitioner waived any defect by his guilty plea during the revocation hearing. *See Johnson v. Carlsen*, No. 09-CV-0066, 2010 WL 1817343, at *7 (N.D.N.Y. Mar. 29, 2010) (Homer, M.J.), *report and recommendation adopted by* 2010 WL 1837779 (N.D.N.Y. May 5, 2010) (Suddaby, J.), (concluding that, even assuming the petitioner's constitutional rights were violated by an untimely final parole revocation hearing, the petitioner "waived all hearing defects by pleading guilty") (citing *Tollett v. Henderson*, 411 U.S. 258, 267 (1973); *United States v. Coffin*, 76 F.3d 494, 498 (2d Cir. 1996)). Absent a basis to conclude that the plea was not knowing and voluntary, *Johnson*, 2010 WL 1817343, at *7, – and none has been presented – McCullough's plea of guilty waived any claim that he was deprived of due process by the short notice of the revocation hearing. Having carefully reviewed the transcript of the revocation hearing and petitioner's plea allocution, I find no basis to conclude that his counselled plea was not knowing and voluntary. In this regard, it is worth noting that petitioner took full responsibility for the parole violations during the revocation hearing. Dkt. No. 12-1 at 28-29. Indeed, he admitted to making "bad decision[s]" and acknowledged his need to "follow[] the guidelines and regulations established by parole." *Id.* Accordingly, I recommend a finding that petitioner has waived his right to raise a due

24

process claim with regard to the notice of the revocation hearing.

D.    Certificate of Appealability

To appeal a final order denying a request for habeas relief by a state prisoner, a petitioner must obtain from the court a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(A); *see also* Fed. R. App. P. 22(b)(1) ("[T]he applicant cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)."). In the absence of a COA, a federal court of appeals lacks jurisdiction to entertain an appeal from the denial of a habeas petition. *Hoffler v. Bezio*, 726 F.3d 144, 152 (2d Cir. 2013). A COA may issue only "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Hoffler*, 726 F.3d at 154. A petitioner may demonstrate a "substantial showing" if "the issues are debatable among jurists of reason; . . . a court could resolve the issues in a different manner; or . . . the questions are adequate to deserve encouragement to proceed further." *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) (quotation marks and alterations omitted); *see also Slack v. McDaniel*, 529 U.S. 473, 478 (2000) ("[A] COA should issue . . . if the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right,

and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."). In this instance, I conclude that the petitioner has not made a substantial showing of the denial of a constitutional right and therefore recommend against the issuance of a COA.

IV.    <u>SUMMARY AND RECOMMENDATION</u>

Because the two claims raised by the petitioner in this matter are both unexhausted and procedurally barred based upon his failure to properly present those claims to the highest court in New York State prior to commencing this proceeding, they are subject to dismissal in this procedural basis. Addressing the merits, and applying the deferential standard required under the AEDPA, I conclude that petitioner has failed to establish a basis to conclude he received constitutionally deficient representation during the course of the revocation hearing, and further that, by his plea of guilty, he waived the procedural defects associated with the revocation hearing, including any claim of inadequacy of the notice provided to him. Accordingly, it is hereby respectfully

RECOMMENDED that the petition in this matter be DENIED and DISMISSED in all respects; and it is hereby further

RECOMMENDED, based upon my finding that McCullough has not

made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2), that a certificate of appealability not issue with respect to any of the claims set forth in his petition.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     March 23, 2015
           Syracuse, New York


David E. Peebles
U.S. Magistrate Judge

2008 WL 2949388
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Wayne BLANCHARD, Petitioner,
v.
Calvin WEST, Respondent.

No. 9:04-CV-1492.  |  July 30, 2008.

**Attorneys and Law Firms**

Wayne Blanchard, Elmira, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Gerald J. Rock, Esq., Asst. Attorney General, of
Counsel, Albany, NY, for Respondent.

### *ORDER*

Hon. DAVID N. HURD, District Judge.

**\*1** Petitioner, Wayne Blanchard, brought a petition for
a writ of habeas corpus pursuant to 28 U.S.C. § 2254.
By Report-Recommendation dated June 23, 2008, the
Honorable Randolph F. Treece, United States Magistrate
Judge, recommended that the petition be denied and that
because he has made no "substantial showing of the denial of
a constitutional right," no certificate of appealability should
issue with respect to any of petitioner's claims. There have
been no objections made to the Report-Recommendation, and
further, it is noted that mail to the petitioner has been returned
as undeliverable.

Accordingly, it is

ORDERED that

1. The petition for a writ of habeas corpus is DENIED;

2. The petition is DISMISSED in all respects; and

3. No certificate of appealability will be issued with respect
to any of petitioner's claims.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

### *REPORT-RECOMMENDATION AND ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

Presently before the Court is Wayne Blanchard's Petition for
a Writ of *Habeas Corpus* brought pursuant to 28 U.S.C. §
2254. [1] Dkt. No. 1, Pet. By his Petition, Blanchard asserts
that his due process and equal protection rights were violated
when, after being released on parole, he was subsequently
retaken and reincarcerated. Pet. at ¶ 2. Specifically, Blanchard
claims that the warrant issued for his retaking was defective
because the official who issued the warrant also created and
issued the report upon which it was based. *Id.* For the reasons
that follow, it is recommended that the Petition be **denied.**

### I. BACKGROUND

On June 15, 1982, Blanchard was convicted on three counts of
robbery in the first degree and sentenced to concurrent terms
of twelve and a half (12½) to twenty-five (25) years on each
count. *People v. Blanchard,* 481 N.Y.S.2d 774 (N.Y.App.
Div., 3rd Dep't 1984). On December 11, 2003, Petitioner
was released on parole only to be declared delinquent on the
very next day after he absconded from parole supervision.
Supp. Parole Violation Rep., dated Feb. 17, 2004, at R3; [2]
Parole Revocation Decision Notice, dated Jan. 4, 2004, at
R6; Violation of Release Rep., dated Jan. 12, 2004, at R11.
Pursuant to a warrant issued on December 24, 2003, Petitioner
was arrested on February 12, 2004, in Albany, New York.
Warrant, dated Dec. 24, 2003, at R1; Supp. Parole Violation
Rep., dated Feb. 17, 2004, at R3; Violation of Release Rep.,
dated Jan. 12, 2004, at R13. Petitioner waived his right
to a preliminary parole revocation hearing. A final parole
revocation hearing was heard on April 12, April 26, and
May 17, 2004, at the conclusion of which Petitioner's parole
was revoked and he was sentenced to thirty-six (36) months
incarceration. Notice of Violation, dated Feb. 17, 2004, at
R2; Parole Revocation Decision Notice, dated Jan. 4, 2004, at
R5-9; Final Parole Revocation Hr'g Tr., dated Apr. 12, Apr.
26, & May 17, 2004, at R21-102. Petitioner filed a notice of
appeal, but failed to submit a petition to the Appeals Unit of
the Division of Parole and therefore did not perfect the appeal.
Pet. at ¶ 1.

**\*2** During the pendency of his final revocation hearing, Blanchard filed a petition for a writ of *habeas corpus* before the New York State Supreme Court of Albany County on April 27, 2004, which was subsequently denied. Judgment, dated May 25, 2004, at R108-09. On September 7, 2004, Petitioner filed another writ of *habeas corpus* in the Chemung County Supreme Court, which was also denied. [3] Pet., Ex. H, Decision and Order, dated Oct. 22, 2004. Petitioner has made no indication that he appealed either of his state court *habeas* applications, nor does the record reflect that he did. *See generally* Pet. & State Ct. R.

On November 19, 2004, Petitioner filed the instant Petition for a Writ of *Habeas Corpus.* For the reasons that follow, it is recommended that Blanchard's Petition be **denied.**

## II. DISCUSSION

### A. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), a federal court may not grant habeas relief to a state prisoner on a claim unless the state court adjudicated the merits of the claim and such adjudication either

1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Hawkins v. Costello,* 460 F.3d 238 (2d Cir.2006); *DeBerry v. Portuondo,* 403 F.3d 57, 66 (2d Cir.2005); *Miranda v. Bennett,* 322 F.3d 171, 177-78 (2d Cir.2003); *Boyette v. Lefevre,* 246 F.3d 76, 88 (2d Cir.2001).

The petitioner bears the burden of proving by a preponderance of the evidence that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Jones v. Vacco,* 126 F.3d 408, 415 (2d Cir.1997); *Rivera v. New York,* 2003 WL 22234679, at \*3 (S.D.N.Y. Aug. 28, 2003). The AEDPA also requires that "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the

burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e) (1); *see also DeBerry v. Portuondo,* 403 F.3d at 66; *Boyette v. LeFevre,* 246 F.3d at 88 (quoting § 2254(e)(1)) (internal quotations omitted).

The Second Circuit has provided additional guidance concerning application of this test, noting that:

> [u]nder AEDPA, we ask three questions to determine whether a federal court may grant habeas relief: 1) Was the principle of Supreme Court case law relied upon in the habeas petition "clearly established" when the state court ruled? 2) If so, was the state court's decision "contrary to" that established Supreme Court precedent? 3) If not, did the state court's decision constitute an "unreasonable application" of that principle?

**\*3** *Williams v. Artuz,* 237 F.3d 147, 152 (2d Cir.2001) (citing *Williams* and *Francis S. v. Stone,* 221 F.3d 100, 108-09 (2d Cir.2000)).

### B. Exhaustion

A state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for writ of *habeas corpus. O'Sullivan v. Boerckel,* 526 U.S. 838, 842 (1999). To satisfy the exhaustion requirement with respect to a claim, a defendant must "present the substance of the same federal constitutional claim[s]" to the state courts "that he now urges upon the federal courts[.]" *Aparicio v. Artuz,* 269 F.3d 78, 89 (2d Cir.2001) (internal quotation marks omitted) (citing *Turner v.. Artuz,* 262 F.3d 118, 123-24 (2d Cir.2001)). As the Supreme Court noted in *O'Sullivan,* "[c]omity ... dictates that when a prisoner alleges that his continued confinement for a state court conviction violates federal law, the state courts should have the first opportunity to review this claim and provide any necessary relief." *O'Sullivan v. Boerckel,* 526 U.S. at 844 (citations omitted).

"A federal constitutional claim has not been fairly presented to the State courts unless the petitioner has informed those courts of all the 'essential factual allegations' and 'essentially the same legal doctrine he asserts in his federal petition.' "

*Strogov v. Attorney Gen. of State of New York,* 191 F.3d 188, 191(2d Cir.1999) (citing *Daye v. Attorney Gen. of the State of New York,* 696 F.2d 186, 191 (2d Cir.1982) (further citing *Picard v. Connor,* 404 U.S. 270, 276–77 (1971)).

In order to properly exhaust a challenge to a parole revocation, a *habeas* petitioner must "first file an administrative appeal with the Division of Parole's Appeals Unit. If that appeal is denied, he must seek relief in state court pursuant to Article 78." *Medina v. Berbary,* 2008 WL 312762, at \*2 (N.D.N.Y. Feb. 1, 2008) (internal citations and quotation marks omitted).

In the case at bar, Petitioner filed a notice of appeal to the Division of Parole but failed to perfect that appeal by filing a petition with the Appeals Unit. *See* Pet. at ¶ 1; *see also* N.Y. COMP.CODES R. & REGS. tit. 9 § 8006.2(a) & (b) ("An appeal is perfected by the filing [of a written appeal] with the appeals unit ... [that] shall explain the basis for the appeal."). Similarly, Petitioner failed to appeal both denials of his state court *habeas* petitions. Therefore, Petitioner's claims have not been properly exhausted in the state courts.

Since a request for an extension to appeal, or an appeal of a parole revocation decision must be filed within four months of the decision, N.Y. COMP.CODES R. & REGS. tit. 9 § 8006.2(a), Petitioner cannot now re-enter the administrative appellate process in order to exhaust his claims. When "it is clear that the unexhausted claim is procedurally barred by state law and its presentation in the state forum would be futile[,]" *Aparicio v. Artuz,* 269 F.3d at 90, a district court may deem such claim exhausted but also procedurally defaulted, *Bossett v. Walker,* 41 F.3d 825, 828–29 (2d Cir.1994). Therefore, Petitioner's claims are deemed exhausted but procedurally defaulted.

 **\*4** Where a prisoner has defaulted on his federal claims at the state level, a district court may reach the merits of such claim only upon a demonstration of "cause for the default and actual prejudice," or that a "failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750 (1991). To establish "cause" sufficient to excuse a procedural default, a petitioner must show that some objective external factor impeded his or her ability to comply with the relevant procedural rule. *Id.* at 753; *Restrepo v. Kelly,* 178 F.3d 634, 639 (2d Cir.1999). Examples of external factors include "interference by [an]official," ineffective assistance of counsel, or that "the factual or legal basis for a claim was not reasonably available" at trial or on direct appeal. *Murray v. Carrier,* 477 U.S. 478, 488 (1986);

*Bossett v. Walker,* 41 F.3d at 829 (citing *Murray* ); *United States v. Helmsley,* 985 F.2d 1202, 1206 (2d Cir.1992).

In the case at bar, Petitioner states that he did not appeal the Parole Board's decision because "he was not made aware of the procedural errors and statutory violations until after the revocation process." Pet. at ¶ 1. However, Petitioner submitted a writ of *habeas corpus* in state court on the same grounds raised in this Petition within three months of the issuance of the decision revoking his parole. *See* Parole Revocation Decision Notice, dated June 4, 2004, at R5-9; Pet., Attach., Statement of the Case at ¶ 5 (stating he filed a petition for a writ of *habeas corpus* before the Supreme Court of Dutchess County on August 17, 2004) & Ex. H, Decision and Order, dated Oct. 22, 2004. Therefore, it appears that Petitioner was aware of the alleged defects in the warrant issued for his retaking and could have properly raised them in a timely appeal to the Appeals Unit of the Division of Parole; he merely failed to do so. Petitioner offers no other cause for his failure to appeal the Parole Board's decision.

When, as here, a petitioner has failed to establish adequate cause for his procedural default, the court need not determine whether he suffered prejudice, since federal *habeas* relief is generally unavailable as to procedurally defaulted claims unless both cause and prejudice are demonstrated. *Stepney v. Lopes,* 760 F.2d 40, 45 (2d Cir.1985); *Long v. Lord,* 2006 WL 1977435, at \*6 (N.D.N.Y. Mar. 21, 2006).

Finally, Petitioner has proffered no argument that failure to consider these claims would result in a fundamental miscarriage of justice, which "occurs only in those 'extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime.' " *Rodriguez v. Mitchell,* 252 F.3d 191, 203 (2d Cir.2001) (quoting *McCleskey v. Zant,* 499 U.S. 467, 494 (1991). There is nothing in the record before us that suggests Petitioner's innocence. In fact, Petitioner admitted to violating his parole during his final parole revocation hearing. Final Parole Revocation Hr'g Tr., dated May 17, 2004, at R88-89 & R96-97.

 **\*5** For all these reasons, it is recommended that the Petition be **dismissed.**

## III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Petition for a Writ of *Habeas Corpus* be **DENIED;** and it is further

**RECOMMENDED,** that because the Court finds Petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2), no certificate of appealability should issue with respect to any of Petitioner's claims. *See* 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right."); *see also Lucidore v. New York State Div. of Parole,* 209 F.3d 107, 112 (2d Cir.2000); and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

Footnotes

1    This Petition was transferred from the Western District of New York on December 27, 2004, *see* Dkt. Nos. 5-6, and referred to the undersigned for a report-recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c). The Petition was originally brought pursuant to 28 U.S.C. § 2241 but was later converted, with Petitioner's assent, to one pursuant to 28 U.S.C. § 2254. *See* Dkt. Nos. 1, & 3-5.

2    In accordance with this District's Local Rules, the State Court Record, encompassing various documents, has been paginated and sequentially numbered. *See* N.D.N.Y.L.R. 72.4(d). For ease of reference, we will refer to these assigned page numbers as "R1-R109 ."

3    It seems that Petitioner originally filed his second application for a writ of *habeas corpus* in the New York State Supreme Court of Dutchess County, however that application was "dismissed without prejudice to filing in the Chemung County Supreme Court" after it was learned that Blanchard had been transferred from the Downstate Correctional Facility to the Elmira Correctional Facility. Pet., Ex. F, Order of Dismissal Upon Transfer, dated Sept. 17, 2004. The only record of the Dutchess County *habeas* application is attached to the Petition; it was not included in the State Court Records submitted by Respondent.

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2000 WL 33952256
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Ralph HALL, Petitioner,

v.

NEW YORK STATE DIVISION OF PAROLE,
Earl A. Couture, Superintendent, Gouverneur
Correctional Facility, Respondents.

No. 99CIV11317(RMB)(JCF). | Nov. 29, 2000.

**Attorneys and Law Firms**

Ralph Hall (N.Y., NY), for petitioner, pro se.

Lee Adlerstein,-Office of the Attorney General (N.Y., NY),
for respondents.

Before Judge RICHARD M. BERMAN.

*ORDER*

BERMAN, J.

**I.** *Introduction*

 **\*1** On November 15, 1999, Ralph Hall ("Petitioner" or
"Hall"), a *pro se* litigant, filed a petition ("Petition") for a writ
of habeas corpus pursuant to 28 U.S.C. § 2254. In his Petition,
Hall challenged a decision of the New York State Division of
Parole to revoke his parole and incarcerate him.

On October 11, 2000, the Honorable James C. Francis IV,
United States Magistrate Judge, to whom the matter had
been referred, issued a report and recommendation ("Report")
recommending that the Petition be denied. Magistrate Francis
determined, among other things, that Hall's Petition should
be dismissed because he "has not exhausted all state
remedies." (Report p. 4). Hall filed written objections to
the Report on or about November 14, 2000, i.e. after the
ten-day filing deadline required by 28 U.S.C. § 636(b)(1).
Respondents do not protest the timeliness of Hall's objections
(and they have been considered by the Court). Respondents
have filed no objections of their own. For the reasons set forth
below, the Court adopts the Magistrate's Report in its entirety
and denies Hall's Petition.

**II.** *Background*

On April 10, 1972, after being convicted of first degree
murder in New York State Supreme Court, New York
County, Hall was sentenced to a term of imprisonment of
twenty years to life. *See* Report p. 2. After having been
released on parole (in December of 1992), Hall was re-
arrested on September 13, 1998 for allegedly assaulting his
girlfriend. *See id.* Hall's parole was revoked following a
hearing on January 28, 1999 before Administrative Law
Judge Brigitte Fortune, N.Y.S. Division of Parole. *See id.;*
Adlerstein Affidavit in Opposition to Petition for Habeas
Corpus Relief, Exh. I (hereinafter "Adlerstein Aff."). Hall
was reincarcerated for a term of twenty-four months. *See*
Report p. 2. Hall filed an administrative appeal with the
Appeals Unit of the New York State Board of Parole.
*See id.;* Adlerstein Aff., Exh. K. In addition, Hall filed
a petition in New York State Supreme Court pursuant to
Article 70 of the Civil Practice Law and Rules ("CPLR")
arguing, among other things, that the 1997 guidelines upon
which his parole revocation was presumably based were
allegedly retroactively applied to him in violation of the ex
post facto clause in Article I, Section 9, Clause 3 of the
United States Constitution. *See id.;* Adlerstein Aff., Exh. L.
On January 22, 1999, the New York State Supreme Court,
Bronx County, dismissed Hall's Article 70 petition on the
grounds that "[b]efore [the] court may review the actions
of the Board of Parole under a habeas corpus proceeding,
the challenged action or decision itself must be completed....
The [Petitioner's] claim is therefore denied at this time as
premature." (Adlerstein Aff., Exh. M.); Report p. 2. Hall's
appeal from the New York State Supreme Court's decision
was denied by the Appellate Division, Second Department.
*See* Report. p. 2-3. Thereafter, Hall filed the instant habeas
petition on November 15, 1999.

**III.** *Standard of Review*

 **\*2** A district court evaluating a Magistrate's report may
adopt those portions of the report to which no "specific,
written objection" is made, as long as those sections are
not clearly erroneous. Fed.R.Civ.P. 72(b); *Thomas v. Arn,
474 U.S. 140, 149 (1985); Greene v. WCI Holdings Corp.,
956 F.Supp. 509, 513 (S.D.N.Y.1997).* The Court conducts
a de novo review of those portions of the Report to which
objections have been made. *See Cespedes v. Coughlin, 956
F.Supp. 454, 463 (S.D.N.Y.1997); East River Sav. Bank
v. Secretary of Hous. and Urban Dev., 702 F.Supp. 448,
453 (S.D.N.Y.1988).* The Court is not required, however, to
conduct a de novo hearing as to the objections raised. *See East*

*River Sav. Bank,* 702 F.Supp. at 453. Thereafter, a district judge may accept, reject, or modify, in whole or in part, the findings and recommendations of the Magistrate. *See DeLuca v. Lord,* 858 F.Supp. 1330, 1345 (S.D.N.Y.1994); *Walker v. Hood,* 679 F.Supp. 372, 374 (S.D.N.Y.1988).

#### IV. *Analysis*

The Court has conducted a review of the underlying record herein, the Report, applicable law and Hall's objections. In reviewing the objections, the Court is mindful that Hall is proceeding *pro se* and that his "submissions should be held to less stringent standards than formal pleadings drafted by lawyers." *Miller v. First Sec. Inv., Inc.,* 30 F.Supp.2d 347, 349 (E.D.N.Y.1998) (citation omitted). Hall claims that the Magistrate's determination that he did not satisfy the exhaustion requirement is "obvious error." (Petitioner's objections p. 2).

The Court finds that the record and case law support the Magistrate's findings of fact and his conclusions of law. Magistrate Francis was correct in recommending dismissal of Hall's Petition. A petitioner must exhaust all available state remedies before obtaining habeas corpus review under 28 U.S.C. § 2254. *See* 28 U.S.C. § 2254(b)(1); Report p. 3. "This includes completing all appeals through the highest state court." (Report p. 3). *See also O'Sullivan v. Boerckel,* 526 U.S. 838, 845 (1999) ("Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts, we conclude that state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process. Comity, in these circumstances, dictates that [the plaintiff] use the State's established appellate review procedures before he presents his claims to a federal court."). In the instant case, Hall did not exhaust his available state remedies. *See* Report p. 3; *People ex. rel. Woods v. McGreevy,* 594 N.Y.S.2d 906, 907 (3d Dept.1993) ("Judicial review of alleged errors in the parole revocation process is precluded prior to the exhaustion of [administrative] remedies...."). [1]

**\*3** Additionally, Hall's Petition should be dismissed as moot in light of the fact that he apparently was released from Gouverneur Correctional Facility on October 18, 2000. *See People ex. rel. Brown v. New York State Div. of Parole,* 691 N.Y.S.2d 162 (2d Dept.1999) ("While on parole from a prior conviction, the petitioner was found to be in

violation of the terms of his release and was reimprisoned. The petitioner thereafter commenced this habeas corpus proceeding asserting that his parole had been improperly revoked.... The Supreme Court denied the ... writ ... [and] [d]uring the pendency of the petitioner's appeal to this Court, he was returned to parole supervision. Accordingly, ... this appeal has been rendered academic.").

#### V. *Conclusion*

Accordingly, the Court incorporates the Report by reference and, for the reasons set forth herein and therein, denies Hall's Petition. The Clerk is respectfully directed to dismiss the action with prejudice.

#### *REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

Ralph Hall brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging revocation of his parole. He argues that the regulation under which the revocation decision was made constitutes an ex post facto law in violation of Article I, Section 9, Clause 3 of the United States Constitution. [1] Because Mr. Hall has not properly exhausted all state law remedies with respect to this claim, I recommend that the petition be dismissed.

#### *Background*

On April 10, 1972, the petitioner was sentenced to a term of imprisonment of twenty years to life after being convicted of first degree murder. (Adlerstein Aff., Exh. M, at 1). He was released on parole on December 21, 1992. (Adlerstein Aff., Exh. M, at 1). However, on September 13, 1998, Mr. Hall was arrested for assaulting his girlfriend. (Adlerstein Aff., Exh. J). Following a hearing, his parole was revoked. (Adlerstein Aff., Exh. J). On the basis of guidelines that had apparently been promulgated in 1997, the petitioner was reincarcerated for a term of twenty-four months. (Adlerstein Aff., Exh. J).

Mr. Hall then appealed this determination to the Appeals Unit of the New York State Board of Parole. (Adlerstein Aff., Exh. K). While that administrative appeal was still pending, however, he also filed a petition in New York State Supreme Court pursuant to Article 70 of the Civil Practice Law and Rules (the "CPLR"), arguing that the 1997 guidelines were retroactively applied to him in violation of the ex post facto clause. (Adlerstein Aff., Exh. L). The

court dismissed that petition on the ground that it was premature since there had been no final determination of Mr. Hall's administrative appeal. (Adlerstein Aff., Exh. M). Subsequently, the Appellate Division, Second Department, dismissed Mr. Hall's appeal of the Supreme Court's decision. (Adlerstein Aff., Exh. M). He then filed the instant petition.

### Discussion

**\*4** Prior to obtaining habeas corpus review under 28 U.S.C. § 2254, a petitioner must exhaust all available state remedies. 28 U.S.C. § 2254(b)-(c); see Duckworth v. Serrano, 454 U.S. 1, 3 (1981); Pesina v. Johnson, 913 F.2d 53, 54 (2d Cir.1990). This includes completing all appeals through the highest state court. See O'Sullivan v. Boerckel, 526 U.S. 838, 844-45 (1999). The exhaustion requirement is fully applicable to petitioners, like Mr. Hall, who challenge revocation of their parole release status. See Hall v. NYS Division of Parole, No. 00-0053, 2000 WL 1186256, at \*2 (2d Cir. Aug. 21, 2000) (unpublished opinion in related case); Hili v. Sciarrotta, 140 F.3d 210, 216 (2d Cir.1998).

Although the petitioner filed an administrative appeal, he has not fully exhausted his available state remedies. Under New York State law, once an appeal from a parole revocation decision has been rejected by the Board of Parole, the inmate is entitled to bring a petition in state court pursuant to Article 70 or Article 78 of the CPLR. See People ex rel. Washington v. Irvin, 201 A.D.2d 907, 907, 607 N.Y.S.2d 804, 805 (4th Dep't 1994); People ex rel. Woods v. McGreevy, 191 A.D.2d 938, 938, 594 N.Y.S.2d 906, 907 (3d Dep't 1993). Although Mr. Hall did commence an Article 70 proceeding in this case, he did so before any decision was rendered on his administrative appeal, and it was rejected as premature.

Accordingly, the filing of that procedurally defective petition did not constitute exhaustion of Mr. Hall's state judicial remedies.

It is true, as the petitioner argues, that no final decision was rendered by the Board of Parole within four months as required by law. See 9 N.Y.C.R.R. § 8006.4(c). However, the consequence of this is not to excuse the petitioner from pursuing all state remedies. Rather, his administrative remedies are deemed exhausted, and he is now entitled to proceed immediately in state court under Article 70 or 78. See Lord v. State of New York Executive Department Board/ Division of Parole, 263 A.D.2d 945, 946, 695 N.Y.S.2d 461, 462 (4th Dep't 1999). As he has failed to do so, he has not exhausted all state remedies.

### Conclusion

For the reasons set forth above, I recommend that Mr. Hall's petition for a writ of habeas corpus be dismissed without prejudice to being refiled upon exhaustion of all available state remedies.

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Richard M. Berman, Room 201, 40 Foley Square, New York, New York 10007, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

### Footnotes

1    The Magistrate notes that "no final decision was rendered by the Board of Parole within four months as required by 9 N.Y.C.R.R. § 8006.4(c) ]." (Report p. 4). This does not excuse Hall, however, from pursuing all available state remedies. See id.; Lord v. State of New York Executive Dep't Bd./ Div. of Parole, 695 N.Y.S.2d 461, 462 (4th Dept.1999) ("We disagree with petitioner that the failure of the appeals unit of the Board of Parole to decide his administrative appeal within four months rendered the decision of the appeals unit constitutionally defective. The consequence of the appeals unit's failure to decide an administrative appeal within four months is that petitioner may deem his administrative remedy exhausted and may immediately seek judicial review of the underlying determination."), leave to appeal denied, 700 N.Y.S.2d 427 (1999).

1    The respondents treat the petition as also raising claims that the revocation decision was not supported by sufficient evidence and that the petitioner's sentence was improperly calculated. Although these arguments are included in Mr. Hall's administrative appeal of the parole revocation (Affidavit of Lee Alan Adlerstein dated March 15, 2000 ("Adlerstein Aff."), Exh. K), they are not included in his federal habeas corpus petition except to the extent that Mr. Hall alludes to having raised them previously. (Petition, ¶ 9). Even if these claims were part of the petition, it would not alter the analysis in this Report and Recommendation.

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Not Reported in F.Supp.2d, 2006 WL 1977435 (N.D.N.Y.)

(Cite as: 2006 WL 1977435 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Julia LONG, Petitioner,
v.
Elaine A. LORD, Respondent.
No. 03-CV-0461 NPM.

March 21, 2006.
Julia Long, Bedford Hills Correctional Facility, Bedford Hills, NY, Petitioner, pro se.

Hon. Eliot Spitzer, Office of Attorney General, New York State Attorney General, The Capitol, Albany, NY, for the Respondent.

Bridget E. Holohan, Ass't Attorney General, of counsel.

*Memorandum-Decision and Order issued in*

SMITH, J.

MEMORANDUM-DECISION and ORDER
MCCURN, Senior J.

**\*1** Petitioner Julia Long, a New York State prison inmate as a result of 1997 convictions for the crimes of first degree assault and criminal possession of a weapon, has commenced this proceeding seeking federal habeas relief pursuant to 28 U.S.C. § 2254. In her petition, Long asserts seven separate grounds in support of her request for federal habeas intervention. Respondent has filed a response in opposition to Long's petition, arguing therein that some of the claims asserted by Long are procedurally barred, and additionally that none of the grounds advanced in her petition have merit.

This Court finds that Long is procedurally barred from asserting several of the claims she has raised in her petition. Since petitioner has not established cause for her procedural default concerning those grounds or that she is actually innocent of any of the crimes of which he stands convicted, this Court denies those claims as procedurally

barred. Furthermore, after considering the remaining grounds raised by Long in her petition in conjunction with applicable case law, this Court finds that the additional claims asserted by Long in her habeas petition lack merit. Accordingly, this Court denies and dismisses Long's petition.

I. *BACKGROUND*

A. *State Court Proceedings*

According to the state court records below, in the afternoon of May 1, 1995, Long attended a meeting at the TC Club in Albany, New York in order to discuss the possibility of leasing that property from its owner. *See* Transcript of Trial of Julia Long (1/3/97) ("Trial Tr.") at 366. Ivetta Parson, an individual with whom Long had had an altercation earlier that year, was also at the club around the time of Long's meeting. *See* Trial Tr. at 120-23. For reasons not apparent from the record, Long approached Parson at that time and sprayed her face with mace. Trial Tr. at 123-24. Parson ran out of the club and went to the home of her friend, Regina Monell, where Parson washed her face. Trial Tr. at 125. The two then decided to drive to the TC Club with some friends and confront Long about the incident that had just transpired. Trial Tr. at 126-27. When the group arrived at the club, Parson observed Long holding a handgun. Trial Tr. at 132. Parson exited her vehicle, and as she was walking around her car she discovered that she was bleeding.[FN1] Trial Tr. at 132-33. Around this same time, Monell observed Long firing her weapon at Parson, Trial Tr. at 163-64, and soon thereafter Monell noticed that she had also been shot. Trial Tr. at 164.

> FN1. Parson did not hear Long's gun discharge. Trial Tr. at 133.

**\*2** The trial transcript also reflects that on May 1, 1995, Charles Traynham was a long time acquaintance of Robert Temple. Trial Tr. at 292. At approximately 5:00 p.m. on that date, Traynham and Temple were across the street from the TC Club. Trial Tr. at 293. Soon after Traynham went into a nearby store, he heard gunshots. Trial Tr. at 293-94. Traynham left the store and heard

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1977435 (N.D.N.Y.)

(Cite as: 2006 WL 1977435 (N.D.N.Y.))

Temple calling out that he had been "hit." Trial Tr. at 294. When Traynham noticed that Temple was bleeding, Traynham drove him to a nearby hospital to be treated for his injuries, Trial Tr. at 296, which included a life-threatening gunshot wound to an artery in his right arm. Trial Tr. at 186-89.[FN2]

> FN2. The prosecution was unable to locate Temple prior to the date of Long's trial. Trial Tr. at 289.

Kenneth Kennedy, a Detective with the Albany Police Department, was assigned to perform a criminal investigation relating to the above-referenced shooting. After speaking with several individuals, Detective Kennedy began looking for Long so that he could question her about her activities on May 1, 1995. Trial Tr. at 325. When Long learned that the police were attempting to question her about the shooting, she contacted an attorney and thereafter surrendered to law enforcement agents. Trial Tr. at 438-39.

On October 13, 1995, an Albany County grand jury returned an indictment against Long. See Indictment No. 950631 ("Indictment"). In that accusatory instrument, Long was charged with one count of attempted murder, two counts of first degree assault, and two counts of second degree criminal possession of a weapon. See Indictment, Counts One through Five. Beginning on January 3, 1997, Long was tried before a jury on the foregoing charges in Albany County Court with County Court Judge Thomas A. Breslin presiding. After the parties presented their closing arguments and the court instructed the jury, the jury began its deliberations. Following several requests by the jury for the reading back of testimony and clarifications regarding the court's instructions, Trial Tr. at 634-52, the jury declared that it had reached a verdict in the case. In its verdict, the jury: i) acquitted Long of the attempted murder charge; ii) convicted her of both counts charging Long with first degree assault; iii) convicted her of the count charging Long with second degree criminal possession of a weapon (which related to victim Monell); and iv) acquitted her of the final count charging Long with second degree criminal possession of a weapon (which related to victim Temple). Trial Tr. at 652-55.

Prior to sentencing, Long's counsel filed a motion to set aside the jury's guilty verdict pursuant to New York Criminal Procedure Law ("CPL"), Section 330.30 ("CPL § 330 Motion"). See Record on Appeal ("Record") at 133. In that application, defense counsel alleged that the convictions must be reversed because Parson was allowed to testify that she was shot by Long despite the fact that Long had never been charged with assaulting Parson. Record at 134. Counsel also claimed that there was insufficient evidence adduced at trial to establish that Temple was shot by Long. Record at 135. After hearing argument on that application, on February 21, 1997, the county court denied Long's CPL § 330 Motion in its entirety. Record at 119-24. That court then sentenced Long to consecutive, indeterminate terms of five to fifteen years imprisonment on each of the first degree assault convictions, and a lesser, concurrent term of imprisonment on the criminal possession of a weapon conviction. See Record at 130-31.

**3** Long appealed her convictions and sentences to the New York State Supreme Court, Appellate Division, Third Department. However, on November 25, 2000, prior to perfecting that appeal, Long filed a motion to vacate her sentence pursuant to CPL § 440.20. Record at 138. In that application, Long alleged that the consecutive sentences that had been imposed on her by the county court were illegal and contrary to her rights under both the federal and New York state constitutions. See Record at 139-44 ("CPL 440.20 Motion"). In support of that application, Long provided an affidavit of Temple-of whom Long had been convicted of assaulting-in which Temple declared that he could not identify the individual who shot him on May 1, 1995. Record at 145. Long's application was opposed by the District Attorney, Record at 146-47, and by Decision and Order dated January 25, 2001, Judge Breslin denied Long's CPL 440.20 Motion in its entirety. Record at 149-51 ("January, 2001 Order"). Long sought leave to appeal that decision to the Appellate Division, see Record at 152, and in its order dated April 20, 2001, the Third Department granted Long leave to appeal the January, 2001 Order to the Appellate Division along with her direct appeal of her conviction. Record at 155.

With the assistance of counsel, Long argued in her

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1977435 (N.D.N.Y.)

(Cite as: 2006 WL 1977435 (N.D.N.Y.))

direct appeal that: i) she was unduly prejudiced by Parson's testimony to the effect that she was shot by Long; ii) there was insufficient evidence adduced at trial to convict Long of the first degree assault of Temple; iii) she was denied her right to a fair trial due to the manner in which the trial court mischaracterized the allegations of one of the charges in the Indictment; iv) the jury's verdict was repugnant; and v) the sentences were unduly harsh and excessive. *See* Appellant's Brief on Appeal ("App.Br.") at 1-25. That appeal was opposed by the District Attorney in his brief dated December 14, 2001, and on February 28, 2002, the Third Department unanimously affirmed Long's convictions and sentences. *People v. Long,* 291 A.D.2d 720, 738 N.Y.S.2d 721 (3d Dept.2002). New York's Court of Appeals denied Long leave to appeal in its order dated June 17, 2002. *See People v. Long,* 98 N.Y.2d 677, 746 N.Y.S.2d 467, 774 N.E.2d 232 (2002).

B. *Proceedings in this Court*

Long commenced this proceeding, *pro se,* on April 14, 2003. *See* Petition (Dkt. No. 1). In that pleading, petitioner argues that: i) admission into evidence of an uncharged crime purportedly committed by Long deprived her of her right to a fair trial; ii) the trial court wrongfully denied Long's application to dismiss the third count in the Indictment; iii) the jury's verdict was repugnant; iv) the trial court misstated the factual allegations contained in the third count in the Indictment in its instructions to the jury; v) the sentence imposed was both harsh and excessive; vi) the imposition of consecutive sentences was both illegal and violative of Long's right against Double Jeopardy; and vii) the Appellate Division wrongfully refused to hear Long's appeal of the denial of her CPL 440.20 Motion. *See* Petition at ¶ 13. Long has also filed a memorandum of law in support of her petition. *See* Dkt. No. 2 ("Supporting Mem.").

**\*4** By Order dated April 24, 2003, the respondent was ordered to file a response to Long's petition. On June 20, 2003, the Office of the Attorney General for the State of New York, acting on respondent's behalf, filed an answer together with a memorandum in opposition to Long's petition. Dkt. Nos. 8-9. In his opposing memorandum, respondent argues that Long is procedurally barred from asserting certain of the claims raised in her petition, and

that none of Long's claims have merit. *See* Dkt. No. 9 ("Opp.Mem.").

II. *DISCUSSION*

A. *Procedurally Defaulted Claims*

This Court initially considers respondent's claim that Long has procedurally defaulted on her claims: i) which allege that she was denied her right to a fair because Parson was allowed to testify about an uncharged crime purportedly committed by Long; ii) that assert that the county court mischaracterized a charge contained in the Indictment; and iii) which contest both the legality and constitutionality of her sentences. *See* Opp. Mem. at 3-6.
1. *Admission of Evidence of an Uncharged Crime*

Petitioner's initial ground for relief is based upon Parson's trial testimony in which she suggested that she was shot by Long. *See* Petition, Ground A.

In her direct appeal, Long noted that the Indictment never charged her with committing any crime against Parson. *See* App. Br. at 3; *see also* Indictment. Prior to trial, defense counsel obtained a ruling from the county court that precluded Parson from testifying about the fact that she had been shot on May 1, 1995. *See* App. Br. at 5; *see also* Appellant's Appendix at A1. At trial, however, Parson testified that she was shot on that day in a manner which suggested that Long was the individual who had shot her. *See* Trial Tr. at 163-64. In addressing Long's appellate claim that the admission of that testimony constituted reversible error, the Third Department ruled that Long had "failed to object to Parson's testimony and, therefore, did not preserve this issue for appellate review." *Long,* 291 A.D.2d at 721, 738 N.Y.S.2d 721 (citing CPL § 470.05[2] ) (other citation omitted).

A state court's determination that a claim was not preserved for appellate review is a finding of procedural default. *See Rivera v. Moscicki,* No. 03 CIV. 5810, 2005 WL 2347840, at *3 (S.D.N.Y. Sept. 22, 2005); *Wilson v. Supt., Attica Corr. Facility,* No. 9:00-CV-767, 2003 WL 22765351, at *3 (N.D.N.Y. Nov.24, 2003) (Sharpe, M.J.) (citations omitted), *adopted, Wilson v. Supt., Attica Corr. Facility,* slip op. at 2 (N.D.N.Y. Feb. 3, 2004) (Mordue, J.); *Betancourt v. Bennett,* No. 02-CV-3204, 2003 WL 23198756, at *12 (E.D.N.Y. Nov.7, 2003). Therefore,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1977435 (N.D.N.Y.)

(Cite as: 2006 WL 1977435 (N.D.N.Y.))

Long has procedurally defaulted on her first ground for relief.

2. *Misstatement Regarding Count Three of the Indictment*

In her fourth ground seeking federal habeas intervention, Long argues that in its charge to the jury, the trial court mischaracterized the allegations contained in Count Three of the Indictment. Petition, Ground D. Specifically, she notes that such count alleged that Long shot Temple in his *chest* and right arm. *See* Indictment, Count Three (emphasis added). In its charge to the jury, however, the trial court declared that this count alleged that Long had shot Temple in the right side of his *head* and in his right arm. *See* Trial Tr. at 617 (emphasis added). Long claims in this action, as she did in her direct appeal, that as a result of the foregoing she was deprived of her right to a fair trial. *See* Supporting Mem. at 16-18; App. Br. at 16-18.

**\*5** In addressing this appellate claim, the Appellate Division determined that Long had "failed to object to the court's charge and, therefore, that error has not been preserved for review (*see,* CPL 470.05[2] )." Since the Third Department explicitly determined that Long had failed to preserve this issue for appellate review, Long has procedurally defaulted on the fourth claim asserted in her petition.[FN3] Rivera, 2005 WL 2347840, at \*3; Wilson, 2003 WL 22765351, at \*3; Betancourt, 2003 WL 23198756, at \*12.

> FN3. The Appellate Division's decision might be liberally read as one that alternatively addressed the merits of this claim. *See* Long, 291 A.D.2d at 723, 738 N.Y.S.2d 721 (after noting Long's procedural default on the claim relating to the county court's misreading of Count Three of the Indictment, the Third Department opined that "were we to address the issue, we would find it without merit since all other trial references to Temple's wound correctly characterized its nature").
>
> Even assuming, *arguendo,* that the above cited language may properly be characterized as an (alternative) decision addressing the merits of this claim, the undersigned notes that "federal

habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim." Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir.1990); Glenn v. Bartlett, 98 F.3d 721, 724-25 (2d Cir.1996) (citing *Velasquez* ); *see also* Olivo v. Thorton, No. 05 CIV.3237, 2005 WL 3292542, at \*8 (S.D.N.Y. Dec. 6, 2005); Broome v. Coughlin, 871 F.Supp. 132, 134 (N.D.N.Y.1994) (Kaplan, J., sitting by designation). Therefore, this Court deems Long to have procedurally defaulted on this ground.

3. *Claims Raised in* CPL 440.20 *Motion*

Long argued in her CPL 440.20 Motion, and similarly asserts in her sixth ground for relief herein, that the county court's imposition of consecutive sentences on Long was both illegal and contrary to her constitutional right to be free from Double Jeopardy. *See* Record at 139-44; Petition, Ground F.

As noted above, the Appellate Division granted Long permission to appeal the county court's January, 2001 Order denying Long's CPL 440 .20 Motion. *See* Record at 155. Long's appellate counsel did not, however, assert on appeal any claims that Long had raised in her CPL 440.20 Motion. *See* App. Br. at 4-25. In addressing this fact in the context of Long's appeal, the Third Department noted:

> Although [Long] appeals from both the judgment of conviction and the order denying Long's CPL 440.20 motion, her failure to address any issues pertaining to the denial of her CPL 440.20 motion constitutes an abandonment of the appeal from that order. Accordingly, we address only the arguments raised on the appeal from the judgment of conviction.

> Long, 291 A.D.2d at 721, 738 N.Y.S.2d 721.

Where a petitioner abandons a claim at the appellate level, federal courts are to view such a claim as procedurally defaulted. Delucia v. West, No. 04 CIV. 3605, 2005 WL 1981708, at \*4 (S.D.N.Y. Aug. 17, 2005)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1977435 (N.D.N.Y.)

(Cite as: 2006 WL 1977435 (N.D.N.Y.))

("claims [that] may be considered abandoned ... result[ ] in a procedural default"); *Stephens v. Lacy,* 914 F.Supp. 44, 45 (E.D.N.Y.1996) (claims abandoned at the appellate level are procedurally defaulted). This Court accordingly finds that Long has procedurally defaulted on her sixth ground seeking federal habeas intervention.

### B. *Consequences of Procedural Default*

A federal district court is precluded from reviewing a habeas claim if the state courts' rejection of that same claim rested on a state procedural bar. *Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Jones v. Stinson,* 229 F.3d 112, 118 (2d Cir.2000); *Marengo v. Conway,* 342 F.Supp.2d 222, 228 (S.D.N.Y.2004) (citations omitted). Thus, where the state court decision clearly and expressly indicates that its determination rests on a state procedural bar, a federal court may not review such claim when it is subsequently asserted in a federal habeas petition unless the petitioner demonstrates both good cause for and actual prejudice resulting from the noncompliance with the state's procedural rule. *Fama v. Commissioner of Correctional Services,* 235 F.3d 804, 809 (2d Cir.2000); *Livingston v. Herbert,* No. 00-CV-1698, 2002 WL 59383, at *2 (N.D.N.Y. Jan. 3, 2002) (Homer, M.J.), *adopted,* No. 00-CV-1698, docket no. 20 (N.D.N.Y. Jan. 24, 2002) (Kahn, J.), *appeal dismissed,* No. 02-2083, slip op. at 1 (2d Cir. Aug. 28, 2002) (unpublished). Additionally, review of procedurally defaulted claims is available where the petitioner demonstrates that a fundamental miscarriage of justice would occur absent federal court review.[FN4] *Dixon,* 293 F.3d at 80; *Morales v. Greiner,* No. CV-98-6284, 2005 WL 1009545, at *8 (E.D.N.Y. May 2, 2005).

> FN4. A fundamental miscarriage of justice exists "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Dixon v. Miller,* 293 F.3d 74, 81 (2d Cir.2002).

*6 For this Court to excuse Long's procedural default under the "cause and prejudice" exception which permits federal review of procedurally barred claims, she must first establish "cause" for her default. *E.g.,* *St. Helen v. Senkowski,* 374 F.3d 181, 184 (2d Cir.2004) (citation

omitted), *cert. denied,* 543 U.S. 1058, 125 S.Ct. 871, 160 L.Ed.2d 785 (2005); *Stepney v. Lopes,* 760 F.2d 40, 45 (2d Cir.1985). To establish such cause, a petitioner must show that "some objective external factor impeded [her] ability to comply with the relevant procedural rule." *Wilson,* 2003 WL 22765351, at *3 (citing *Coleman v. Thompson,* 501 U.S. 722, 753, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)); *Restrepo v. Kelly,* 178 F.3d 634, 638 (2d Cir.1999)). Examples of such "external factors" include "interference by officials," the ineffective assistance of counsel, or proof that "the factual or legal basis for a claim was not reasonably available" at the time of petitioner's trial or on direct appeal. *Wilson,* 2003 WL 22765351, at *3 (citing *Murray v. Carrier,* 477 U.S. 478, 488 (1986)); *see* *Bossett v. Walker,* 41 F.3d 825, 829 (2d Cir.1994) (citing *Murray* ); *United States v. Helmsley,* 985 F.2d 1202, 1206 (2d Cir.1992).

In the present action, Long has not offered any cause for her failure to preserve the above-referenced procedurally defaulted claims-all of which were based upon matters contained in the record-for review in her direct appeal of her conviction. Significantly, Long has never asserted, in the state courts or this action, that her trial counsel rendered ineffective assistance by his failure to object to either Parson's trial testimony or the manner in which the trial court described the allegations contained in the third count in the Indictment to the jury during the county court's instructions.[FN5] Nor has Long ever argued that her appellate counsel rendered ineffective assistance by failing to raise any of the claims Long asserted in her CPL 440.20 Motion on appeal.

> FN5. Long was represented by Eugene Grenz, Eq. at her criminal trial, and by Theresa M. Suozzi, Esq. on appeal.

Since Long has not established cause for her procedural default concerning these claims, this Court need not decide whether she suffered prejudice, because federal habeas relief is unavailable under this limited exception permitting review of procedurally barred claims unless *both* cause and prejudice is demonstrated.[FN6] *See* *Stepney,* 760 F.2d at 45; *D'Alessandro v. Fischer,* No. 01 CIV. 2551, 2005 WL 3159674, at *9 n. 10 (S.D.N.Y. Nov. 28, 2005) ("[a]s Petitioner has not shown cause for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1977435 (N.D.N.Y.)

(Cite as: 2006 WL 1977435 (N.D.N.Y.))

his default, this Court need not even reach the question of whether Petitioner can show prejudice") (citing *Stepney* ); *Moore v. Greiner,* No. 02 CIV.6122, 2005 WL 2665667, at *12 (S.D.N.Y. Oct.19, 2005) (citing *Stepney* ); *Lutes v. Ricks,* No. 02-CV-1043, 2005 WL 2180467, at *9 (N.D.N.Y. Sept. 9, 2005) (McAvoy, S.J.) (citing *Stepney* and *Jones v. Barkley,* No. 9:99-CV-1344, 2004 WL 437468, at *9 (N.D.N.Y. Feb.27, 2004) (Sharpe, J.) (collecting cases)); *Pou v. Keane,* 977 F.Supp. 577, 581 (N.D.N.Y.1997) (Kahn, J.).

> FN6. The petitioner bears the burden of demonstrating cause for her procedural default and resulting prejudice. *See Simpson v. Portuondo,* 01CIV.8744, 2002 WL 31045862, at *5 (S.D.N.Y. June 4, 2002).

**\*7** The finding that Long has failed to establish cause for her procedural default does not necessarily preclude this Court from considering her procedurally forfeited claims, however, because, as noted above, a federal court may nonetheless properly invoke habeas review as to such claims if the court is convinced of the petitioner's actual innocence. On this question, the Second Circuit has observed that:

> The Supreme Court has explained that the fundamental miscarriage of justice exception is "extremely rare" and should be applied only in "the extraordinary cases." *Schlup v. Delo,* 513 U.S. 298, 321-22, 115 S.Ct. 851, 130 L.Ed.2d 808 ... (1995). " "[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 ... (1998). "To establish actual innocence, [a] petitioner must demonstrate that, 'in light of all the evidence,' 'it is more likely than not that no reasonable juror would have convicted him." ' *Id.* (citing *Schlup,* 513 U.S. [at] 327-28 ... (some internal citation marks omitted)).

> *Sweet v. Bennett,* 353 F.3d 135, 142 (2d Cir.2003); *see also D'Alessandro,* 2005 WL 3159674, at *8; *Marengo,* 342 F.Supp.2d at 228. Thus, in considering whether a petitioner's procedural default may be excused under this "actual innocence" exception, federal courts are

to consider the sufficiency of the evidence offered against the petitioner at his or her trial. *Dixon,* 293 F.3d at 81.

Considering first Long's convictions for the crimes of first degree assault, this Court notes that "New York Penal Law § 120.10(1) provides that a person is guilty of first degree assault when, '[w]ith intent to cause serious physical injury to another person, he [or she] causes such injury to such person or to a third person by means of a deadly weapon or dangerous instrument." ' *Jackson v. Lacy,* 74 F.Supp.2d 173, 178 (N.D.N.Y.1999) (McAvoy, C.J.).

With respect to Long's assault conviction relating to Monell, the trial transcript reflects that soon after Monell observed Long firing her weapon at Parson, Monell heard Parson's friend, Charlene Gause, directing Parson to shoot Monell.<sup>FN7</sup> Trial Tr. at 165. Soon thereafter, Monell discovered that she had been shot. Trial Tr. at 165-66. Additionally, a forensic detective with the Albany Police Department testified that the location of seven shell casings found at the crime scene was consistent with having been fired from the area where Long was observed standing by Monell and Parson. Trial Tr. at 270-77. The foregoing evidence amply supported the jury's finding that Long was guilty of the first degree assault of Monell.<sup>FN8</sup>

> FN7. Monell testified that on the date of the shooting, she inquired of Gause why she was asking Long to shoot Monell, however Gause responded by stating: "You better back up, you better back up." Trial Tr. at 165.

> FN8. Long never claimed in the state courts that the evidence at trial was insufficient to establish her guilt of the assault charge relating to Monell. *See* App. Br. In fact, at trial, Long's defense counsel conceded that there was "a factual basis to send that [charge] to the jury." Trial Tr. at 350-51.

As to Long's conviction on the first degree assault relating to Temple, after reviewing the relevant trial testimony relating to this charge, this Court adopts the Appellate Division's determination that the trial testimony "provided a valid line of reasoning and permissible

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1977435 (N.D.N.Y.)

(Cite as: 2006 WL 1977435 (N.D.N.Y.))

inferences from which any rational trier of fact could find [Long] guilty beyond a reasonable doubt of all the essential elements of the crime of assault in the first degree" as to Temple. See *Long,* 291 A.D.2d at 722, 738 N.Y.S.2d 721.[FN9]

> FN9. This Court discusses in more detail the evidence adduced at trial relating to Long's conviction on the assault of Temple *infra* in conjunction with Long's habeas challenge relating to the trial court's failure to grant her motion to dismiss the count in the Indictment accusing petitioner of that crime.

**\*8** Turning to Long's conviction of second degree criminal possession of a weapon in conjunction with her assault on Monell, the Court notes that in New York, a person is guilty of that crime when, with the intent to use a weapon unlawfully against another, a person "possesses a loaded firearm." *See* New York Penal L. § 265.03. The evidence adduced at trial was more than sufficient to establish that on May 1, 1995, Long possessed a loaded firearm which she intended to use unlawfully with respect to Monell. *See, e.g.,* Trial Tr. at 134, 164-66.

In sum, after carefully considering this issue, this Court concludes that petitioner has failed to meet her burden of proving that she is actually innocent of any of the crimes of which she was convicted.[FN10] Therefore, this Court finds no basis to overlook Long's procedural default regarding the above-referenced claims, and accordingly denies her first, fourth and sixth grounds for relief (delineated by petitioner as Grounds "A," "D," and "F," respectively) as procedurally forfeited. *See, e.g., Lutes,* 2005 WL 2180467, at \*9; *Ayuso v. Artuz,* No. 99 CIV 12015, 2001 WL 246437, at \*8-9 (S.D.N.Y. Mar.7, 2001); *DeLeon v. Hanslmaier,* No. CV-94-5512, 1996 WL 31232, at \*3-4 (E.D.N.Y. Jan.19, 1996), *aff'd,* 104 F.3d 355 (2d Cir.1996).

> FN10. The petitioner bears the burden of proving actual innocence where he or she seeks federal review of procedurally defaulted habeas claims. *E.g., Speringo v. McLaughlin,* 202 F.Supp.2d 178, 189 (S.D.N.Y.2002).

C. *Remaining Claims*

1. *Standard of Review*

Enactment of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), brought about significant new limitations upon the power of a federal court to grant habeas relief to a state prisoner under 28 U.S.C. § 2254. Under the AEDPA, a federal court cannot grant habeas relief to a state prisoner on a claim:

> that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

> 1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also DeBerry v. Portuondo,* 403 F.3d 57, 66 (2d Cir.2005); *Miranda v. Bennett,* 322 F.3d 171, 177-78 (2d Cir.2003); *Boyette v. LeFevre,* 246 F.3d 76, 88 (2d Cir.2001). The AEDPA also requires that in any such proceeding "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also DeBerry,* 403 F.3d at 66; *Boyette,* 246 F.3d at 88 (quoting § 2254(e)(1)) (internal quotations omitted).

The Second Circuit has provided additional guidance concerning application of this test, noting that:

> [u]nder AEDPA, we ask three questions to determine whether a federal court can grant habeas relief: 1) Was the principle of Supreme Court case law relied upon in the habeas petition "clearly established" when the state court ruled? 2) If so, was the state court's decision "contrary to" that established Supreme Court precedent? 3) If not, did the state court's decision

Not Reported in F.Supp.2d, 2006 WL 1977435 (N.D.N.Y.)

(Cite as: 2006 WL 1977435 (N.D.N.Y.))

constitute an "unreasonable application" of that principle?

**\*9** *Williams v. Artuz,* 237 F.3d 147, 152 (2d Cir.2001) (citing *Francis S. v. Stone,* 221 F.3d 100, 108-09 (2d Cir.2000)).

In *Sellan v. Kuhlman,* 261 F.3d 303, 309-10 (2d Cir.2001), the Second Circuit answered the question of whether deference under section 2254(d) is mandated if a state court decides a case without citing to federal law or otherwise making reference to a federal constitutional claim. Specifically, that court held that deference is required if the claim was presented to the state court and there was an adjudication on the merits, even though the state court's decision lacks explicit reference to the federal claim or to federal case law. *Sellan,* 261 F.3d at 311-12. As the Second Circuit explained, the plain meaning of § 2254(d)(1) dictates that:

[f]or the purposes of AEDPA deference, a state court "adjudicate[s]" a state prisoner's federal claim on the merits when it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim-*even if the state court does not explicitly refer to either the federal claim or to relevant federal case law."*

*Sellan,* 261 F.3d at 312 (emphasis added), *see also Ryan v. Miller,* 303 F.3d 231, 246 (2d Cir.2002). When a state court's decision is found to be decided "on the merits," that decision is "contrary to" established Supreme Court precedent if it applies a rule that contradicts Supreme Court precedent, or decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor,* 529 U.S. 362, 405-06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A federal court engaged in habeas review is to determine not whether the state court's determination was merely incorrect or erroneous, but instead whether it was "objectively unreasonable." *Williams,* 529 U.S. at 409; *see also Sellan,* 261 F.3d at 315. The Second Circuit has noted that this inquiry admits of "[s]ome increment of

incorrectness beyond error," though "the increment need not be great[.]" *Francis S.,* 221 F.3d at 111.

2. *Substance of Long's Remaining Claims*

A. *Motion to Dismiss Indictment*

In her second ground for relief, Long argues that the trial court wrongfully failed to dismiss the third count in the Indictment despite the fact that insufficient evidence was adduced at trial establishing her guilt of that charge. *See* Petition, Ground B; Supporting Mem. at 7-10; *see also* Indictment, Count Three; App. Br. at 7-10.

At the close of the prosecution's proof, Long's counsel moved pursuant to CPL § 290.10 to dismiss, *inter alia,* Count Three of the Indictment, which accused Long of the first degree assault of Temple.[FN11] *See* Trial Tr. 351. The county court denied that application, concluding that there existed a sufficient factual basis to submit that Count to the jury for its consideration. Trial Tr. at 352.

> FN11. That procedure under the CPL, which is now referred to as a request for a trial order of dismissal, is derived from the prior practice utilized to secure the same result-the directed verdict of acquittal. *Faux v. Jones,* 728 F.Supp. 903, 907 (W.D.N.Y.1990) (citing CPL § 290.10).

**\*10** A motion under CPL § 290.10 must be denied where the trial evidence, when viewed in a light most favorable to the prosecution, is legally sufficient to support a guilty verdict. *People v. Phillips,* 256 A.D.2d 733, 734-35, 682 N.Y.S.2d 685 (3d Dept.1998) (citation omitted). A claim based upon a trial court's failure to dismiss a charge in an indictment is properly considered a challenge to the sufficiency of evidence relating to such charge. *See Gwathney v. Sabourin,* 269 F.Supp.2d 63, 66 (E.D.N.Y.2003); *Phillips,* 256 A.D.2d at 734-35, 682 N.Y.S.2d 685 (citation omitted). Accordingly, federal courts considering habeas claims premised upon a trial court's failure to dismiss one or more counts in an indictment must determine whether the state court's decision denying the motion to dismiss is contrary to, or involved an unreasonable application of, Supreme Court

case law governing evidence sufficiency claims. *E.g., Ubrich v. Murphy,* No. 98-CV-0655, slip op. at 41 (N.D.N.Y. Apr. 4, 2003) (Peebles, M.J.), *adopted,* No. 98-CV-0655, Dkt. No. 28, slip op. at 2 (N.D.N.Y. May 13, 2003) (Scullin, C.J.).

i. *Clearly Established Supreme Court Precedent*

The Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crimes with which he or she is charged. *See Fiore v. White,* 531 U.S. 225, 228-29, 121 S.Ct. 712, 148 L.Ed.2d 629 (2001); *Jackson v. Virginia,* 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). This inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins,* 506 U.S. 390, 402, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). A habeas petitioner claiming that there was insufficient evidence supporting a challenged conviction is entitled to relief under 28 U.S.C. § 2254 only if it is found "that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson,* 443 U.S. at 324; *see also Schlup,* 513 U.S. at 323 n. 38; *United States v. Powell,* 469 U.S. 57, 67, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984) (citations omitted). Moreover, in reviewing the record, the court is required to consider the evidence in the light most favorable to the prosecution, and draw all inferences in its favor. *Jackson,* 443 U.S. at 319.

ii. *Contrary To, or Unreasonable Application Of, Clearly Established Supreme Court Precedent*

The trial evidence established that on May 1, 1995, Traynham and Temple were across the street from the TC Club. Trial Tr. at 293. Soon after Traynham went into a nearby store, he heard gunshots. Trial Tr. at 293-94. Around that same time, both Parson and Monell observed Long near the TC Club brandishing a gun. Trial Tr. at 132, 163-64. Long was observed firing the weapon at Parson, Trial Tr. at 163-64, and around that same time Temple, who was near the TC Club on that date, sustained a life-threatening gunshot wound. Trial Tr. at 188-89, 294.

Additionally, seven 9 mm shell casings were found in the area where Long was observed by Monell and Parson holding a gun, Trial Tr. at 270-77, evidence which strongly suggested that Long fired her weapon multiple times. The foregoing evidence, viewed collectively, is more than sufficient to surpass the relatively modest hurdle imposed by *Jackson* with respect to Long's conviction on the first degree assault charge relating to Temple. Therefore, this Court concludes that Long has not demonstrated that the Appellate Division's decision denying the aspect of her appeal which challenged the denial of her motion to dismiss the third count in the Indictment due to evidence insufficiency, *see Long,* 291 A.D.2d at 721-22, 738 N.Y.S.2d 721, is either contrary to, or involves an unreasonable application of, *Jackson* and its progeny. This Court accordingly denies her second ground for relief.

B. *Repugnant / Inconsistent Verdict*

*11 As noted above, the jury acquitted Long of the attempted murder charge relating to Monell (Count One), as well as the weapons possession charge which accused her of possessing a firearm and intending to use same unlawfully as to Temple (Count Five). *See* Trial Tr. at 652-55.

Long argues in this proceeding, as she did in state court, that the jury's verdict is repugnant because she was acquitted of the charge which accused Long of criminally possessing a weapon but convicted of the assault charge as to Temple, which required, *inter alia,* a finding by the jury that Long used a firearm in conjunction with such assault. *See* Petition, Ground C; Supporting Mem. at 11-15; *see also* App. Br. at 11-15; Indictment, Counts Three, Five.

i. *Clearly Established Supreme Court Precedent*

In *Dunn v. United States,* 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932), the Supreme Court opined that:

The most that can be said in [ ] cases [in which the jury renders an inconsistent verdict] is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1977435 (N.D.N.Y.)

(Cite as: 2006 WL 1977435 (N.D.N.Y.))

through lenity.

*Dunn,* 284 U.S. at 393 (internal quotation and citation omitted); *see also* *Powell,* 469 U.S. at 64-65 (quoting *Dunn* ). Since the Government is unable to seek review of the portion of the verdict that acquits a defendant due to the Double Jeopardy Clause of the United States Constitution, it is "unclear whose ox has been gored" by an inconsistent verdict. *Powell,* 469 U.S. at 65-66 (footnote omitted). Consequently, the Supreme Court has held that inconsistent verdicts are generally enforceable and not subject to judicial review. *See* *Powell,* 469 U.S. at 65-66; *Bradshaw v. Stumpf,* 545 U.S. 175, 125 S.Ct. 2398, 2409, 162 L.Ed.2d 143 (2005) ("inconsistent jury verdicts may be enforced") (citing *Powell, Dunn* ) (Souter and Ginsburg, concurring); *Dowling v. United States,* 493 U.S. 342, 353-54, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) ("inconsistent verdicts are constitutionally tolerable") (citation omitted); *Harris v. Rivera,* 454 U.S. 339, 345, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981) ("[i]nconsistency in a verdict is not a sufficient reason for setting it aside").

### ii. *Contrary To, or Unreasonable Application of, Supreme Court Precedent*

In denying Long's appellate claim relating to the alleged inconsistency of the jury's verdict, the Appellate Division opined:

> Defendant reasons that she cannot be guilty of shooting Temple if the jury also determined that she did not possess a gun. However, it is equally possible that the verdict resulted from the jury's assessment that, although she possessed a loaded handgun, she did not have the intent to use it unlawfully against Temple (*see,* Penal Law § 265.03[2] ). The jury could have determined that she acted recklessly by creating a grave risk of death to Temple causing serious physical injury (*see,* Penal Law § 120.10[3] ). Therefore, "[t]he acquittal of the former ... did not negate [any] elements of the latter [.]" Where, as here, a rational theory exists to support each verdict, the jury's determination will not be disturbed.

**\*12** *Long,* 291 A.D.2d at 722-23, 738 N.Y.S.2d 711 (citation to case law omitted). Thus, the Third Department

found that the jury's verdict was not, in fact, inconsistent.

Since the present habeas claim is rooted in the assumption that the jury's verdict was repugnant, *see* Petition, Ground C, this Court initially considers whether the verdict was, in fact, inconsistent.

In instructing the jury on the first degree assault charge relating to Monell, the trial court charged the jury that the prosecution was required to establish that on or about May 1, 1995, Long, "did, with intent to cause serious physical injury to another person, cause[ ] such injury to such person ... by means of a deadly weapon." Trial Tr. at 613-14. In sharp contrast to that charge, when instructing the jury as to the first degree assault charge relating to Temple, the county court instructed the jury that the prosecution was required to establish that on or about May 1, 1995, "under circumstances evincing a depraved indifference to human life, [Long] recklessly engaged in conduct which created a grave risk of death to another person, and thereby caused serious physical injury to another person." Trial Tr. at 616-17. Thus, unlike the assault charge relating to Monell, the jury was *not* required to find that Long *intended* to cause serious physical injury to Temple in considering whether she was guilty of that assault charge. Both weapons possession charges, however, required the jury to find, *inter alia,* that Long possessed a firearm *with the intent to use that weapon unlawfully. See* Trial Tr. at 622, 624 (weapons possession charge relating to Monell); Trial Tr. at 626-28 (weapons possession charge relating to Temple). Thus, unlike the assault charge relating to Temple, the jury was instructed that it could *only* find Long guilty of the weapons possession charge relating to that victim if it found, *inter alia,* that: "she possessed [a loaded pistol] *with intent to use it unlawfully against ... Robert Temple.*" Trial Tr. at 627.

Under New York law, "[t]wo counts are 'inconsistent' when guilt of the offense charged in one necessarily negates guilt of the offense charged in the other." CPL § 300.30(5). "Whether verdicts are repugnant or inconsistent ... is determined by examining the charge to see the essential elements of each count, as described by the trial court, and determining whether the jury's findings on those elements can be reconciled." *People v. Loughlin,* 76

Not Reported in F.Supp.2d, 2006 WL 1977435 (N.D.N.Y.)

(Cite as: 2006 WL 1977435 (N.D.N.Y.))

N.Y.2d 804, 806, 559 N.Y.S.2d 962, 559 N.E.2d 656 (1990) (citing *People v. Tucker,* 55 N.Y.2d 1, 6-7, 447 N.Y.S.2d 132, 431 N.E.2d 617 (1981)).

In the state court matter below, the Appellate Division determined that the jury could have properly found both: i) that Long acted recklessly when she shot Temple, thereby creating a grave risk of death to him and causing him serious physical injury; and ii) that although Long possessed a loaded handgun on May 1, 1995, she did not *intend* to use it unlawfully against Temple. [FN12] *Long,* 291 A.D.2d at 722-23, 738 N.Y.S.2d 721. This Court agrees with the Third Department's determination that the jury's verdict was in no way inconsistent or repugnant. Thus, Long cannot prevail on her third ground for relief, which is premised upon the assumption that the jury's verdict was inconsistent.

> FN12. Unlike the evidence adduced at trial regarding shooting victim Monell, the testimony adduced at trial established that Temple merely happened to be a bystander near the TC Club at the time Long fired her weapon. Trial Tr. at 293-94.

**\*13** Additionally, as noted above, the Supreme Court has held that inconsistent verdicts are generally enforceable and not subject to judicial review. *See Powell,* 469 U.S. at 65-66. Since an allegedly inconsistent verdict is not a sufficient reason for setting it aside, *Harris,* 454 U.S. at 345, the Appellate Division's decision denying this aspect of Long's appeal is neither contrary to, nor an unreasonable application of, the above-referenced Supreme Court authority. Therefore, for this reason as well, this Court must deny Long's third ground for relief. *E.g.,* *Brunson v. Tracy,* 378 F.Supp.2d 100, 110 (E.D.N.Y.2005) ("[i]t is well-settled that federal habeas relief is unavailable for inconsistent verdicts") (citations omitted); *Vassell v. McGinnis,* No. 04-CV-0856, 2004 WL 3088666, at \*6 (E.D .N.Y. Dec. 22, 2004); *Muldrow v. Herbert,* 299 F.Supp.2d 166, 170 (W.D.N.Y. Feb.3, 2004) ("an allegedly inconsistent verdict does not present a constitutional violation. Therefore, such a claim is not even cognizable on habeas review"), *appeal dismissed,* No. 04-1839pr (2d Cir. Jan. 20, 2005).

C. *Harsh and Excessive Sentence*

In her fifth claim, Long alleges that in light of her age, background, familial obligations and lack of criminal history, the sentence imposed on her was harsh and excessive. [FN13] Petition, Ground E. She further alleges that the sentences "violate[ ] New York State and Federal Sentencing Guidelines." Petition, Ground E.

> FN13. This claim was asserted by Long in her direct appeal. *See* App. Br. at 20-24.

These claims, however, fail to acknowledge the established authority which holds that "[n]o federal constitutional issue is presented where ... the sentence is within the range prescribed by state law." *White v. Keane,* 969 F.2d 1381, 1383 (2d Cir.1992) (citing *Underwood v. Kelly,* 692 F.Supp. 146 (E.D.N.Y.1988), *aff'd mem.,* 875 F.2d 857 (2d Cir.1989)); *see also* *Brown v. Donnelly,* 371 F.Supp.2d 332, 343-44 (W.D.N.Y.2005); *Jackson,* 74 F.Supp.2d at 181 ("[i]t is well-settled ... that a prisoner may not challenge the length of a sentence that does not exceed the maximum set by state law"). Although petitioner now claims that the sentences imposed on her were illegal, *see* Petition, Ground E, the Court notes that in Long's direct appeal, appellate counsel explicitly acknowledged that the sentences imposed on her client were authorized by New York law. *See, e.g.,* App. Br. at 20 (counsel conceding that the imposed sentences were "authorized by law").

Moreover, the Court's review of Long's sentences establishes that the imposed sentences were consistent with New York Penal Law. For example, Long was sentenced to terms of five to fifteen years imprisonment on each of her first degree assault convictions. *See* Record at 130-31. The Appellate Division has specifically noted that such a sentence for a conviction of that crime is "within permissible statutory ranges" in New York. *See* *People v. Duncan,* 279 A.D.2d 887, 889, 720 N.Y.S.2d 578 (3d Dep't), *leave denied,* 96 N.Y.2d 828, 729 N.Y.S.2d 448, 754 N.E.2d 208 (2001). Similarly, Long's sentence of five to fifteen years imprisonment on her weapons possession conviction, Record at 131, has been explicitly acknowledged as authorized under New York law. *See* *People v. Rodriguez,* 276 A.D.2d 326, 326-27, 714 N.Y.S.2d 267 (1st Dep't 2000), *leave denied, People v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1977435 (N.D.N.Y.)

(Cite as: 2006 WL 1977435 (N.D.N.Y.))

*Rodriguez,* 96 N.Y.2d 738, 722 N.Y.S.2d 805, 745 N.E.2d 1028 (2001).[FN14]

> FN14. As to Long's claim relating to the United States Sentencing Guidelines, *see* Petition, Ground E, the Court finds that Long has not articulated how the United States Sentencing Guidelines are germane, in any way, to her convictions, which arose out of state court prosecutions based upon Long's violation of New York's penal laws.

**\*14** With respect to the consecutive nature of the sentences imposed on Long regarding the first degree assault convictions,[FN15] this Court notes that the discretionary power of trial courts in New York "includes the ability to impose consecutive penalties for multiple crimes." *People v. Ramirez,* 89 N.Y.2d 444, 450, 654 N.Y.S.2d 998, 677 N.E.2d 722 (1996) (citing *Matter of Walker v. Walker,* 86 N.Y.2d 624, 629, 635 N.Y.S.2d 152, 658 N.E.2d 1025 (1995)) (other citation omitted). "[E]ven if the statutory elements of multiple offenses overlap, sentences may be imposed to run consecutively when multiple offenses are committed through separate and distinct acts, though they are part of a single transaction." *Ramirez,* 89 N.Y.2d at 451, 654 N.Y.S.2d 998, 677 N.E.2d 722 (citing *People v. Laureano,* 87 N.Y.2d 640, 643, 642 N.Y.S.2d 150, 664 N.E.2d 1212 (1996)) (other citation omitted).

> FN15. The trial court imposed consecutive sentences with respect to the assault convictions; the sentence on the weapons possession conviction was ordered to run concurrent with the other sentences imposed by the county court. Record at 130-31.

Long's assault on two different victims-Monell and Temple-clearly constitutes separate acts which permitted the county court to impose consecutive sentences. *See DeSordi v. Walker,* No. 98-CV-1351, slip op at 31-32 (N.D.N.Y. Mar. 7, 2002) (Sharpe, M.J.) ("the stabbing of separate victims clearly constituted separate acts, [rendering permissible] the imposition of consecutive sentences") (citations omitted), *adopted DeSordi v. Walker,* No. 98-CV-1351 (N.D.N.Y. July 30, 2002)

(Kahn, J.), *aff'd,* 84 Fed.Appx. 160 (2d Cir. Jan.12, 2004), *cert. denied sub nom. DeSordi v. Burge,* 543 U.S. 811, 125 S.Ct. 44, 160 L.Ed.2d 15 (2004). Thus, the sentences imposed on Long, including the consecutive nature of some of those sentences, are clearly permitted by state law.

Arguably, this ground could be construed as a claim that the imposed sentences constitute a violation of the Eighth Amendment to the United States Constitution, which prohibits the imposition of a sentence that is "grossly disproportionate to the severity of the crime." *Rummel v. Estelle,* 445 U.S. 263, 271, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980). However, "[o]utside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare." *Rummel,* 445 U.S. at 272; *see Harmelin v. Michigan,* 501 U.S. 957, 995, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (Eighth Amendment only forbids sentences which are "grossly disproportionate" to the crime). Sentences of imprisonment that are within the limits of valid state statutes are simply not cruel and unusual punishment in the constitutional sense. *Brumfield v. Stinson,* 297 F.Supp.2d 607, 622 (W.D.N.Y.2003) (citing *Thompson v. Lord,* No. 97-CV-0792, 2002 WL 31678312, at *8 (N.D.N.Y. Nov. 8, 2002) (Peebles, M.J.)) (other citations omitted) [, *adopted, Thompson v. Lord,* No. 97-CV-0792 (Dkt. No. 19) (N.D.N.Y. Sept. 25, 2003) (Scullin, C.J.) ].

Long has not provided anything in support of her petition which suggests that either the terms of imprisonment or consecutive nature of the sentences imposed on her is "grossly disproportionate" to her crimes. *E.g., Harmelin,* 501 U.S. at 995. This Court therefore finds no basis upon which it may properly find that Long is entitled to habeas relief due to the sentences she received as a consequence of her convictions and accordingly denies ground E in her petition.

D. *Failure to Consider Appeal of Denial of* CPL 440.20 *Motion*

**\*15** In her seventh and final ground, petitioner argues that although the Third Department granted her leave to appeal the denial of her CPL 440.20 Motion, that court

Not Reported in F.Supp.2d, 2006 WL 1977435 (N.D.N.Y.)

(Cite as: 2006 WL 1977435 (N.D.N.Y.))

nevertheless "refused to hear [s]aid motion" in violation of her constitutional rights. *See* Petition, Ground "G." [FN16]

FN16. In her seventh ground for relief, Long also refers to a "reconsideration motion." *See* Petition, Ground G. None of the state court records provided to this Court reflect any motion for reconsideration. Thus, it appears as though Long's reference to a "reconsideration motion" merely constitutes a typographical error on the part of petitioner.

This claim appears to allege that the Third Department wrongfully determined that Long failed to assert any appellate claim relating to her CPL 440.20 Motion and had therefore abandoned those claims. *See Long,* 291 A.D.2d at 721, 738 N.Y.S.2d 721. Therefore, this Court briefly reviews Long's CPL 440.20 Motion, together with the claims raised in her appellate brief, in order to ascertain whether the Third Department's determination that Long abandoned any appellate claim relating to the denial of her CPL 440.20 Motion is supported by the record.

Long's CPL 440.20 Motion alleged that the county court's imposition of consecutive sentences violated: i) the provisions of both the federal and New York State constitutions which prohibit individuals from being placed in Double Jeopardy; and ii) New York's Penal Law which addresses the issue of when a trial court may properly impose consecutive sentences. *See* CPL 440.20 Motion. Although Long's appellate brief made one brief reference to the CPL 440.20 Motion filed by Long, *see* App. Br. at 21, that brief never referred to any of the arguments asserted in the CPL 440.20 Motion. Nor did that brief incorporate by reference any of the claims asserted in that motion. *See* App. Br. Thus, the appellate brief never asserted as a basis for relief any claim that the sentences imposed on Long violated the Double Jeopardy clauses of either the state or federal constitutions, or which argued that the consecutive nature of the sentences rendered them illegal under New York law. [FN17] *See* App. Br. Rather, the portion of the appellate brief which challenged the sentences imposed on Long was limited to an argument that the sentences were harsh and excessive. *See* App. Br. at 20-24.

FN17. As noted *ante* by this Court in addressing Long's claim that the imposed sentences were harsh and excessive, appellate counsel *conceded* in her brief that the sentences imposed by the trial court were "authorized by law." *See* App. Br. at 20.

The foregoing conclusively establishes that although Long was afforded the opportunity to challenge the denial of her CPL 440.20 Motion on appeal, appellate counsel chose, apparently for strategic reasons, to refrain from asserting any claims relating to the denial of that motion in counsel's direct appeal of Long's conviction. Thus, to the extent Long now seeks federal habeas relief based upon a claim that the Appellate Division erred in either: i) concluding that Long failed to assert any of the claims raised by her in her CPL 440.20 Motion on appeal; or ii) deeming Long to have abandoned those claims, this Court finds such claims to be contradicted by the record and entirely without merit.

### III. *CONCLUSION*

After carefully considering all of the submissions before the Court, the undersigned concludes that Long has procedurally defaulted on her claims which allege that: i) she was denied her right to a fair because testimony relating to an uncharged crime was admitted into evidence against her at trial; ii) the trial court mischaracterized the allegations asserted against her in Count Three of the Indictment; and iii) her sentences are illegal and violative of both the federal and New York state constitutions. Since petitioner has not established cause for her procedural default concerning such claims or that she is actually innocent of any of the crimes of which she stands convicted, this Court denies those claims as procedurally barred. Furthermore, after considering the remaining grounds raised by Long in her petition, this Court finds that such claims lack merit and do not afford Long a basis for federal habeas relief. Thus, those claims are denied on the merits.

**\*16** IT IS THEREFORE HEREBY

ORDERED, that Long's habeas petition (Dkt. No. 1) is DENIED and DISMISSED, and it is further

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1977435 (N.D.N.Y.)

(Cite as: 2006 WL 1977435 (N.D.N.Y.))

ORDERED, that the Clerk of Court serve a copy of this Memorandum-Decision and Order upon the parties to this action by regular or electronic mail, and it is further

ORDERED, that the state court records be returned directly to the Attorney General at the conclusion of these proceedings (including any appeal of this Memorandum-Decision and Order filed by any party).

IT IS SO ORDERED.

N.D.N.Y.,2006.

Long v. Lord
Not Reported in F.Supp.2d, 2006 WL 1977435 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

2015 WL 1036047
Only the Westlaw citation is currently available.
United States Court of Appeals,
Second Circuit.

Hector RIVAS, Petitioner–Appellant,

v.

Brian FISCHER, Superintendent, Sing Sing
Correctional Facility, Respondent–Appellee.

No. 13–2974–pr.  |  Argued: Dec.
9, 2014.  |  Decided: March 11, 2015.

**Synopsis**
**Background:** Following affirmance of a petitioner's state-court conviction for second-degree murder, 214 A.D.2d 996, and denial of state post-conviction relief, the petitioner sought federal habeas relief. The United States District Court for the Northern District of New York, Gary L. Sharpe, Chief Judge, denied relief. The petitioner appealed. The Court of Appeals, JosÉ A. Cabranes, Circuit Judge, 294 F.App'x 677, vacated and remanded. On remand, the District Court, 2010 WL 1257935, denied relief. The petitioner appealed. The Court of Appeals, 687 F.3d 514, reverse and remanded. On remand, the District Court, 2013 WL 4026844, denied relief. The petitioner appealed.

**Holdings:** The Court of Appeals, JosÉ A. Cabranes, Circuit Judge, held that:

[1] the state postconviction court's determination that trial counsel provided effective assistance was an unreasonable application of *Strickland*, and

[2] the petitioner's demonstration of a compelling and credible claim of actual innocence for purposes of an equitable exception to the Antiterrorism and Effective Death Penalty Act (AEDPA) satisfied *Strickland's* prejudice requirement.

Reversed and remanded.

West Headnotes (9)

**[1]    Habeas Corpus**
        Federal Review of State or Territorial Cases

**Habeas Corpus**
        Review De Novo

The Court of Appeals reviews a district court's denial of a petition for a writ of habeas corpus de novo, and the underlying state court's denial for an objectively unreasonable application of clearly established federal law. 28 U.S.C.A. § 2254(d).

Cases that cite this headnote

**[2]    Habeas Corpus**
        Federal Review of State or Territorial Cases

For a state court's decision to be "objectively unreasonable," for purposes of federal habeas relief under the Antiterrorism and Effective Death Penalty Act (AEDPA), the decision must be so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement. 28 U.S.C.A. § 2254(d)(1).

Cases that cite this headnote

**[3]    Criminal Law**
        Preparation for Trial

Where a petitioner's claim stems from trial counsel's strategic choice made after less than complete investigation, such a choice is reasonable, for purposes of an ineffective assistance of counsel claim, precisely to the extent that reasonable professional judgments support the limitations on investigation. U.S.C.A. Const.Amend. 6.

Cases that cite this headnote

**[4]    Criminal Law**
        Preparation for Trial

In assessing whether counsel exercised reasonable professional judgment, for purposes of an ineffective assistance of counsel claim, a court's principal concern is not whether counsel should have presented the additional evidence that further investigation would have revealed, but rather, whether the investigation

supporting counsel's decision not to introduce the additional evidence was itself reasonable; in doing so, the court look to not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. U.S.C.A. Const.Amend. 6.

Cases that cite this headnote

**[5]** **Criminal Law**
🔑 Presumptions and Burden of Proof in General

A court's scrutiny of trial counsel's performance must be highly deferential because the court must apply a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. U.S.C.A. Const.Amend. 6.

Cases that cite this headnote

**[6]** **Habeas Corpus**
🔑 Adequacy and Effectiveness of Counsel

On federal habeas review of a state conviction, the relevant question on an ineffective assistance of counsel claim is not whether counsel's actions were reasonable, but whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard. U.S.C.A. Const.Amend. 6.

Cases that cite this headnote

**[7]** **Habeas Corpus**
🔑 Evidence; Procurement, Presentation, and Objection

A state court's determination that trial counsel's failure to investigate further into the basis of a medical examiner's revised findings as to the time of the victim's death was a matter of reasonable trial strategy was an objectively unreasonable application of *Strickland*, as would support grant of federal habeas relief, where the medical examiner revised his time-of-death finding six years after his initial determination on the basis of no new evidence, the revision shifted the time of death from when the defendant had

a complete alibi to a time period in which the defendant had no alibi, and the trial counsel justified his decision not to pursue further investigation based on the defendant's alibi defense. U.S.C.A. Const.Amend. 6; 28 U.S.C.A. § 2254(d).

Cases that cite this headnote

**[8]** **Habeas Corpus**
🔑 Evidence; Procurement, Presentation, and Objection

**Habeas Corpus**
🔑 Miscarriage of Justice; Actual Innocence

Habeas petitioner's demonstration of a credible and compelling claim of actual innocence, for purposes of establishing an equitable exception to the Antiterrorism and Effective Death Penalty Act's (AEDPA) limitations period, satisfied the prejudice requirement of the petitioner's ineffective assistance of counsel claim under *Strickland* that, absent the failure of trial counsel to investigate further into the basis of a medical examiner's revised findings as to the time of the victim's death, a factfinder would have had a reasonable doubt as to the petitioner's guilt. U.S.C.A. Const.Amend. 6; 28 U.S.C.A. § 2254(d).

Cases that cite this headnote

**[9]** **Criminal Law**
🔑 Prejudice in General

When a defendant challenges a conviction based on ineffective assistance of counsel, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. U.S.C.A. Const.Amend. 6.

Cases that cite this headnote

On Appeal from the United States District Court for the Northern District of New York.

Petitioner Hector Rivas appeals from the judgment of the United States District Court for the Northern District of New

York (Gary L. Sharpe, Chief Judge) denying his amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d). On March 25, 1993, a jury in Onondaga County Court in Syracuse, New York, found Rivas guilty of second-degree murder for killing his former girlfriend, Valerie Hill. At trial, the prosecution argued that Rivas killed Hill on the night of Friday, March 27, 1987. Rivas was sentenced to an indeterminate term of imprisonment of 25 years to life, which he has been serving for the last 22 years. In 1999, Rivas filed a motion for post-conviction relief pursuant to New York Criminal Procedure Law § 440.10, raising, *inter alia,* a claim of ineffective assistance of counsel and presenting essentially unchallenged expert testimony persuasively demonstrating that Hill could not have died on Friday, March 27, 1987. The Supreme Court of the State of New York, Onondaga County, denied Rivas's § 440.10 motion in its entirety.

In 2002, Rivas filed an amended petition for a writ of habeas corpus in the District Court. The District Court dismissed the petition as time-barred, and we vacated and remanded, holding that additional fact-finding on the issue of timeliness was required. After an evidentiary hearing, the District Court again dismissed the petition as time-barred. We reversed, holding that a "credible" and "compelling" showing of actual innocence warrants an equitable exception to the limitation period set forth by the Antiterrorism and Effective Death Penalty Act of 1996, allowing a petitioner to have his otherwise time-barred claims heard by a federal court. We concluded that Rivas had made such a showing, having produced essentially unchallenged expert testimony "which call [ed] into serious doubt the central forensic evidence linking him to the crime," and, as a result, "a reasonable juror, apprised of all the evidence in the record, would more likely than not vote to acquit." We remanded the cause for Rivas's petition to be heard on the merits. On remand, the District Court nonetheless denied Rivas's petition in its entirety.

Because we conclude that the state court's denial of Rivas's ineffective-assistance claim involved an "unreasonable application" of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), we **REVERSE** the judgment of the District Court denying habeas relief and **REMAND** the cause. On remand, the District Court shall issue a writ of habeas corpus to Rivas by the sixtieth calendar day after the issuance of our mandate unless the state has, by that time, taken concrete and substantial steps expeditiously to retry Rivas.

**Attorneys and Law Firms**

Richard M. Langone, Langone & Associates, PLLC, Levittown, NY, for Petitioner–Appellant.

Priscilla Steward, Assistant Attorney General (Barbara D. Underwood, Solicitor General, Nikki Kowalski, Deputy Solicitor General, on the brief), for Eric T. Schneiderman, Attorney General for the State of New York, New York, NY, for Respondent–Appellee.

Before CABRANES, POOLER, and SACK, Circuit Judges.

**Opinion**

JOSÉ A. CABRANES, Circuit Judge:

 **\*1** The question presented is whether we are required to grant a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d) because the state court in this case unreasonably applied *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in rejecting petitioner Hector Rivas's claim of ineffective assistance of counsel.

Rivas was convicted in Onondaga County Court of second-degree murder for the death of his former girlfriend, Valerie Hill. At trial, the prosecution argued that Rivas killed Hill on the night of Friday, March 27, 1987, at her apartment in Syracuse, New York. In formulating a defense strategy, Rivas's defense counsel relied principally on Rivas's professed alibi, which placed him elsewhere for most of that weekend. Crucially, however, Rivas did not have an alibi during a key three-and-a-half hour window—between approximately 9:00 p.m. on Friday, March 27, 1987, and 12:30 a.m. on Saturday, March 28, 1987. The prosecution argued that Rivas killed Hill during this exact time frame. The prosecution's case was almost entirely circumstantial and turned on the testimony of the Chief Medical Examiner, Dr. Erik K. Mitchell.

At the time of Hill's murder, Dr. Mitchell had estimated the time of Hill's death as sometime after the close of that window—between Saturday, March 28 and Sunday, March 29, 1987. At trial nearly six years later, however, Dr. Mitchell expressed a very different opinion, testifying instead that Hill died *one night earlier*—on the evening of Friday, March 27, 1987—during which time Rivas had no alibi. Despite its critical importance to his client's case, defense counsel failed to investigate the basis for Dr. Mitchell's apparently revised findings regarding the time of death and instead relied principally on Rivas's effectively irrelevant alibi for the remainder of the weekend. After deliberating for approximately eight hours, the jury in Onondaga County Court found Rivas guilty of second-degree murder. He

was subsequently sentenced to an indeterminate term of imprisonment of 25 years to life.

On July 12, 1999, Rivas, with new counsel, filed a motion for post-conviction relief pursuant to New York Criminal Procedure Law § 440.10, raising, *inter alia,* a claim of ineffective assistance of counsel. In his motion, Rivas presented essentially unchallenged expert testimony persuasively showing that Hill in fact died sometime after 3:30 p.m. on Saturday, March 28, 1987, casting grave doubt on the prosecution's theory that Hill was murdered on Friday night. In his § 440.10 filing, Rivas also presented compelling evidence further discrediting Dr. Mitchell. Rivas's filing alleged that Dr. Mitchell had perjuriously purported to base his time-of-death opinion in part on "brain slides" that, Rivas later learned, were nonexistent. Rivas also introduced evidence that, at the time of Rivas's trial, Dr. Mitchell was under investigation by state and local agencies (including possibly the office of the prosecutor who charged Rivas) for various forms of misconduct. At trial, Rivas's counsel failed to challenge Dr. Mitchell's reliance on the non-existent "brain slides," or to cross-examine him regarding the investigations into his alleged misconduct that were pending at the very time of the prosecution of Rivas.

**\*2** On September 8, 2000, the Supreme Court of the State of New York, Onondaga County, denied Rivas's § 440.10 motion, holding, *inter alia,* that "[d]efense counsel employed a trial strategy based upon a defense that defendant was sufficiently alibied for the entire weekend, ... and that the People would not be able to prove defendant's guilt beyond a reasonable doubt [as to] whether the jury found that the crime occurred on Friday night or on Saturday night." *People v. Rivas,* No. 92–2794, slip. op. at 34–35 (N.Y.Sup.Ct. Sept. 8, 2000). On June 19, 2002, Rivas filed an amended petition for a writ of habeas corpus in the United States District Court for the Northern District of New York, raising substantially the same claims that he advanced in his § 440.10 motion. The District Court (Gary L. Sharpe, *Judge*) dismissed Rivas's petition as time-barred under 28 U.S.C. § 2254(d). *See Rivas v. Fischer,* No. 01–cv–1891, ECF No. 21 (N.D.N.Y. Jan. 28, 2005). We vacated and remanded, holding that additional fact-finding on the issue of timeliness and actual innocence was required. *See Rivas v. Fischer,* 294 F. App'x 677, 678–79 (2d Cir.2008).

After a hearing, the District Court again dismissed the petition as untimely. *See Rivas v. Fischer,* No. 01–cv–1891 (GLS/DEP), 2010 WL 1257935 (N.D.N.Y. Mar. 26, 2010).

We reversed, holding as a matter of first impression in this Circuit that a "credible" and "compelling" showing of actual innocence warrants an equitable exception to AEDPA's limitation period, allowing a petitioner to have his otherwise time-barred claims heard by a federal court. *Rivas v. Fischer,* 687 F.3d 514, 517–18 (2d Cir.2012). We concluded that Rivas had made such a showing, having produced essentially unchallenged expert testimony "which call[ed] into serious doubt the central forensic evidence linking him to the crime," and, as a result, "a reasonable juror, apprised of all the evidence in the record, would more likely than not vote to acquit." *Id.* at 552. We remanded the cause for Rivas's petition to be heard on the merits. After hearing oral argument, the District Court nonetheless denied Rivas's petition in its entirety. *See Rivas v. Fischer,* No. 01–cv–1891 (GLS), 2013 WL 4026844 (N.D.N.Y. Aug. 6, 2013).

We now reverse. We hold that, in viewing all the circumstances at the time, no reasonable argument can be made that Rivas's defense counsel satisfied his "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691. We further hold that no reasonable argument can be made that defense counsel's deficient performance did not prejudice the defense. *See Strickland,* 466 U.S. at 687. As a result, the state court's conclusion to the contrary involved an "unreasonable application" of *Strickland.* 28 U.S.C. § 2254(d)(1).

Accordingly, we **REVERSE** the judgment of the District Court denying habeas relief and **REMAND** the cause. On remand, the District Court shall issue a writ of habeas corpus to Rivas by the sixtieth calendar day after the issuance of our mandate unless the state has, by that time, taken concrete and substantial steps expeditiously to retry Rivas.

## BACKGROUND

**\*3** We previously set forth the relevant facts in our prior opinion, *Rivas v. Fischer,* 687 F.3d 514 (2d Cir.2012). We incorporate those facts herein by reference and reproduce the relevant portions here:

### [BEGINNING OF QUOTED PASSAGES FROM OUR PRIOR 2012 OPINION] [1]

### A. The Murder of Valerie Hill

At approximately 11:45 a.m. on Monday, March 30, 1987, Randall Hill ("Randall") discovered the lifeless body of his twenty-eight-year-old daughter, Valerie Hill ("Hill"), on the living-room floor of her apartment on Hickok Avenue in Syracuse, New York. Transcript of the Trial of Hector Rivas (March 17, 1993) ("Trial Tr.") at 103.

Randall had last seen his daughter on Friday night, March 27, when the two met for dinner at a nearby restaurant. He later recalled that Hill seemed upset during their meeting and did not eat anything. *Id.* at 96–98. During their conversation, Hill informed her father that she was planning to spend the weekend visiting a friend in the Albany area and would not return until Sunday evening. *Id.* at 99. Hill left the restaurant at approximately 8:15 p.m. on Friday. *Id.* at 97–98. The friend Hill planned to visit, Laura Adams, later testified that she called Hill "dozens of times" on Friday night and throughout the weekend, but never reached her, although she encountered at least one "busy" signal. *Id.* at 217–19, 221. Randall also had no success when he attempted to call Hill on Sunday night and again Monday morning. *Id.* at 99–100.

On Monday morning, Randall went to the hospital where Hill was employed as a pediatric nurse (and where Randall's wife was then admitted as a patient) and discovered that Hill had not reported to work. *Id.* at 101, 103. Concerned, he drove to Hill's apartment, where he found her car parked in the driveway. Randall let himself in through the unlocked side door and discovered Hill lying "face down on the carpet" in her living room. She was wearing a bathrobe, which was pulled "up around her shoulders," and was otherwise naked. *Id.* at 100–03. The belt of the bathrobe was wrapped around her neck. *Id.* at 157.

Randall immediately called the police, as well as his son, David. *Id.* at 104. Arriving at the scene, police investigators found no signs of forced entry into Hill's apartment, which was on the bottom floor of a two-family house. *Id.* at 107, 228–29. The apartment was "very neat," and nothing appeared to be out of order. *Id.* at 228. A number of cigarettes of the brand Rivas smoked were found in an ashtray in Hill's kitchen. *Id.* at 150–51, 638. Later testing revealed that fingerprints on the ashtray, as well as on a bottle of wine, belonged to Rivas. *Id.* at 591–93. [2] In addition to Rivas's and Hill's fingerprints, an unidentified set of prints was taken from

the telephone. *Id.* at 588. Missing from the apartment was an airline ticket that Hill had collected from her travel agent on the afternoon of Friday, March 27.

**\*4** After learning from Randall and David that Hill had recently broken up with Rivas, police officers went to Rivas's house in Cazenovia, a town about twenty miles southeast of Syracuse. *Id.* at 235. Rivas agreed to accompany the officers to the Syracuse police station. Sergeant John D. Brennan later testified that Rivas appeared nervous, [3] but was cooperative and did not inquire as to why he was being questioned. *Id.* at 237–28. At the police station, Rivas was taken to an interrogation room where police proceeded to question him for approximately twelve hours. Despite the fact that he was interrogated at length regarding his activities the weekend of Hill's death, Rivas was never informed of his *Miranda* rights because, the police officers later insisted, he was not regarded as a suspect at that time. Trial Tr. at 239. At approximately 5:30 p.m., after over two hours of questioning, police informed Rivas that Hill had been killed. According to Brennan, Rivas exhibited no discernible reaction upon hearing this news. *Id* . at 247.

During the interview, Rivas told the police that he had last seen Hill four days earlier, on the evening of Thursday, March 26, 1987, when he had gone to her house and talked to her for half an hour. *Id.* at 240. He had also driven by Hill's apartment at 2:00 p.m. the following day, Friday, March 27, and again approximately four hours later, at 6:00 p.m. He claimed he did not linger on either occasion after discovering that Hill was not home. *Id.* at 240–41. Rivas said that he had spent most of Friday evening with friends at various bars in Syracuse and Cazenovia. *See* Trial Exh. 1. He stated that he was at Coleman's Bar ("Coleman's") in Syracuse from about 6:00 to 11:00 p.m. He then went to Albert's Bar ("Albert's") in Cazenovia and stayed there until 2:00 a.m., before returning to Syracuse to get breakfast at an all-night diner. He finally went home and fell asleep at 4:00 a.m. Rivas claimed that he awoke at 11:30 a.m. on Saturday and returned to Albert's to do some plumbing work. He remained for lunch and then went home to take care of some yard work. He then returned to Albert's to watch Syracuse compete in the "Final Four" of the NCAA Men's Basketball Tournament. He remained at Albert's until approximately 8:00 p.m., whereupon he went to a party at a friend's house until 4 a.m. on Sunday, March 29, before returning home to bed. As Rivas stated

in the interview, many people saw him and spoke with him on Saturday night. *Id.*

While Rivas was being questioned at the station, other police officers put together an application for a warrant to search his residence. Attached to the application was an affidavit signed by Officer Timothy Phinney, attesting that there was probable cause to believe that several items would be found in Rivas's home, including a key to Hill's apartment and clothing soiled with blood, fecal matter, or other contaminants. *See* Motion to Vacate Sentence Pursuant to Criminal Procedure Law 440.10 ("Section 440.10 Mot.") Exhs. 1 & 2. The affidavit also stated that the Onondaga County Medical Examiner, Dr. Erik Mitchell, had preliminarily estimated the time of Hill's death to be "sometime [between] [S]aturday the 28th of March afternoon and [S]unday morning [the] 29th of March 1987." *Id.* Exh. 2.[4]

 **\*5** In the basement of Rivas's house, investigators discovered a damp jacket draped over a clothesline. Trial Tr. [at] 274–75. Although a search of household trash was not expressly contemplated by the warrant, investigators also seized and reconstructed a torn-up note, which they found in a trash bag in Rivas's kitchen.[5] The note was from Hill to another former boyfriend, Bob Lucas, expressing her thanks for their time together. *See* Trial Exh. 5.[6] Finally, inside a bedroom closet, investigators observed what they described as a "shrine," consisting of a large statue of the Virgin Mary surrounded by two small candles and a photograph of Hill. Trial Tr. at 270–74, 316. Although photographs were taken of the trash bag that contained the note, as well as other items in Rivas's house, no photograph was taken of the "shrine." *See id.*

Despite a thorough investigation, neither Rivas nor anyone else was charged with, or even publicly identified as a suspect in, Hill's murder, which remained a "cold case" for five years.

## B. The Indictment of Hector Rivas

In January 1992, William J. Fitzpatrick was sworn in as District Attorney of Onondaga County, having previously served in that office as an Assistant District Attorney. According to his biography on the Onondaga County District Attorney's website, when he was Chief Assistant District Attorney, "Fitzpatrick specialized in re-

opening cases that had previously been considered inactive and, with the cooperation of various police agencies in Onondaga County and the state of New York, he brought numerous killers to justice in cases that were thought to be un-winnable." *See* "Meet the DA," Office of the Onondaga District Attorney, www.ongovda.net/section/meet—the—da/ (last visited May 30, 2012).

On November 22, 1992, nearly six years after the murder of Valerie Hill, a grand jury indicted Rivas on charges of murder in the second degree and aggravated sexual abuse. It is not clear what, if any, new evidence might have come to light that would lead authorities to pursue, and the grand jury to indict, Rivas nearly six years after the murder. In its Bill of Particulars, responding to a defense request for the date when Rivas was first identified as a possible perpetrator of the crime, the prosecution stated, simply: "It is very difficult to respond to this request. Defendant was indicted in November 1992." *See Rivas v. Fischer,* No. 01–cv–1891, (N.D.N.Y. Sept. 18, 2009), ECF No. 55–2 at 56 (Answering Affidavit).

Rivas contends that, sometime after becoming District Attorney, Fitzpatrick approached Mitchell, the medical examiner, and requested that he review Hill's autopsy report with an eye toward expanding the time of death to include Friday, March 27, 1987, when Rivas's alibi was not as strong. According to Rivas, at the time this alleged request was made, Mitchell "was under criminal investigation by DA Fitzpatrick's office, as well as by the Department of Health and the Department of Environmental Conservation" for varieties of misconduct, including improper disposal of waste and stealing and mishandling of body parts. Appellant's Br. at 8.

 **\*6** The State concedes that Mitchell was accused of various forms of misconduct as early as 1989, *see* Appellee's Br. at 24, and does not dispute that he was under investigation by the State Department of Health at the time he testified against Rivas. It is also undisputed that Mitchell resigned in November 1993, in part to avoid prosecution by the District Attorney's Office. *See* Remand Hearing Tr.[, dated Sept. 21 & 22, 2009,] at 205.[7] It is not clear from the record, however, at what point the District Attorney's Office opened its criminal investigation into Mitchell's conduct.[8] Though Rivas's state post-conviction attorneys submitted requests under New York's Freedom of Information Law requesting

information regarding the investigation, the County provided only one page (a press release) in response, maintaining that other materials were non-final agency records and attorney work product. *See* Remand Hearing Tr.[, dated Sept. 21 & 22, 2009,] at 208. Rivas's attorneys also persuaded a state Supreme Court justice to conduct an *in camera* review of the County's investigation of Mitchell in 1998, but the judge determined that the documents would not be provided to Rivas. [9]

In any case, whether it was out of an "eager[ness] to please the prosecutor," Appellant's Br. at 5, as Rivas suggests, or based upon an independent reevaluation of the medical record, it does appear that sometime in 1992, Mitchell reconsidered his estimate of the time of death. The grand jury's indictment alleges that Rivas killed Hill "on or about" Friday, March 27, 1987. The State has identified no new evidence that came to light between March 1987 and November 1992 that led to the indictment. [10] As far as the record reflects, therefore, the only thing that changed during that span of time was the medical examiner's estimation of the time of death.

## C. The Trial of Hector Rivas

Rivas was tried before a jury in March 1993, with now-deceased Onondaga County Court Judge J. Kevin Mulroy presiding. He was represented by Richard J. Calle, an attorney then practicing in Queens, New York. Rivas, who had moved downstate, hired Calle because Calle happened to be representing him in a civil arbitration matter in the fall of 1992, around the time the District Attorney's Office renewed its investigation of him in connection with Hill's murder. *See* Section 440.10 Hearing Tr. at 11. Calle did not work out of a formal business office and, on the occasions that he met with Rivas prior to Rivas's incarceration, those meetings were typically held in Rivas's sister's apartment or at a local diner. [11]

### 1. *The People's Direct Case*

The People's case was almost entirely circumstantial. [12] District Attorney Fitzpatrick, who tried the case himself, presented Rivas as an obsessive, jilted lover who harassed Hill following their breakup and was pushed over the edge when he learned that Hill was planning to take a trip to the Bahamas alone. Trial Tr. at 1127–28. As Fitzpatrick summarized: "Hector Rivas stalked this woman [for] two and a half months, and finally strangled her and killed her in a jealous rage on March the 27th of 1987." *Id.* at 1069.

**\*7** Trial testimony and exhibits supported at least part of this theory. Friends of Hill testified that Rivas persisted in contacting Hill on a regular basis, even after she had made clear that she did not want to continue or revive their relationship. In addition, the prosecution introduced dozens of notes, cards, and letters that Rivas had written to Hill in the months between their breakup and her death. *See id.* at 1092–97. Police investigators also testified regarding Rivas's strange behavior when he was first questioned, including his lack of reaction when he was told that Hill had died. *Id.* at 247.

Several witnesses testified regarding Rivas's whereabouts on Friday, March 27, 1987, the alleged date of the murder. Taken together, the testimony of these witnesses suggested that there may have been a window of time during which Rivas could have gone to Hill's house and strangled her while en route from Coleman's in Syracuse to Albert's in Cazenovia, about thirty minutes away. Prosecution witnesses testified that Rivas left Coleman's at around 9:00 or 9:30 p.m. and did not arrive at Albert's until sometime between 11:00 p.m. and 12:30 a.m. *Id.* at 461–63, 439–40, 849. One witness, a clerk at a liquor store near Hill's apartment, testified that he saw Rivas enter the store between 9:30 and 10:00 p .m. *Id.* at 496–99. Two witnesses testified that they observed Rivas smoking a cigarette in his car, which was parked outside Hill's house, sometime between 11:00 p.m. and 12:00 a.m. that night—around the time that the prosecution theorized Hill was murdered. *Id.* at 533–34, 936–37. [13]

Beyond making the case that Rivas had motive and the opportunity to murder Hill on Friday night, Fitzpatrick deftly turned Rivas's alibi for Saturday against him. Through witness testimony and in his opening and summation, Fitzpatrick suggested that Rivas had contrived to be seen by many people at all hours of the day Saturday and into Sunday morning, so that he would have an alibi in the event that police focused on Saturday evening as the time of death. *See, e.g., id.* at 1084, 1124. For example, Elizabeth Lewis, one of Hill's friends, testified that Rivas sought her out at a party Saturday evening and remarked that "[i]t's too bad Valerie's not feeling well, that she can't be here tonight." *Id.* at 780. The implication, according to the prosecution, was that Rivas wanted to plant the idea in Lewis's mind that Hill was alive on Saturday evening,

knowing that he was at that very moment cementing his alibi. *See id.* at 1124. [14]

Similarly, Fitzpatrick emphasized a seemingly exculpatory item of evidence: a Stephen King novel that Hill had checked out from the Cazenovia Public Library, and which a witness had seen in the back seat of Hill's car on Friday afternoon. *See id.* at 190–91. The book was returned to the library's drop box sometime between Saturday afternoon and Sunday morning, suggesting that Hill (the most likely person to have returned it) was alive at least as late as Saturday afternoon. But Fitzpatrick theorized that it was Rivas who returned the book, hoping that it would cause investigators to believe that Hill was not killed on Friday night, when his alibi was relatively weaker. *Id.* at 54–55, 1085. [15]

**\*8** Finally, [Fitzpatrick] elicited testimony from Joe Fields, an acquaintance of Rivas, who encountered him at Albert's bar approximately three weeks after the murder. Rivas had been drinking heavily and was crying over Hill's death. According to Fields, at a moment when Rivas did not know that Fields was in earshot, he said to himself, "Valerie, Valerie, I didn't mean to do it." *Id.* at 817–18.

### 2. *The Medical Examiner's Testimony*

No matter how much circumstantial evidence the prosecution could amass tending to link Rivas to the crime, however, it had no case unless it could prove that Hill died on Friday night. Fitzpatrick himself acknowledged that Rivas's alibi was "complete—for Saturday night." *Id.* at 55. Indeed, it was the People's position that Rivas's alibi was so strong on Saturday night precisely because he had concocted it, having murdered Hill the night before. Therefore, the prosecution's case rested almost entirely on the testimony of Mitchell, the medical examiner, to persuade the jury that Hill died on Friday night and not on Saturday as Mitchell had initially determined.

Mitchell testified that, when he first observed Hill's body on the afternoon of Monday, March 30, it "was in rigor," and that by the time he performed an autopsy later that day, "[s]he was coming out of rigor." *Id.* at 869, 872. [16] He cautioned that no medical examiner can pinpoint with certainty the time of a person's death, *id.* at 886, but stated that, based on his observations of the body, there was nothing inconsistent with Hill having died on either the night of Saturday, March 28, or Friday,

March 27. *Id.* at 888. However, taking into account a number of external factors—namely, that Hill's cat was seen outside on Saturday morning; that Hill had not been seen after Friday; that she never contacted the friend whom she intended to visit that weekend; that her car had apparently not been driven since Friday; and that she had not been in touch with her father despite the fact that his wife was gravely ill—Mitchell opined that "it's more likely that she died Friday night, to possibly very early Saturday morning" than on Saturday night. Trial Tr. [at] 889–90. He also stated his opinion "within a reasonable degree of medical certainty" that Hill died as a result of being strangled. *Id.* at 891. [17]

Confronted on cross-examination with contemporaneous newspaper accounts that reported on his preliminary findings, Mitchell admitted that he "[q]uite possibly" had estimated at some point that Hill died late on Saturday night or early Sunday morning. *Id.* at 895–96. [18] Mitchell also conceded that, when he testified before the grand jury in November 1992, he had stated that it was merely "on the outside edge of [ ] possibility" that Hill could have been murdered on Friday night. *Id.* at 907. At trial, however, he insisted that he had never "tied [himself]" to a Saturday night estimate. *Id.* at 895. He stressed that the onset and relaxation of rigor mortis was highly variable and could be slowed, for example, by cold temperatures. *Id.* at 905–06. Although Mitchell thus acknowledged that in most cases rigor mortis relaxes within twenty-four to forty-eight hours (which would put Hill's time of death somewhere between Saturday and Sunday afternoon), he suggested that the cool temperatures in Hill's apartment could have retarded the process.

**\*9** On redirect examination, Mitchell explained that, when he testified before the grand jury several months earlier, he had not reviewed "some of [his] notes and slides." *Id.* at 915. Having had the opportunity to review the "slides" before trial, he noticed in them "some decomposition to the brain." *Id.* This, he stated, "tends to push the [time] limits further out." *Id.* [19]

### 3. *Belated Disclosure of Exculpatory Evidence*

At the close of the People's case, Fitzpatrick disclosed the existence of an August 1988 affidavit from one Joe Morgan, in which Morgan attested that an individual named Patsy Barricella had admitted to Morgan that

he (Barricella) murdered Hill. Trial Tr. at 947–48. [20] Recognizing that this evidence was "exculpatory without a doubt," *id.* at 984, the trial judge allowed Calle, Rivas's attorney, to decide whether to adjourn and attempt to call Morgan or Barricella as witnesses, or instead to bring out the information contained in the affidavits by examining the Syracuse police officer who had interviewed Morgan. Calle opted to draw the information out of the police officer, Michael Ostuni. *Id.* at 987. According to [Officer] Ostuni, Morgan claimed that he had a conversation with his friend and neighbor Barricella in March 1988, at which time Barricella confessed to killing "the girl on Hickok Avenue." Section 440.10 Mot. Exh. 8. In addition, Barricella had, according to Morgan, driven by the crime scene several times as police were investigating Hill's murder and was stopped by police as a result. (Indeed, a contemporaneous police report revealed that Barricella was stopped by police after driving by the crime scene repeatedly. *See* Section 440.10 Mot. Exhs. 9 & 10.) However, on cross-examination by the District Attorney, Ostuni also testified that Morgan was a con artist and career criminal who had contacted the police from a county jail cell, demanding release as a *quid pro quo* for cooperation. Trial Tr. at 998–1000. Ostuni further testified that Barricella was known to be "mildly mentally retarded." *Id.* at 1001.

#### 4. *Rivas's Direct Case*

Beyond the testimony of Ostuni, Rivas's direct case was underwhelming. As Calle later testified, he did not appreciate at trial that the precise time of Hill's death was important because he felt that Rivas had a strong alibi throughout the entire weekend. He therefore never considered calling an expert forensic pathologist to challenge Mitchell's adjusted findings. *See* Section 440.10 Hearing Tr. at 85, 87. He did attempt to establish that Hill was alive on Saturday by calling a prosecution witness, Hill's upstairs neighbor, to read from an affidavit in which she had stated that she had seen Hill in their shared basement that morning. However, on cross-examination by Fitzpatrick, the witness readily conceded that she had been mistaken in her affidavit and had in fact seen Hill on Friday morning, not the following day. *See* Trial Tr. at 927–932. Calle also attempted to establish Rivas's alibi by calling a single witness who claimed to have seen Rivas at Albert's in Cazenovia as early as 7:30 p.m. on Friday. *Id.* at 967. Finally, he called a witness who testified that Rivas was acting normally on Saturday night. *Id.* at 974. Rivas did not testify in his own defense, and claims that Calle never

informed him of his right to do so. Section 440.10 Hearing Tr. at 17–18.

#### 5. *Summations*

**\*10** In his closing argument, Calle argued that the Hill murder had been solved backwards: The police and the District Attorney's Office had decided at the outset that Rivas was the killer and then set out to find, or fabricate, the proof of the murder from there, ignoring other potential leads along the way. Trial Tr. at 1044. With respect to the time of death, Calle argued that Mitchell had to stretch science beyond the breaking point to opine at trial that it was more likely that Hill had been killed on Friday than on Saturday, when Mitchell had previously testified before the grand jury that a Friday time of death was only "on the outside limits of possibility." *Id.* at 1062. Calle did not explicitly challenge Mitchell's credibility or suggest that he might be beholden to the District Attorney's Office. Indeed, Rivas claims that neither he nor Calle were aware of the investigations into Mitchell's conduct at the time of the trial, despite their widespread publicity in the weeks leading up to it, apparently because they both then lived downstate. *See* § 2254 Petition at iv; Remand Hearing Tr. [, dated Sept. 21 & 22, 2009,] at 271–72.

> Fitzpatrick, in his summation, defended Mitchell's estimates:

> [A]s [Dr. Mitchell] told the grand jury, rigor mortis, the stiffening of the body after death, normally begins to pass off within 24 to 48 hours. If we were looking at a calendar, this would put the normal time of death or the normal median time of death sometime Saturday afternoon. Could it have been 16, 17, 18 hours earlier? Absolutely. Heating conditions refer, first of all, to 75 degrees. It wasn't the temperature of the house. The temperature of the house was 62 degrees.... Basement underneath her, cold floor. And the nights as you might expect, in March of 1987 were cold as well.

> Trial Tr. at 1082–83. [21] Furthermore, Fitzpatrick argued, Mitchell had "had a chance to review autopsy sectional slides of the brain," *id.,* which tended to expand the range of possible times of death. This review, Fitzpatrick claimed, combined with the external indications Mitchell had identified, had led Mitchell to opine that it was most likely that Hill died on Friday, March 27.

Summarizing the evidence against Rivas, Fitzpatrick theorized that Rivas had paid Hill a visit on Friday night after he left Coleman's bar, and had brought over a bottle of rum and a bottle of wine in hopes that the two could mend their relationship. When he discovered that Hill not only did not want to reunite with him, but was also planning a trip to the Bahamas alone, he flew into a rage and strangled her. Then, realizing he needed to cover up the crime, he got rid of the airline ticket (but left an ashtray full of his cigarettes), and, on the way to his car, took Hill's library book from the back seat of her car, intending to return it the next day to make it appear as though Hill were still alive. He then crafted a tight alibi for the rest of the weekend. *Id.* at 1125–30.

**\*11** The jury deliberated for eight hours over the course of one day, during which time it asked for further instructions on the meaning of "reasonable doubt." *Id.* at 1188. At approximately 10:45 p .m. on March 25, 1993, nearly six years to the day after Valerie Hill was killed, Hector Rivas was found guilty of second-degree murder. He was subsequently sentenced on May 12, 1993, to an indeterminate term of imprisonment of twenty-five years to life.

### D. State Post–Conviction Proceedings

Rivas, with the assistance of new counsel, appealed his conviction to the Appellate Division of the New York Supreme Court.... On April 28, 1995, the Appellate Division issued a decision unanimously affirming Rivas's conviction. *People v. Rivas,* 214 A.D.2d 996, 626 N.Y.S.2d 640 (4th Dep't 1995) .... Rivas's application for leave to appeal to the New York Court of Appeals was denied on August 15, 1995. *People v. Rivas,* 86 N.Y.2d 801, 632 N.Y.S.2d 514, 656 N.E.2d 613 (1995) (table). [22]

Thereafter, with the assistance of yet another lawyer, Rivas filed a motion to vacate the judgment of conviction pursuant to N.Y. Criminal Procedure Law § 440.10, which provides the means of collateral attack on a criminal judgment in New York state courts. In that application, Rivas alleged that he had been the victim of a "concerted effort to convict that was severed from concerns over actual guilt very early on in this investigation and was orchestrated by the District Attorney himself, William J. Fitzpatrick, who personally prosecuted this case." Affirmation of H.

Mitchell Schuman in Support of Section 440.10 Mot. at 3.

Principal among Rivas's allegations was that Mitchell, the medical examiner, had altered his original estimate of the time of Hill's death in order to satisfy the District Attorney in hopes of avoiding prosecution for alleged criminal misconduct. *Id.* at 4–7. Rivas claimed not to have known about the investigation of Mitchell and his office until after the trial, when Mitchell was indeed forced to resign to avoid prosecution by Fitzpatrick's office. *Id.* at 6. Additionally, Rivas claimed to have discovered only after the trial that, despite Mitchell's testimony that he had examined "slides" in coming to the conclusion that Hill most likely died on the night of Friday, March 27, 1987, and despite Fitzpatrick's characterization of these slides in his summation as "autopsy sectional slides," there were in fact no sectional slides of Hill's brain in the medical examiner's file. *Id.* at 6–7.

Rivas also pointed to "new evidence," in the form of an affidavit by Dr. Cyril H. Wecht, an expert in forensic pathology, who attested that Mitchell's calculations of the cause of death were "misguided," and that, in his expert opinion, "based upon a reasonable degree of medical certainty, ... the length of time between the death of Valerie J. Hill and the time she was found was less than 48 hours, *and more likely less than 36 hours.*" Affirmation of Cyril H. Wecht in Support of Section 440.10 Mot. (emphasis in original). In other words, according to Wecht, Hill most likely died between 3:30 p.m. on Saturday, March 28, and 3:30 a.m. on Sunday, March 29.

**\*12** In addition, Rivas alleged that a significant amount of exculpatory material was withheld from the defense at trial. Most saliently for our purposes, Rivas claimed that he never received an affidavit taken from one of Hill's neighbors, Mary Lazarski, and a police report memorializing an interview with another unnamed neighbor. In her affidavit, Lazarski attested that, late in the evening of March 28 or early in the morning of March 29, while she was watching "Saturday Night Live" on television, she heard through her open window "a loud shriek or scream [that] seemed to cut off." Section 440.10 Mot. Exh. 4. She stated that "[t]he voice was a woman's voice and it sounded like someone was in trouble and not like anyone kidding around." *Id.* Lazarski's husband also signed an affidavit confirming

that his wife woke him up and told him about the incident that night. *Id.* The unidentified neighbor told police that he heard a dog barking and a car speed away from the vicinity of Hill's house at around 11:00 Saturday night. *Id.*

Beyond these documents, Rivas claimed that the prosecution failed to disclose: (1) a police report regarding an interview with a neighbor who had seen Hill intimately embracing a man other than Rivas a few days prior to her murder, and another interview stating that Hill had been involved in an intimate relationship with a man other than Rivas at the time of her death; (2) information that one of Hill's neighbors had previously been arrested for burglary and was known to peer through windows in the neighborhood; [23] (3) information that an employee at the hospital where Hill worked had been disciplined after Hill made a complaint against him; (4) information regarding a purported "sexual deviant" who was residing in Hill's neighborhood; (5) the fact that one of the prosecution witnesses had a prior conviction; and (6) the affidavit stating that Patsy Barricella, not Rivas, had committed the crime. Section 440.10 Mot. at 7–10.

Finally, Rivas raised a claim of ineffective assistance of counsel, alleging that his trial attorney, Calle, had failed to apprise him of his right to testify in his own defense, and had failed to "investigate or challenge the false and misleading testimony given by the medical examiner at trial." Mem. Law. Supp. Section 440.10 Mot. at 34–40.

On April 7, 2000, Acting Onondaga County Supreme Court Justice John J. Brunetti conducted an evidentiary hearing in connection with Rivas's § 440.10 motion. At the close of the hearing, Justice Brunetti issued an oral ruling denying relief with respect to Rivas's *Brady* claims and one portion of his ineffective-assistance claim, finding that Rivas had not borne his burden of persuasion on those points. *See* Section 440.10 Tr. at 135–41. After taking the remaining issues under advisement and receiving post-hearing briefs from the parties, Justice Brunetti issued a written decision on September 8, 2000, denying relief on the remaining claims. *See People v. Rivas,* No. 92–2794 (N.Y.Sup .Ct. Sept. 8, 2000).

**\*13 [END OF QUOTED PASSAGES FROM OUR 2012 OPINION]**

*Rivas,* 687 F.3d at 518–30.

**E. Federal Habeas Proceedings**

On June 19, 2002, Rivas filed an amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, raising substantially the same claims that he advanced in his § 440.10 motion. [24] The District Court dismissed Rivas's petition as time-barred under 28 U.S.C. § 2254(d), *see Rivas v. Fischer,* No. 01–cv–1891, ECF No. 21 (N.D.N.Y. Jan. 28, 2005), and we vacated and remanded, holding that additional fact-finding on the issues of timeliness and actual innocence was required, *see Rivas v. Fischer,* 294 F. App'x 677, 678–79 (2d Cir.2008).

After an evidentiary hearing, the District Court again dismissed the petition as untimely. *See Rivas v. Fischer,* No. 01–cv–1891 (GLS/DEP), 2010 WL 1257935 (N.D.N.Y. Mar. 26, 2010). We reversed, holding as a matter of first impression in this Circuit that a "credible" and "compelling" showing of actual innocence warrants an equitable exception to AEDPA's limitation period, allowing a petitioner to have his otherwise time-barred claims heard by a federal court. *Rivas v. Fischer,* 687 F.3d 514, 517–18 (2d Cir.2012). [25] We concluded that Rivas had made such a showing, having produced essentially unchallenged expert testimony "which call[ed] into serious doubt the central forensic evidence linking him to the crime," and, as a result, "a reasonable juror, apprised of all the evidence in the record, would more likely than not vote to acquit." *Id.* at 552. We remanded the cause for Rivas's petition to be heard on the merits.

After hearing oral argument, the District Court nonetheless denied the petition on the merits. *See Rivas v. Fischer,* No. 01–cv–1891 (GLS), 2013 WL 4026844 (N.D.N.Y. Aug. 6, 2013). With respect to Rivas's ineffective-assistance claim, the District Court held that the state court's determination "was comprised of both reasonable factual determinations and a reasonable application of *Strickland.*" *Id.* at *22. The District Court reasoned that defense counsel's decision to rely on Rivas's incomplete alibi was sound trial strategy because "[e]ven if Rivas employed an expert who reached the same conclusions as Dr. Wecht ... the time of death would simply be limited to sometime between 3:30 P.M. on Saturday and 11:30 A.M. on Monday," and "Rivas was, by his own account, alone during a large portion of Sunday, beginning at 4:00 A .M." *Id.* at *33. With respect to prejudice, the District Court held that "[a]s discrediting Dr. Mitchell would not narrow the time of death to a period during which Rivas

could not have committed the murder, so too would it fail to alleviate the considerable circumstantial evidence suggesting his involvement in Valerie's death." *Id.* at \*34.

This appeal followed.

### DISCUSSION

**[1]** We review a district court's denial of a petition for a writ of habeas corpus *de novo, Alvarez v. Ercole,* 763 F.3d 223, 229 (2d Cir.2014), and we review the underlying state court's denial under 28 U.S.C. § 2254(d) for an " 'objectively unreasonable' " application of clearly established federal law, *Wiggins v. Smith,* 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting *Williams v. Taylor,* 529 U.S. 362, 409, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). 26

**\*14** Section 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides "[t]he statutory authority of federal courts to issue habeas corpus relief for persons in state custody." *Harrington,* 562 U.S. at 97. Section 2254(d) provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

**[2]** Rivas contends that the state court's denial of his ineffective-assistance claim involved an "unreasonable application" of *Strickland* under Section 2254(d)(1). 27 The Supreme Court has explained that an "unreasonable application" is one that is "more than incorrect or erroneous"; it must be "objectively unreasonable." *Wiggins,* 539 U.S. at 520–21 (internal quotation marks omitted). In other words, the state court's decision must be "so lacking in justification that there was an error well understood and

comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington,* 562 U.S. at 103.

**[3]** *Strickland* has two components:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. Where, as here, a petitioner's claim stems from a "strategic choice[ ] made after less than complete investigation," such a choice is reasonable "precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91. "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691.

**[4]** In assessing whether counsel exercised "reasonable professional judgment," our "principal concern ... is not whether counsel should have presented" the additional evidence that further investigation would have revealed, but rather, "whether the investigation supporting counsel's decision not to introduce" the additional evidence "*was itself reasonable.*" *Wiggins,* 539 U.S. at 522–23. In doing so, we look to "not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527.

**\*15** **[5]** **[6]** Finally, our scrutiny of counsel's performance must be "highly deferential" because we must apply "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689. Similarly, under Section 2254(d), "the range of reasonable applications is substantial," so when *Strickland* and Section 2254(d) apply in tandem our review must be "doubly" deferential. *Harrington,* 562 U.S. at 105 (internal quotation marks omitted). Therefore, the relevant question "is not whether counsel's actions were reasonable," but instead "whether there is any reasonable argument that

counsel satisfied *Strickland's* deferential standard." *Id.* at 102. Our analysis must "determine what arguments or theories supported ... the state court's decision; and then [we] must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent" with *Strickland. Id.*

### A.

[7]   Rivas contends that his trial counsel, Calle, was ineffective because he did not investigate further into the basis of Mitchell's revised findings as to the time of Hill's death. Rivas argues that Calle should have, among other things: (1) consulted with or retained a competing forensic pathologist, who would have found that the revised findings were not scientifically reliable; (2) researched Mitchell's qualifications and background, which would have revealed that he had been accused of, and was under pending investigation for, various forms of misconduct at the time of trial; (3) reviewed the documents relied upon by Mitchell, which would have revealed that he based his revised opinion in part on nonexistent "brain slides"; and (4) used as impeachment evidence a search warrant application in which a Syracuse police officer swore that Mitchell had previously estimated the time of Hill's death as "sometime Saturday the 28th of March afternoon, and [S]unday morning the 29th of March 1987."

At the state 440.10 hearing, Calle attempted to justify his limited investigation as reflecting a tactical judgment to pursue an alternative strategy. He testified as follows:

Q. Did you consider getting an expert witness regarding time of death?

A. No, I didn't.

Q. Okay. Could you tell us what your—what your thoughts were on that at the time of the trial?

A. I was under the belief—I was under the belief that Mr. Rivas did not commit this crime.

Q. Mm, hmm.

A. I was under the belief that the cause of death was not a significant issue to his defense—

Q. Mm, hmm.

A. —because he wasn't the one who committed that.

Q. Mm, hmm.

A. I believe that he had an alibi for the entire weekend.

Q. Mm, hmm.

A. The Friday there was a number of affidavits of people at bars in Cazenovia, Albert's and another bar, I can't recall the name, which placed him at that location some many miles away. In fact, Mr. Rivas and myself had gone up there conducting an investigation together and it didn't seem to me to be pertinent—

*16   Q. Mm, hmm.

A. —before the trial to determine if in fact the cause of death was a significant issue, because six years before the indictment the coroner, if that's what you call him, he had indicated that death was either Saturday or Sunday and then six years later determined it was Friday and I thought that I would be able to impeach his credibility which would prevent the District Attorney's office from proving the crime beyond a reasonable doubt ....

THE COURT: Can I just interrupt? You used a term "cause of death". I'm understanding you to mean time of death or am I incorrect?

THE WITNESS: No, I did mean cause of death. That's why I think I didn't give significant attention to the—the—the retention of an expert coroner to refute the findings of Dr. Mitchell.

THE COURT: And because there was you felt he was well alibied?

THE WITNESS: Yes, sir.

Section 440.10 Hearing Tr. at 85–87; *see also id.* at 94–95, 97–98. The state collateral review court credited this explanation, finding that "[d]efense counsel employed a trial strategy based upon a defense that defendant was sufficiently alibied for the entire weekend ... and that the People would not be able to prove defendant's guilt beyond a reasonable doubt whether the jury found that the crime occurred on Friday night or on Saturday night." *People v. Rivas*, No. 92–2794, slip op. at 34–35 (N.Y.Sup.Ct. Sept. 8, 2000). The state court concluded that "counsel formulated a trial strategy, it was an objectively reasonable one, and it was executed in a reasonably competent manner." *Id.* at 34. We disagree.

The record demonstrates that Calle relied on three sources in formulating his "strategy": (i) Rivas's alibi, (ii) a newspaper article reporting that Mitchell had previously estimated the time of death as Saturday, March 28, or early Sunday morning, March 29, *see* Trial Tr. at 895, and (iii) Mitchell's grand jury testimony, in which he had stated that a Friday time of death was "on the outside edge of possibility," Trial Tr. 907, 1062. Rather than justifying a decision not to investigate Mitchell's findings further, however, this evidence would have led any reasonable attorney to conclude exactly the opposite: further investigation was absolutely vital.[28]

Critically, Rivas's alibi was uncorroborated and incomplete for a key three-and-a-half hour window—between approximately 9:00 p.m. on Friday, March 27, 1987, and 12:30 a.m. on Saturday, March 28, 1987. *See* Trial Tr. at 440, 461–63, 469, 487–88, 849.[29] Not coincidentally, the core of the prosecution's case was that Rivas killed Hill during this exact time frame. *See, e.g.,* Trial Tr. at 31, 56, 1069, 1083, 1125–26. The indictment charged Rivas with killing Hill "on or about the 27th day of March"; the People's Bill of Particulars stated that Rivas was alleged to have killed Hill "[o]n March 27th, 1987 between the hours of 9:00pm and 12:00 midnight at 248 Hickok Avenue in the City of Syracuse"; the prosecution argued repeatedly in its opening and its closing that Rivas killed Hill on Friday, March 27, 1987, Trial Tr. at 31, 56, 1069, 1083, 1105, 1125–26; indeed, it argued that Rivas's alibi was "complete" for Saturday night, March 28, 1987, precisely because he had concocted it, having murdered Hill on Friday, March 27, Trial Tr. at 55; and finally the Certificate of Conviction states that Rivas was indicted for, and convicted of, second-degree murder "committed on March 27, 1987." We are not persuaded by the District Court's speculation that counsel may not have wanted to make an issue of "a narrowed time of death" because of the "risk of fixing the jury's attention on a time frame during which, by his own account, Rivas' whereabouts could not be corroborated [*i.e.,* between 4:00 a.m. and 11:00 a.m. Sunday morning when Rivas was sleeping]." *Rivas,* 2013 WL 4026844, at *33. At no point did the prosecution argue that Rivas murdered Hill on Saturday or Sunday. The District Court's conjecture regarding counsel's motivations—which appears nowhere in the state collateral review court's decision or in Calle's testimony at the state 440.10 hearing—resembles "more a *post hoc* rationalization of counsel's conduct than an accurate description of [his] deliberations." *Wiggins,* 539 U.S. at 526–27.

**\*17** The case therefore turned on rebutting the prosecution's theory as to the time of death.[30] Inexplicably, however, Calle relied on a strategy that was completely divorced from this central issue: He relied on an alibi defense when, in fact, Rivas did not have an alibi for the precise time that the prosecution claimed Rivas had murdered Hill. In effect, Calle's alibi defense amounted to no defense at all. No "fairminded jurist [ ]," *Harrington,* 562 U.S. at 101, could agree that this decision constituted "sound trial strategy," *Strickland,* 466 U.S. at 689 (internal quotation marks omitted). Accordingly, the state court's conclusion to the contrary was objectively unreasonable. *See Wiggins,* 539 U.S. at 521.

As to the newspaper article and grand jury testimony, this evidence also compelled further investigation. By Calle's own admission, this evidence armed him with the knowledge that Mitchell had apparently changed his estimate as to the time of death six years after the fact, seemingly on the basis of no new evidence. *See* Section 440.10 Hearing Tr. at 85–87. Coupled with the fact that the prosecution's case turned entirely on linking Hill's death to a time when Rivas had an incomplete alibi, this knowledge would have led any reasonable attorney to conclude that investigating the basis of Mitchell's new findings was essential.[31] Rather than investigate further, however, counsel's investigation inexplicably stopped there, a decision Calle was unable to justify as consistent with his constitutional "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691. Considering all the circumstances, no "fairminded jurist[ ]" could agree that the quantum of evidence known to Calle at the time justified his decision to forego further investigation and rely instead on a critically deficient alibi and two perfunctory items of impeachment evidence that only scratched the surface of Mitchell's revised findings. *Harrington,* 562 U.S. at 101; *see also Wiggins,* 539 U.S. at 527 ("*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision ....").

In sum, this is the exceedingly rare and exceptional case where the state court's decision involved an "unreasonable application" of *Strickland.* 28 U.S.C. § 2254(d).

### B.

**[8]** **[9]** Having established deficient performance, Rivas must also show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." *Strickland,* 466 U.S. at 694. It is well established that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

**\*18** We previously held that Rivas had presented a "credible" and "compelling" claim of actual innocence for purposes of establishing an equitable exception to AEDPA's limitations period—that is, Rivas established that "a reasonable juror, apprised of all the evidence in the record, would more likely than not vote to acquit." *Rivas,* 687 F.3d at 552. The Supreme Court has held that this standard, which we previously concluded Rivas had met, requires "a stronger showing than that needed to establish prejudice" under *Strickland. Schlup v. Delo,* 513 U.S. 298, 327 & n. 45, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Accordingly, for substantially the same reasons, we now hold that Rivas has established that, absent his counsel's unprofessional errors and omissions, a factfinder would have had a reasonable doubt respecting his guilt. *See Strickland,* 466 U.S. at 695. [32] Specifically, as we previously observed, those reasons were as follows:

> Ultimately ... it does not matter how much indirect, circumstantial evidence the State amassed to suggest that Rivas killed Hill on Friday night, if she in fact died [at another time].... Therefore, the question turns almost entirely on the relative credibility of the prosecution's expert, Mitchell, and Rivas's expert, Wecht. In this regard, we stress once more that the State, despite having the opportunity to challenge Wecht's [affirmation before the state collateral review court], or to [submit] its own expert to support Mitchell's conclusions, failed to raise any serious question about Wecht's qualifications or conclusions. We therefore are left to weigh the unchallenged [affirmation] of a renowned forensic pathologist—who concluded "to a reasonable degree of medical certainty" that Hill could not have died on Friday—against the testimony of a disgraced and allegedly beholden medical examiner, who initially told police that Hill died on Saturday evening, later told the grand jury that it was on the "outside edge of possibility" that she died on Friday evening, and finally testified, without reference to any degree of medical certainty, that it was "more likely" that she died on Friday night ....

> Finally, though we do not suggest that Mitchell intentionally lied on the stand or that District Attorney Fitzpatrick suborned perjury, we think a reasonable juror would discredit Mitchell's testimony upon learning that he had been subject to numerous investigations for misconduct and official malfeasance and was under investigation for potentially criminal misconduct at the very moment that he was providing testimony in the criminal trial. In short, based on the record before us, any reasonable juror would almost certainly credit Wecht over Mitchell and would therefore, more likely than not, harbor a reasonable doubt about Rivas's guilt.

*Rivas,* 687 F.3d at 546. [33]

Although the state collateral review court did not make any express findings as to prejudice, we are required to assume for the purpose of argument that it would have denied Rivas's ineffective-assistance claim also on that basis. *See Harrington,* 562 U.S. at 98 (holding that habeas petitioner must show "there was no reasonable basis for the state court to deny relief" regardless of "whether or not the state court reveals which of the elements in a multipart claim it found insufficient"). [34] To the extent it would have so ruled, we conclude that such a decision would have been objectively unreasonable for the reasons set forth above and in our prior opinion.

### CONCLUSION

**\*19** To summarize: We hold that it was an unreasonable application of *Strickland* for the state collateral review court to deny Rivas's claim of ineffective assistance of counsel. Accordingly, we

(1) **REVERSE** the judgment of the District Court, and

(2) **REMAND** the cause.

On remand, the District Court shall issue a writ of habeas corpus to Rivas on the sixtieth calendar day after the issuance of our mandate unless New York State has, by that time, taken concrete and substantial steps expeditiously to retry Rivas.

The mandate shall issue forthwith. If further proceedings arising from Rivas's habeas petition are required in this Court, the parties shall inform the Clerk of this Court. Jurisdiction will then be automatically restored to this Court without need for a new notice of appeal. After jurisdiction is restored, the Clerk shall set an expedited briefing schedule, and, in the

interest of judicial economy, the matter will then be heard by
this panel on letter briefs.

## Footnotes

1    Although our previous recitation of the facts drew from both the record of Rivas's state collateral proceeding and the evidentiary hearing held by the District Court, *id.* at 518, our review under 28 U.S.C. § 2254(d) "is limited to the record that was before the state court that adjudicated the claim on the merits," *Cullen v. Pinholster,* ——U.S. ——, ——, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011). The footnotes within the quoted passages are numbered as in the original. Brackets are used to correct typographical errors.

2    Rivas, having dated Hill, had been in her apartment many times before and it was undisputed at trial that he had been in her apartment as recently as Thursday, March 26, 1987. *Id.* at 240.

3    However, another officer who interviewed Rivas that day, Frank Pieklik, testified at a pretrial motions hearing that Rivas "appeared, as I recall, quite normal." Transcript of Feb. 24, 1993, Hearing ("Pretrial Hearing Tr.") at 30 (Feb. 24, 1993).

4    Contemporaneous newspaper articles also reported that Mitchell had estimated the time of death to have been sometime late Saturday night, March 28, to early Sunday morning, March 29. *See, e.g.,* Mike McAndrew, "As Wife Lay Dying, Man Found His Daughter Slain," *The Syracuse Post–Standard,* Apr. 1, 1987, at A1 ("Onondaga County Medical Examiner Erik Mitchell has determined that Hill was strangled late Saturday or early Sunday, Deputy Police Chief Robert Galvin said."); John Doherty, "Police Have No Clues into Slaying of Nurse," *The Syracuse Post–Standard,* Apr. 1, 1987, at B3 ("An autopsy has determined that Valerie J. Hill ... was strangled to death with the cloth belt of her bathrobe, police said. The report also indicated that she died sometime Saturday or early Sunday morning, police said.").

    We take judicial notice of "the *fact* that press coverage contained certain information, without regard to the truth of [its] contents." *Staehr v. Hartford Fin. Servs. Grp.,* 547 F.3d 406, 425 (2d Cir.2008).

5    Rivas later argued that the note had been recovered from Hill's apartment and not his. *See* Mem. Supp. § 440.10 Mot. at 34.

6    The note was admitted at trial over Rivas's objection. On direct appeal, the Appellate Division of the New York Supreme Court held that the note should have been suppressed because it was not within the scope of the warrant and did not fall under the "plain view" exception, but that its improper admission at trial constituted harmless error. *See People v. Rivas,* 214 A.D.2d 996, 626 N.Y.S.2d 640, 641 (4th Dep't 1995). [In our prior opinion, we explained that, because] in reviewing a claim of actual innocence we consider "all the evidence ... without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial," *House,* 547 U.S. at 538, 126 S.Ct. 2064, 165 L.Ed.2d 1 (internal quotation marks omitted), we need not ignore the contents of the note.

7    Mitchell's decision to resign was widely reported in the local newspapers. *See, e.g.,* John O'Brien & Todd Lightly, "DA: Mitchell 'Went Too Far': Medical Examiner, Accused of Mishandling Body Parts, Quits Under Pressure," *The Syracuse Post–Standard,* Nov. 20, 1993, at A1 ("Thursday, Fitzpatrick told Mitchell's lawyer that if Mitchell resigned, the criminal investigation would end."). In the separate investigation by the State Department of Health, Mitchell was later cleared of wrongdoing. *See* Jim O'Hara, "Ex–Medical Examiner Cleared of Wrongdoing: Mitchell was Accused of Improperly Harvesting Body Parts," Syracuse Post–Standard, Nov. 16, 1995, at B1.

8    The investigation was triggered when two subordinates publicly accused Mitchell of misconduct. These self-styled "whistleblowers" submitted statements that were included in the record of Rivas's initial appeal to this Court. One subordinate claimed to have witnessed Mitchell "slant the interpretation of evidence and/or exclude evidence to serve his predetermined objectives," and averred that "Dr. Mitchell's opinions and interpretations of evidence cannot be trusted as impartial or accurate." Aff. of William R. Sawyer at *5–7* (quoted in Joint App'x at 337 n. 7). Another—who was himself fired at the same time Mitchell resigned, and later had his medical license revoked for persistent drug and alcohol abuse—claimed that Mitchell had instructed him to fashion his autopsy reports in a way that would allow for manipulation of the case findings and had remarked that "the medical examiners worked for Onondaga County and were there to serve the needs of the District Attorney's Office." Letter of David A. Rigle at 16 (quoted in Joint App'x at 337 n. 7).

9    The judge did, however, inform one of Rivas's attorneys that Fitzpatrick scheduled to attend a meeting with a legislative committee regarding allegations against Mitchell on April 13, 1993, just over two weeks after the conclusion of Rivas's trial. *See* Remand Hearing Tr.[, dated Sept. 21 & 22, 2009,] 117–19.

10    It appears that the only new evidence prosecutors employed at Rivas's trial was the testimony of a former friend, who stated that Rivas made an incriminating statement to the effect that he "didn't mean to do it" shortly after Hill's death. *See* Trial Tr. at 816–17. However, prosecutors evidently did not learn of this alleged statement until after the indictment was returned, when the witness's girlfriend came forward. *See id.* at 828–29.

11    Calle was later indicted and convicted on federal charges of obstruction of justice and mail fraud unrelated to his representation of Rivas. He was disbarred from the practice of law in New York State nine years after Rivas's trial. *See In re Calle,* 301 A.D.2d 218, 749 N.Y.S.2d 528 (1st Dep't 2002).

12    Several of Rivas's fingerprints had been found on items in Hill's house, including a bottle of wine. However, the prosecution acknowledged at trial that Rivas had been in the apartment many times before, including in the week prior to Hill's death.

13    One of these witnesses, Hill's upstairs neighbor, was in fact called by Rivas as a defense witness, apparently because she had initially told police that she had seen Hill in their shared basement on Saturday morning, March 28. However, under cross examination by Fitzpatrick, she readily conceded that she was mistaken in her initial statement to police and had in fact seen Hill on Friday morning, March 27. Trial Tr. 928–29, 932.

14    Lewis did not testify that Rivas claimed to have spoken to Hill on Saturday. However, it was her sense, six years later, that he was trying to convey the impression that he had. This purported plan backfired, because Lewis—unlike Rivas—knew that Hill was planning to be out of town that weekend. Rivas's comment therefore struck her as odd. Trial Tr. [at] 780.

15    As Rivas pointed out in his state collateral motion, however, Hill had requested the book through an interlibrary loan and all of the markings on the book indicated it was from a different library, in Utica. Thus, Rivas (belatedly) argued, only Hill would have known to return it to Cazenovia library and not the original library. Furthermore, although the prosecution's fingerprint expert examined the book and found three prints that he could not identify, he apparently did not recover any of Rivas's prints from the book. *See* Trial Tr. at 588.

16    In the "scene investigation" report that Mitchell prepared and signed at the time of his initial inquiry into the cause and time of Hill's death, he reported that he had found Hill's body in "*full* rigor, with fixed anterior livor." *See* Remand Hearing Tr. [at] 75–76[, dated Sept. 21 & 22, 2009] (emphasis added).

17    Whether by design or oversight, Mitchell did not testify that his opinion on Hill's time of death was "within a reasonable degree of medical certainty." Trial Tr. at 891.

18    Although Calle attempted to impeach Mitchell with newspaper articles suggesting that Mitchell had initially estimated the time of death to be [Saturday] night, he did not refer to the police affidavit supporting the application to search Rivas's residence, which stated that Mitchell had preliminarily estimated the time of Hill's death to be "sometime [between] [S]aturday the 28th of March afternoon and [S]unday morning [the] 29th of March 1987," Section 440.10 Mot. Exh. 2. *See* Section 440.10 Hearing Tr. at 98.

19    Rivas contends that Mitchell committed perjury when he testified that he had examined "brain slides," because the medical examiner's file did not, in fact, contain any such slides. The state concedes that there were no "brain slides"—that is, sectional slides containing actual brain tissue. It argues, however, that there were in fact two photographic slides containing images of Hill's brain, and that Mitchell may have been referring to those slides in his testimony.

       We need not, and therefore do not, address Rivas's allegation that Mitchell committed perjury. We note, however, that Fitzpatrick specifically characterized the slides in question as "autopsy sectional slides" in his closing argument. Trial Tr. at 1082–83. Furthermore, Rivas's expert, Dr. Cyril Wecht, has testified [at the federal evidentiary hearing before the District Court in 2009] that a forensic pathologist would "not use the word slide synonymously with a photograph." Remand Hearing Tr.[, dated Sept. 21 & 22, 2009,] at 27. In any case, Wecht has also testified [before the state collateral review court in 1999] that, even if Mitchell had examined "brain slides" (that is, sectional slides), such a review is "totally unreliable" as a means of determining the time of death, because the sections of the brain contained in such slides continue to decompose for up to ten days after the brain is placed in a formalin bath for preservation. *See* Aff. of Cyril H. Wecht[, dated June 11, 1999,] Supp. Section 440.10 Mot. at 6.

20    Though it is unclear when Fitzpatrick first became aware of or obtained Morgan's affidavit itself, the trial transcript suggests that he was in possession of at least some documents relating to Morgan before opening statements were made, and thus well before this information was turned over to the defense. *See* Trial Tr. at 65.

21    In fact, the temperature of the apartment was never recorded and Hill was lying on a carpeted floor. The record also reveals that the week of Hill's death was unusually warm. One witness told police that the last time she had seen Hill, Hill was sunbathing in her backyard. Section 440.10 Mot. Exh. 24. Another witness stated that she had her window open late Saturday night, when she heard a woman's scream. *Id.* Exh. 4.

       Parenthetically, we note that, according to the National Climatic Data Center, the mean temperature in Syracuse, NY, on March 27, 1987, was 51° Fahrenheit, with a high of 61° and a low of 40°. On March 28, the temperature ranged from 37–65° with a mean of 51°. And on Sunday, March 29, the day before Hill's body was discovered, the high temperature was 74° and the low 36[°] with a mean of 55°. *See* Local Climatological Data, Monthly Summary for Syracuse, NY, March 1987, *available at* http://www7.ncdc.noaa.gov/IP S/lcd/lcd.html?—finish=0.400803217488396 (last visited July 3, 2012).

22    Rivas also filed an application for a writ of error *coram nobis,* which was denied by the Appellate Division on September 27, 1996. People v. Rivas, 231 A.D.2d 971, 647 N.Y.S.2d 648 (4th Dep't 1996) (Table).

23    This neighbor appears to have been a member of the family [that] lived upstairs from Hill at 250 Hickok Avenue. The individual was interviewed by police in connection with Hill's murder and admitted to having been arrested and charged in 1985 with a burglary of 248 Hickok Avenue, the apartment later occupied by Hill. (He was ultimately convicted of petit larceny, according to the report.) When questioned about his whereabouts the weekend of Hill's death, he mentioned having "pass[ed] by his parents house at 250

Hickok Avenue." Section 440.10 Mot. Exh. 18. Although it appears that the individual had an alibi for the relevant time period, the very fact that he was questioned by police and had previously been arrested for suspicious criminal activity involving Hill's apartment, if disclosed to the defense, would likely have provided grounds for challenging the credibility of his family members, who testified against Rivas.

24  In addition to his ineffective-assistance claim, Rivas re-raised his various claims under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), *People v. Sandoval,* 34 N.Y.2d 371, 357 N.Y.S.2d 849, 314 N.E.2d 413 (1974), and the Due Process Clause. Because we grant Rivas's petition on the basis of his ineffective-assistance claim, we need not address these other claims.

25  The Supreme Court subsequently confirmed in *McQuiggin v. Perkins,* ––– U.S. ––––, ––––, 133 S.Ct. 1924, 1928, 185 L.Ed.2d 1019 (2013), that "actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar ... or ... expiration of the statute of limitations." *See id.* at 1931 (citing *Rivas,* 687 F.3d at 547–48).

26  *See Harrington v. Richter,* 562 U.S. 86, 101–02, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (distinguishing between *de novo* review and review for objective unreasonableness).

27  There is no dispute that *Strickland* constitutes "clearly established Federal law." *Cullen v. Pinholster,* ––– U.S. ––––, ––––, 131 S.Ct. 1388, 1403, 179 L.Ed.2d 557 (2011).

28  The Supreme Court explained in *Strickland* that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." 466 U.S. at 688. The American Bar Association standards in effect in 1993 stated that "[d]efense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case." ABA Standards of Criminal Justice: Prosecution and Defense Functions § 4–4.1(a) (3d ed.1993); *see also Rompilla v. Beard,* 545 U.S. 374, 387, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (finding ABA Standards useful " 'guides to determining what is reasonable' " (quoting *Wiggins,* 539 U.S. at 524)).

29  Indeed, the two witnesses who demonstrate that Rivas's alibi was incomplete for these key three-and-a-half hours, Mark Brosh and Beverly Dorland, were listed on Rivas's own notice of alibi, albeit apparently misspelled. *See* Notice of Alibi, *People v. Rivas,* Index No. 92–2794 (Onondaga Cnty. Ct.), *available at Rivas v. Fischer,* No. 01–cv–1891, ECF No. 55–2 at 42 (N.D.N.Y.).

30  As we previously stated, "it was the People's position that Rivas's alibi was so strong on Saturday night precisely because he had concocted it, having murdered Hill the night before. Therefore, the prosecution's case rested almost entirely on the testimony of Mitchell, the medical examiner, to persuade the jury that Hill died on Friday night and not on Saturday as Mitchell had initially determined." *Rivas,* 687 F.3d at 524.

31  The Supreme Court has "recognized the threat to fair criminal trials posed by the potential for incompetent or fraudulent prosecution forensics experts.... This threat is minimized when the defense retains a competent expert to counter the testimony of the prosecution's expert witnesses." *Hinton v. Alabama,* ––– U.S. ––––, ––––, 134 S.Ct. 1081, 1090, 188 L.Ed.2d 1 (2014); *see also id.* at 1088 (" 'Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence.' " (quoting *Harrington,* 562 U.S. at 106)).

32  As we previously noted, our review is limited to the record before the state court that adjudicated Rivas's claim. *See supra* note 1 (quoting *Pinholster,* 131 S.Ct. 1398). For purposes of the present appeal we do not rely on Dr. Wecht's testimony from the federal evidentiary hearing but note that Dr. Wecht's unchallenged affirmation, which was submitted to the state collateral review court, reached the same conclusions. Aff. of Cyril H. Wecht, dated June 11, 1999, ¶ 17, *available at Rivas v. Fischer,* No. 01–cv–1891, ECF No. 56–2 at 23 (N.D.N.Y. Sept. 18, 2009).

33  The District Court stated that "the extent to which Dr. Mitchell's investigation was public knowledge ... is unclear." *Rivas,* 2013 WL 4026844, at *27. There were, however, numerous news articles predating Rivas's March 1993 trial reporting on investigations into Dr. Mitchell and his office. *See, e.g.,* John O'Brien, *Mitchell's Policies Studied by Miller,* SYRACUSE POST–STANDARD, Nov. 25, 1989, at B1 ("The Onondaga County health commissioner has begun reviewing the policies and performance of the medical examiner's office, in light of recent publicity about questionable activities in the office."); *Coroner Boiling Bones in Parking Lot: Report,* SCHENECTADY GAZETTE, Oct. 28, 1989, at 47 ("Medical Examiner Dr. Erik Mitchell has drawn complaints recently for the way he runs his office. Last month, Mitchell was directed by County Executive Nick Pirro to halt his practice of donating body parts for medical research without the consent of the dead person's family.... Pirro has appointed an independent panel of three forensic pathologists to review [Mitchell's handling of a separate] case."); *see also* William Kates, *Who Really Killed Nanette Gordon ?,* THE JOURNAL, Oct. 9, 1989, at 1 ("The [victim's] family has assailed the competency of Mitchell's investigation and questioned whether the medical examiner could be objective because he was once a suspect in Gordon's death."); Jim O'Hara, *Medical Examiner Denies He Ordered Staff to Dice Body Parts,* SYRACUSE HERALD–JOURNAL, Mar. 5, 1993, at A1 ("Onondaga County Medical Examiner Erik Mitchell today dismissed as Ties, insults and slander' a series of allegations leveled against him by employees, including a complaint he had staff dice brains and other body parts to be flushed away.").

34  In denying the other portions of Rivas's § 440.10 motion, the state collateral review court held that "defendant cannot show that the fact that brain 'tissue' slides never existed impacted the jury verdict, because it is still not apparent that Dr. Mitchell wasn't referring

to a review of the photographic slides that were contained in the medical examiner's file." *People v. Rivas,* No. 92–2794, slip op. at 8 (N.Y.Sup.Ct. Sept. 8, 2000). This argument, however, overlooks the fact that the prosecutor told the jury in his closing statement that Dr. Mitchell had "review[ed] autopsy sectional slides of the brain." Trial Tr. at 1083; *see also Rivas,* 687 F.3d at 525 n. 19. It also overlooks the fact that Dr. Wecht's unchallenged affirmation states that "[d]ecomposition of internal organs is highly variable, and cannot be used for the determination of the time of death.... The examination of the brain or brain slides is an unreliable aid in estimating the time of death." Aff. of Cyril H. Wecht, dated June 11, 1999, ¶¶ 10, 14, *available at Rivas v. Fischer,* No. 01–cv–1891, ECF No. 56–2 at 21–22 (N.D.N.Y. Sept. 18, 2009); *see also Rivas,* 687 F.3d at 525 n. 19.

The state collateral review court also held that the investigation of Dr. Mitchell "revealed misconduct relative to disposal of bodies and body parts by the office, and while those activities may have contributed to Dr. Mitchell's stepping down from his office, there have never been any allegations that he testified falsely in any trials." *People v. Rivas,* No. 92–2794, slip op. at 13 (N.Y.Sup.Ct. Sept. 8, 2000). As noted above and in our prior opinion, however, this material would have been invaluable in impeaching Dr. Mitchell's credibility, not necessarily because of the nature of the investigations themselves, but because of Dr. Mitchell's possible conflict of interest in rendering his opinions in Rivas's prosecution while under pending investigation by state and local investigators, including possibly those who were prosecuting Rivas. *See Rivas,* 687 F.3d at 546.

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1817343
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Judah JOHNSON, Petitioner,
v.
Scott C. CARLSEN, Superintendent, Respondent.

No. 09–CV–66 (GTS/DRH). | March 29, 2010.

**Attorneys and Law Firms**

Petitioner, Watertown, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Priscilla I. Steward, Esq., Assistant Attorney General, of Counsel, New York, NY, for Respondent.

**REPORT–RECOMMENDATION AND ORDER[1]**

DAVID R. HOMER, United States Magistrate Judge.

**\*1** Petitioner pro se Judah Johnson ("Johnson") is currently an inmate in the custody of the New York Department of Correctional Services (DOCS) at Watertown Correctional Facility. Docket No. 5–11, Ex. J at 3. Johnson pleaded guilty to criminal sale of a controlled substance in violation of New York Penal Law § 220.39(1) in Queens County on July 16, 1997. Docket No.5–8, Ex. G at 11. He was sentenced to an indeterminate prison term of 3 1/3 to ten years and is currently serving that sentence. *Id.* Johnson now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the grounds that 1) DOCS improperly failed to grant him state jail time credit for the period that he was in federal prison, 2) his final parole revocation hearing was untimely, and 3) the parole board improperly delayed his parole revocation hearing. Docket No. 1 at 4–5. For the reasons which follow, it is recommended that the petition be denied.

## I. Background

On September 5, 1996, Johnson sold over sixteen ounces of marijuana to an undercover police officer. Docket No. 5–2, Ex. A at 9. On October 11 and November 22, 1996, Johnson also sold cocaine to an undercover police officer. *Id.* He was arrested for these crimes on January 14, 1997. Docket No. 5–8, Ex. G at 10–11. In satisfaction of all charges Johnson pleaded guilty to one count of criminal sale of a controlled substance and, on July 16, 1997, was sentenced as indicated above. Docket No. 5–8, Ex. G at 10–11.

On March 5, 1998, Johnson was released on parole but was arrested again on May 21, 1999 for driving while intoxicated and resisting arrest. Docket No. 5–3, Ex. B at 8–9. A parole violation warran[2] was issued. Docket No. 5–3, Ex. B at 2. That warrant was cancelled when Johnson entered a Transitional Program[3] on November 8, 1999. Docket No. 5–2, Ex. A at 9. However, Johnson was declared delinquent[4] when he absconded from the program on December 15, 1999. *Id.* A second parole warrant was issued. Docket No. 5–2, Ex. A at 10; *see also* Docket No. 7 at 8–9. Johnson was again declared delinquent as of May 21, 1999. Docket No. 5–7, Ex. F at 6. His sentence was interrupted as of that date. *See Id.*

Johnson was arrested on March 29, 2001 in the State of Massachusetts for both a weapons offense and the unlawful use of a Social Security Number. Docket No. 5–5, Ex. D at 2. On April 1, 2001, the Division of Parole lodged a detainer warrant[5] against Johnson, but cancelled the warrant in June 2001. Docket 4 at 6. On July 23, 2002, Johnson pleaded guilty in the United States District Court in Massachusetts to being a Felon in Possession of a Weapon and Ammunition, and for Unlawful Use of a Social Security Number. Docket No. 5–5, Ex. D at 2. On November 20, 2002, he was sentenced to a thirty-seven months incarceration[6] in federal prison. *Id.* at 2–3.

Upon completion of his federal sentence on December 4, 2003, Johnson returned to New York for a parole revocation hearing with respect to the second warrant. Docket No. 5–11, Ex. J at 5; Docket No. 7 at 13. During his final revocation hearing on March 2, 2004, Johnson pleaded guilty to violating the conditions of his parole by resisting arrest on May 21, 1999. Docket No. 5–7, Ex. F at 5–7; *see also* Docket No. 7 at 13. As a result, the remaining charges were withdrawn. Docket No. 5–7, Ex. F at 6. Johnson did not file an appeal from the final revocation hearing. *See* Docket No. 5–7, Ex. F; *see also* Docket No. 7 at 13.

**\*2** In March 2008, Johnson pleaded guilty to possession of contraband in a prison. Docket No. 5–8, Ex. G at 4. In June, Johnson was sentenced to nine months on the criminal conviction. *Id.* On August 20, 2008, Johnson filed a writ of habeas corpus in the Jefferson County Supreme Court, which was denied on December 18, 2008. Docket No. 1 at 3–4. He did not appeal the denial of the state habeas corpus petition. *Id.* at 4. This action followed.

## II. Discussion

### A. Timeliness

A federal court may view a habeas corpus petition if it is timely filed. 28 U.S.C. § 2244(d). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a habeas petition is considered timely when it is filed within a year of the date that the decision becomes final. *Id.* at (d)(1)(a). Johnson's habeas petition is untimely because the parole revocation decision notice was issued on March 5, 2004 and he failed to file an administrative appeal challenging that determination within the thirty day statute of limitations period. *See* Docket No. 5–2, Ex. A; N.Y.Comp.Codes R. & Regs tit. 9, § 8006.1(b). Thus, the administrative decision to revoke petitioner's parole became final on that date because he failed to file his administrative appeal in a timely manner.

Johnson had one year from that date, or until April 4, 2005, to file his petition for habeas relief. 28 U.S.C. § 2244(d)(1)(a). Approximately four years after the statute of limitations expired, Johnson filed his petition on January 15, 2009. Docket No. 1 at 6. Therefore, the habeas petition is not timely and should be denied on this ground.

### B. Exhaustion of State Court Remedies

Respondent contends that Johnson has procedurally defaulted on his federal habeas claims. An application for a writ of habeas corpus may not be granted until the prisoner has exhausted all remedies available in state court. 28 U.S.C.A. § 2254(b). The exhaustion requirement is not satisfied unless the federal claim has been "fairly presented" to the state courts. *Id.* § 2254(b)(c).

Habeas petitions challenging parole revocations are subject to the doctrine of exhaustion. *Scales v. New York State Div. of Parole,* 396 F.Supp.2d 423, 428 (S.D.N.Y.2005) (citations omitted). "To exhaust a denial of parole under New York law, the inmate must first file an administrative appeal with the Division of Parole's Appeals Unit. If that appeal is denied, he must seek relief in state court pursuant to Article 78."[7] *Id.* (quotations omitted); *see also* N.Y.Comp.Codes R. & Regs tit. 9, § 8006.1. If the Article 78 petition is denied, the petitioner must then appeal that denial to the highest state court capable of reviewing the claim. *Scales,* 396 F.Supp.2d at 428 (citing *Cotto v. Herbert,* 331 F.3d 217, 237 (2d Cir.2003)). In this case, Johnson's claims are unexhausted because he failed to present his claims to the highest state court, did not file an administrative appeal, and never sought relief by filing an Article 78 petition.

**\*3** If a petitioner's unexhausted claims can no longer be raised in state courts due to a procedural default, the federal court shall deem the claims exhausted. *See Bossett v. Walker,* 41 F.3d 825, 828 (2d Cir.1994)). When a petitioner fails to exhaust his state remedies, and the state court finds the claims procedurally barred, federal courts must also deem the claims procedurally defaulted. 28 U.S.C.A. § 2254(b)(1); *Aparicio v. Artuz,* 269 F.3d 78, 90 (2d Cir.2001). A procedural default usually occurs when petitioner fails to pursue all of his state remedies in a timely manner. *Schlup v. Delo,* 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Johnson can no longer bring an administrative appeal because he failed to a file a notice of appeal within thirty days, nor can he bring an Article 78 petition because the four month statute of limitations has expired. *See* N.Y.Comp.Codes R. & Regs tit. 9, § 8006.1(b); N.Y. C.P.L.R. 217. Because state remedies are no longer available to Johnson, his claims are deemed exhausted and considered procedurally defaulted. *See Bossett,* 41 F.3d at 828.

However, a procedural default does not automatically bar a state prisoner from relief in federal habeas court. *Felder v. Goord,* 564 F.Supp.2d 201, 212, 213 (S.D.N.Y.2008). Relief may be granted despite the petitioner's failure to exhaust state remedies. *Id.* at 213. The same procedural default that exhausts Johnson's claims also may bar consideration of the merits of the claim. *See Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). This can be overcome if petitioner can show "cause" for the default and actual prejudice for his failure to file a timely notice of administrative appeal or an Article 78 motion in accordance with state procedural rules, or that failure to consider the claims will result in a "fundamental miscarriage of justice." *Siao–Pao v. Connolly,* 564 F.Supp.2d 232 (S.D.N.Y.2008); *see also* 28

U.S.C. § 2254(b)(1).

Neither exception is demonstrated in this case. Johnson makes no attempt to establish cause and prejudice sufficient to excuse his failure to commence an Article 78 proceeding within four months after the determination to be reviewed became final. There is also no record of Johnson administratively appealing the parole revocation decision. As shown in this case, where no cause has been demonstrated, a court need not determine whether petitioner suffered actual prejudice. *McCleskey v. Zant,* 499 U.S. 467, 502, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991). Introduction of new evidence of innocence is essential to establish a "fundamental miscarriage of justice," that would allow a federal court to reach the merits of a barred habeas claim. *Schlup,* 513 U.S. at 316. Nothing introduced in Johnson's habeas petition suggests that he is actually innocent or that if the court fails to consider his unexhausted claims, a "fundamental miscarriage of justice" will occur. *See Id.* at 327.

Therefore, because Johnson failed to exhaust administrative remedies and is in procedural default, the claims should be denied. In the alternative, therefore, the petition should be denied on this ground.

## C. Merits

### 1. Jail Time Credit

**\*4** State issues may not be raised on habeas review. 28 U.S.C. § 2254(a). In conducting habeas review, a federal court has jurisdiction to entertain a petition by a state prisoner for a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." *Williams v. Taylor,* 529 U.S. 362, 375, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *see also* 28 U.S.C. § 2254(a). This Court has no supervisory authority over state courts. *Chandler v. Florida,* 449 U.S. 560, 571, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981). Except in extreme circumstances, a state court interpretation of its penal law is binding on the federal courts. *Champelle v. Coombe,* 567 F.Supp. 345, 352 (S.D.N.Y.1983) (citing *Mullaney v. Wilbur,* 421 U.S. 684, 691, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975)); *see also Tisdale v. Menifee,* 166 F.Supp.2d 789, 791 (S.D.N.Y.2001) ("It is well-established that the Bureau of Prisons, not the courts, determines when a defendant's sentence starts and whether the defendant should receive any credit for any time spent in custody.") (internal

citations omitted). New York Penal Law § 70.40(3)(a) governs the provision of jail time credit and therefore does not implicate federal concerns and is not cognizable on a federal habeas petition.

Even in the rare instance that federal review was indicated, Johnson still fails to allege a constitutional violation. In his habeas petition, Johnson claims that he has not received credit for time served in federal custody.[8] Docket No. 1. Pursuant to federal law:

> A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences (1) as a result of the offense for which the sentence was imposed; or (2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed; that has not been credited against another sentence.

18 U.S.C. § 3585(b); *see also Tinsdale,* 166 F.Supp.2d at 792. This precludes the possibility for an inmate to receive a double recovery for time served on both state and federal sentences. *Tinsdale,* 166 F.Supp.2d at 792 ("Therefore, § 3585(b) precludes [petitioner] from receiving 'double credit' for that time on both his state and federal sentences, and the petition will be denied and the action dismissed."). Similarly, state law provides that "[j]ail time credit" includes "[a]ny time spent by a person in custody from the time of delinquency to the time service of the sentence resumes [that is] credited against the term or maximum term of the interrupted sentence." N.Y. Penal Law § 70.40(3)(c). When a parolee is declared delinquent because he violated the terms of his parole, the underlying sentence is deemed interrupted. *United States v. Dumeur,* 214 F.Supp. 293, 294 (S.D.N.Y.1963); *see also* N.Y. Penal Law § 70.40(3)(a).

> When a person is alleged to have violated the terms of presumptive release or parole and the state board of parole has declared such person to be delinquent, the declaration of delinquency shall interrupt the person's sentence as of the date of the delinquency and such interruption shall continue until the return of the person to an institution under the jurisdiction of the state department of correctional services.

**\*5** N.Y. Penal Law § 70.40(3)(a).
Johnson was sentenced to 3–1/3 to ten years. Docket No.
5–2, Ex. A at 9. He served approximately two years in
DOCS custody. *See* Docket No. 5–2, Ex. A at 9. Johnson
was declared delinquent because he violated the terms of
his parole when he left the Transitional Program on
November 25, 1999 and absconded from DOCS
supervision. *See* N.Y. Penal Law § 70.40(3)(a); Docket
No. 5–2, Ex. A at 9. As of this date, petitioner's sentence
was properly interrupted. *Id.* Later, on March 29, 2001,
Johnson was arrested and taken into federal custody for
an unrelated weapons offense in Massachusetts. Docket
No. 5–5, Ex. D. Johnson served, and was given credit for,
the resulting federal sentence. The interruption of
Johnson's state sentence properly continued until he was
returned to DOCS custody on December 4, 2003, after the
completion of his federal sentence. N.Y. Penal Law §
70.40(3)(a); Docket No. 5–11, Ex. J at 5. Upon arrival in
New York, Johnson's state sentence conviction time
began to run. Giving Johnson any additional time served
for his state sentence prior to that moment would
essentially result in a duplicate credit in contravention of
federal and state law.

Additionally, to the extent that Johnson claims his
sentences should have run concurrently, such claims must
also fail. "Multiple terms of imprisonment imposed at
different times run consecutively unless the court orders
that the terms are to run concurrently." *Adul–Malik v.
Hawk–Sawyer,* 403 F.3d 72, 75 (2d. Cir.2005) (quoting
18 U.S.C.A. § 3584(a) (2009)). The United States
Constitution affords no person the right to have state and
federal sentences run concurrently. *United States v.
Dovalina,* 711 F.2d 737, 739 n. 1 (5th Cir.1983).
Furthermore, a federal court has no power to make a
federal sentence run concurrently with a state sentence.
*Clemmons v. United States,* 721 F.2d 235, 238 (8th
Cir.1983). A prompt final parole revocation hearing
granted to a New York parolee who is "subsequently
incarcerated in another jurisdiction by reason of the
commission of and conviction for another crime
committed therein does not enable the parolee to have his
existing New York sentence run concurrently with the
sentence on the new conviction." *People ex rel. Julio v.
Walters,* 88 A.D.2d 259, 452 N.Y.S.2d 888, 892 (2d
Dep't 1982) (*citing* N.Y. Penal Law § 70.40). If the
elements of the crimes do not overlap or if the facts
demonstrate that the acts underlying the crimes are
separate and distinct, then the court should deem the
sentence to run consecutively. *People v. Ramirez,* 89
N.Y.2d 444, 654 N.Y.S.2d 998, 677 N.E.2d 722, 725
(N.Y.1996). Furthermore, state and federal crimes may be
considered separate and distinct. *United States v. Marion,*
535 F.2d 697, 704 (2d Cir.1976).

Johnson's argument that his federal sentence was to run
concurrent with his state sentence is not supported by the
record. Absent such instruction from the court that the
sentences should have been concurrent, and there was
none here, the sentences are automatically consecutive.
Furthermore, petitioner has no right, nor did the court
in Massachusetts have the power, to grant concurrent
sentences. Penal Law § 70.40(3)(c)(iii) does not
distinguish between concurrent and consecutive
sentences. *See* Docket. In fact, that provision is explicitly
contrary to petitioners assertions, providing that his New
York State sentence is interrupted and will not
recommence until he is returned to DOCS jurisdiction.
*See Id.* Here, Johnson's 2001 federal arrest for illegal
weapon possession and unlawful use of a social security
number in Massachusetts, was unrelated to his state arrest
for criminal sale of a controlled substance in 1997 and his
subsequent parole delinquency. *See* Docket No. 5–11, Ex.
J. The elements of Johnson's state and federal crimes are
separate and distinct and the facts of both offenses do not
overlap. For all of the aforementioned reasons, Johnson's
sentences should run consecutively.

**\*6** For these reasons, the petition should be denied in the
alternative on this ground.

### 2. Final Parole Revocation Hearing

A final parole revocation proceeding is an administrative
proceeding held solely to enable parol authorities to
determine whether the parolee violated the terms of
parole. *People ex rel. Maiello v. N.Y.S. Bd. of Parole,* 65
N.Y.2d 145, 147, 490 N.Y.S.2d 742, 480 N.E.2d 356
(1985). Although a parolee facing revocation of such
status is not entitled to the "full panoply of rights" due a
defendant in a criminal prosecution, the Supreme Court
has held that the revocation of parole implicates a liberty
interest protected by the Due Process Clause of the
Fourteenth Amendment. *Morrisey v. Brewer,* 408 U.S.
471, 482, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).
Therefore, parolees must be afforded both a preliminary
hearing upon arrest in order to determine if probable
cause exists to believe that the conditions of parole have
been violated, and within a reasonable time thereafter, a
final revocation hearing dressed with the basic due
process requirements of notice, the opportunity to be
heard and to cross-examine witnesses, and a neutral and
detached hearing body or officer. *Id* . at 489.

New York law requires that a suspected parole violator
receive a preliminary hearing within fifteen days after

arrest, and a final revocation hearing within ninety days after the preliminary hearing. N.Y. Exec. Law § 259–i(3)(c)(i) & (f)(i). If an inmate waives his right to a preliminary hearing[9], the day the inmate waives that right may be deemed the day on which the probable cause determination[10] was rendered and the final hearing must be held within ninety days of that waiver or of the determination that there is probable cause to hold the parolee. *Id.; see also* 28 C.F.R. § 2.49(f) ("Institutional revocation hearings shall be scheduled to be held within ninety days of the date of the execution of the violator warrant upon which the parolee was retaken.").

Contrary to Johnson's argument, a final revocation hearing must only be scheduled to be held, not completed, within ninety days of the probable cause determination. N.Y. Exec. Law § 259–i(3)(c)(i) & (f)(i). However, the ninety day statutory period to hold a final parole revocation hearing may be extended when the petitioner "causes or consents to delay or precludes the prompt conduct of such proceedings...." *People ex. rel. Smith v. N.Y.S. Bd. of Parole,* 131 A.D.2d 401, 517 N.Y.S.2d 145, 147 (1987) (citing N.Y. Exec. Law § 259–i(3)(f)(i)); *see also* 28 C.F.R. § 2.49(f) ("[I]f a parolee requests and receives any postponement or consents to a postponed revocation proceeding ... the above-stated time limits may be extended.").

Here, Johnson claims that he has been denied his statutory right to have a timely revocation hearing. Docket No. 1 at 3–4. However, Johnson's final hearing was held on March 2, 2004, eighty-nine days after his extradition back to New York. Docket No. 5–7, Ex. F at 2–5. The hearing was adjudicated by a neutral decision maker and allowed Johnson, via his counsel, to present his case. *Id.* at Ex. F. Although there is some confusion in the record, the final revocation hearing was both scheduled and held within the ninety day period after the extradition and thus timely under both federal and state law. *Id.* at Ex. F at 2. DOCS properly complied with the required procedure. By complying with the state law requirements, Johnson's constitutional rights were protected.

**\*7** Even if Johnson did not waive his right to a preliminary hearing, and the Court assumes that this constituted a breach of his federal rights, Johnson waived all hearing defects by pleading guilty at his final parole revocation hearing on March 2, 2004. *See generally Tollett,* 411 U.S. at 267; *Coffin,* 76 F.3d at 498. In this case, Johnson was represented by counsel and knowingly and voluntarily pleaded guilty at his parole revocation hearing. Docket No. 5–7, Ex. F at 5–7. Therefore, Johnson's claim that he was entitled to a final revocation hearing within ninety days of his extradition to New York

is rendered moot because he knowingly and voluntarily pleaded guilty to a parole violation charge at his final revocation hearing on March 2, 2004 and did not seek administrative remedies prior to that hearing. Docket No. 5–11, Ex. J; *see also* Docket No. 5–7, Ex. F at 1. Johnson's proper recourse was to attack the voluntariness of his plea. However, there is no evidence in the record that the plea was anything other than knowingly and voluntary, thus such claims would also fail.

Therefore, the petition on this ground should be denied in the alternative on its merits.

### 3. Delay of Revocation Hearing

The failure of DOCS to meet a final parole revocation hearing deadline does not implicate a federal constitutional interest for habeas corpus relief. *Longo v. Carberry,* No. 96–CV–1417 (RSP) (DNH), 1998 WL 236177, at *3 n. 5 (N.D.N.Y. May 7, 1998) ("[T]he Parole Board's alleged failure to meet its own guidelines does not implicate a protected liberty interest belonging to the petitioner.") (citations omitted). As a result, this claim presents no issue cognizable on a federal habeas corpus review because Johnson failed to state a constitutional violation and has only alleged a failure to comply with the New York State Executive Law. *See Id.; see also Morgan v. Fillion,* No. 98–CV–986 (DAB/SEG), 2000 WL 235986, at *6 (S.D.N.Y. Jan.31, 2000) (dismissing petition because violations of revocation proceeding time lines fall under state law, for which federal courts have no jurisdiction, unless petitioner also alleged impingements on rights guaranteed by the Constitution). Additionally, this is the first time Johnson has raised the claim, making it unexhausted and unreviewable by federal court.[11]

Additionally, as previously discussed, Johnson's guilty plea at his final revocation hearing effectively waived all claims relating to events transpiring prior to the entry of the guilty plea, given that the plea was knowing and voluntary. *See generally Tollett,* 411 U.S. at 267; *Coffin,* 76 F.3d at 498. As previously discussed, there is nothing in the record to indicate otherwise. Therefore, in the alternative, the petition should be denied on this ground.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that the petition for a writ of habeas

corpus be **DENIED.**

Furthermore, the Court finds that Johnson has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2) (a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."); *see Slack v. McDaniel,* 592 U.S. 473, 474 (2000). Therefore, the Court recommends that no certificate of appealability should issue with respect to any of petitioner's claims.

**\*8** Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C § 636(b)(1); Fed R. Civ. P. 72, 6(a), 6(e).

Footnotes

1    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.4.

2    A parole warrant is issued when a defendant has violated the conditions of his parole. It calls for the temporary detention of the parolee in accordance with the rules of the Parole Board. N.Y. Exec. Law § 259–I(3)(a)(I).

3    A Transitional Program is designed to rehabilitate the behavior that led to a prisoner's incarceration. *See Ferry v. Goord,* 280 A.D.2d 720, 720 N.Y.S.2d 246, 246 (2000). Johnson's parole was contingent on entering and completing this program. Docket No. 5–2, Ex. A at 12.

4    A prisoner is declared delinquent when he has violated the conditions of his parole or release and a warrant is then issued for his return to prison. N.Y. Exec. Law § 259–i(3)(c)(iv).

5    "A detainer warrant is an administration notification lodged or filed with the institution in which a person is serving a sentence, advising that he or she is wanted to face pending criminal charges in another jurisdiction and requesting that he or she be detained." N.Y.Crim. Proc. Law § 1349 (2009) (citing *People v. Hayden,* 98 Misc.2d 574, 414 N.Y.S.2d 473 (Sup 1979)); *People v. Valenti,* 90 Misc.2d 904, 396 N.Y.S.2d 321 (County Ct.1977)).

6    At sentencing, the judge noted that petitioner had been detained in Massachusetts since March 29, 2001 and should receive a time credit for the detention period of March 29, 2001 to November 20, 2002. Docket No. 5–5, Ex. D at 3.

7    N.Y. C.P.L.R. art. 78 establishes the procedure for judicial review of the actions and inactions of state and local government agencies and officials.

8    Generally, the Federal Bureau of Prisons is "not required to give credit toward a federal sentence for time spent by a prisoner serving a sentence imposed by another jurisdiction for an unrelated offense." *Rosemond v. Menifee,* 137 F.Supp.2d 270, 274 (S.D.N.Y.2000) (*citing Shaw v. Smith,* 680 F.2d 1004, 1006 (5th Cir.1982)). There is an exception to this rule "if the continued state confinement was exclusively the product of such action by federal law-enforcement officials as to justify treating the state jail as the practical equivalent of a federal one." *Id.* (explaining that the exception applies where, absent federal action such as a detainer warrant or filing of a habeas petition, the petitioner would have been released pursuant to state procedures).
     This exception does not apply to the facts of this case as Johnson is not in federal custody and is not seeking to have his federal conviction lessened by the time that he served in state prison. Johnson was federally prosecuted on November 20, 2002 for a weapons offense and the unlawful use of a Social Security Number. Docket No. 5–5, Ex. D at 2. Johnson is attempting to use his federal incarceration in Massachusetts as a basis to decrease the amount of jail time left on his 1997 New York State conviction. The exception to the rule of jail time credit is inapplicable because he does not seek credit toward his federal sentence. Even if the exception was the same for his state sentence, state confinement was not the practical equivalent to his federal sentence because the time petitioner spent in state prison after his release from federal custody was unrelated to his federal sentence. Likewise, Johnson's out of state federal incarceration was not the result of the New York State detainer lodged against him nor due to an arrest based on a parole delinquency, but rather a consequence of the conviction for his federal weapons offense in Massachusetts. Johnson is, therefore, not entitled to jail time credit.

9    Respondent argues that upon his return, Johnson waived his right to a preliminary hearing on December 4, 2003 when he was extradited back to New York. Docket No. 4 at 17. However, this is not clearly evidenced by the record. Even if Johnson did not waive his right to a preliminary hearing, he waived all prior procedural defects by pleading guilty at his final parole revocation

hearing on March 2, 2004. *See generally Tollett v. Henderson,* 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973) ( "When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea....."); *United States v. Coffin,* 76 F.3d 494, 498 (2d Cir.1996) (same). In this case, Johnson was represented by counsel and knowingly and voluntarily pleaded guilty at his parole revocation hearing. Docket No. 5–7, Ex. F at 5–7. Furthermore, the probable cause determination that Johnson violated his parole was clearly evidenced by his criminal record and convictions. Docket No. 8, Ex. G at 8–9. Thus, the probable cause determination was made on December 4, 2003 when Johnson was extradited back to New York and the final revocation hearing was timely held within 90 days of that date.

10     [Missing text].

11     Even when evaluating Johnson's claims on the merits, pursuant to state law, they still fail. "[W]hen a parolee is incarcerated in a foreign jurisdiction due to a conviction arising out of crimes committed therein and is therefore not within the jurisdiction of the New York Parole Board, he must still be granted a prompt final revocation hearing when he is or may be brought within the convenience and practical control of the New York parole authorities ." *People ex rel. Porro v. Walters,* 89 A.D.2d 884, 453 N.Y.S.2d 220, 220 (2d Dep't 1982) (citations omitted). Until the warrant is deemed to be executed, the alleged violator is not "considered to be within the convenience and practical control of the division of parole ..." N.Y. Exec. Law § 259–i(3)(a)(iv). Executive Law § 259–i provides that, "where a parolee is detained in another state, the parole revocation warrant is not deemed executed until the parolee is detained exclusively thereon and he has waived extradition or been ordered extradited." *Austin,* 585 N.Y.S.2d at 307. The Division of Parole is excused from affording a parolee a final revocation hearing during any period in which the parolee is lodged in a place not subject to the "convenience and practical control" of the *Parole Board. N.Y. Exec. Law § 259–*I(3)(c),(f); *see also People ex rel. Walsh v. Vincent,* 40 N.Y.2d 1049, 1050, 392 N.Y.S.2d 240, 360 N.E.2d 919 (1976) (quoting *Matter of Beattie v. N.Y.S. Bd. of Parole,* 39 N.Y.2d 445, 384 N.Y.S.2d 397, 348 N.E.2d 873, 873 (N.Y.1976)). A parolee is in a place "subject to the convenience and practical control" of the Board, when he is an inmate in a correctional facility over which the Parole Board has jurisdiction. *Matter of Beattie,* 384 N.Y.S.2d 397, 348 N.E.2d at 873. Given these restrictions, a final parole revocation hearing for an out-of-state parolee is timely when held within 90 days from the date of parolee's return to New York. *McIver v. Murray,* 275 A.D.2d 1009, 713 N.Y.S.2d 587, 588(4th Dep't 2000). Inmates incarcerated in other states while on New York parole are entitled to a final violation hearing within 90 days of their return to New York. *People ex. rel. Chapman v. New York State Bd. of Parole,* 166 Misc.2d 890, 636 N.Y.S.2d 265, 266 (Rensselaer County S.Ct.1995).

     Here, Johnson contends that the New York State Parole Board had jurisdiction over him while he was incarcerated in Massachusetts. Docket No. 1 at 6. However, these contentions are incorrect. Johnson was not within the jurisdiction of New York State because he was not located in a facility under the exclusive "convenience and control" of New York parole authorities until he was extradited on December 4, 2003. It is immaterial whether New York Department of Correction Services could have easily brought Johnson back into the "convenience and control" of the state. *See* N.Y. Exec. Law § 259–o (4). Because petitioner was located in a foreign state, for a federal crime committed therein, it was not mandated that he be brought back to New York State for a final revocation hearing on unrelated charges before the end of his federal sentence. *See People ex rel. Julio,* 88 A.D.2d 259, 452 N.Y.S.2d 888, 890–91 (2d Dep't 1982) (affirming decision that presence within state's jurisdiction is fundamental to establishing convenience and control). Thus, the ninety day time frame did not begin until Johnson's return to New York on December 4, 2003. Docket No. 5–11, Ex. J at 5; *see* Docket No. 5–8, Ex. G. Additionally, despite Johnson's contention that his final parole revocation hearing was untimely, the New York State Parole Board properly held petitioner's final revocation hearing within the ninety day statutory period of his extradition from Massachusetts on March 2, 2004. *See* Docket No. 5–7, Ex. F.

---

**End of Document**                  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1837779
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Judah JOHNSON, Petitioner,

v.

Scott C. CARLSEN, Superintendent, Respondent.

No. 9:09–CV–0066 (GTS/DRH).    |    May 5, 2010.

**Attorneys and Law Firms**

Judah Johnson, Georgetown, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Priscilla I. Steward, Esq., Assistant Attorney General, of Counsel, New York, NY, for Respondent.

***DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Judah Johnson ("Petitioner") filed his petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 on January 21, 2009. (Dkt. No. 1.) By Report–Recommendation dated March 29, 2010, United States Magistrate Judge David R. Homer recommended that the petition be denied and dismissed, and that a certificate of appealability not issue. (Dkt. No. 8.) Petitioner has filed no Objections to the Report–Recommendation, and the time in which to do so has expired. For the reasons set forth below, Magistrate Judge Homer's Report–Recommendation is accepted and adopted in its entirety, and Petitioner's petition is denied and dismissed in its entirety.

## I. APPLICABLE LEGAL STANDARDS

### A. Standard of Review

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C).[1] When only

general objections are made to a magistrate judge's report-recommendation (or the objecting party merely repeats the allegations of his pleading), the Court reviews for clear error or manifest injustice. *See Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at \*2–3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999).[2] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v.. Walker,* 94–CV2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

### B. Standard Governing Review of Petitioner's Habeas Petition

Magistrate Judge Homer correctly recited the legal standard governing review of Petitioner's *habeas* petition. (Dkt. No. 8, at 4–7.) As a result, this standard is incorporated by reference in this Decision and Order, which is intended primarily for the review of the parties.

## II. ANALYSIS

For the sake of brevity, the Court will not repeat the factual background of Petitioner's multiple convictions,[3] but will simply refer the parties to the relevant portions of Magistrate Judge Homer's Report–Recommendation, which accurately recites that factual background. (Dkt. No. 8, at 1–4.)

In his petition, Petitioner asserts the following claims: (1) the DOCS failed to grant him state jail time credit for the period of time during which he was in federal prison; (2) his final parole revocation hearing was untimely; and (3) the parole board improperly delayed his parole revocation hearing. (Dkt. No. 1, at 2–7.)

In his Report–Recommendation, Magistrate Judge Homer recommends dismissal of Petitioner's petition for each of the following reasons: (1) Petitioner's petition is untimely; (2) Petitioner failed to exhaust his available administrative remedies before filing this action; and (3) Petitioner has failed to establish a constitutional violation.

**\*2** After carefully reviewing all of the papers in this action, including Magistrate Judge Homer's Report–Recommendation, the Court agrees with each of the recommendations made by Magistrate Judge Homer. Magistrate Judge Homer employed the proper legal standards, accurately recited the facts, and correctly applied the law to those facts. (Dkt. No. 8, at 4–17.)[4] As a result, the Report–Recommendation is accepted and adopted in its entirety, and Petitioner's petition is denied and dismissed in its entirety.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Homer's Report–Recommendation (Dkt. No. 8) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Petitioner's petition (Dkt. No. 1) is ***DENIED*** and ***DISMISSED*** in its entirety; and it is further

**ORDERED** that a certificate of appealability not issue with respect to any of the claims set forth in the petition, because Petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2).

---

Footnotes

1   On *de novo* review, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse discretion in denying plaintiff's request to present additional testimony where he "offered no justification for not offering the testimony at the hearing before the magistrate").

2   *See also Vargas v. Keane,* 93–CV–7852, 1994 WL 693885, at \*1 (S.D.N.Y. Dec. 12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895 (1996).

3   Since July 1997, Petitioner has been convicted of the following crimes: (1) Criminal sale of controlled substance (in July 1997); (2) being a felony in possession of a weapon and unlawful use of social security number (in July 2002); (3) violating the conditions of his parole by resisting arrest on May 21, 1999 (in December 2003); and (4) possession of contraband in prison (in March 2008).

4   The Court notes that Magistrate Judge Homer's thorough and correct Report–Recommendation would survive even a *de novo* review.

---

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.